### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| EBONY PAYNE, PAM HEAVENS, UNITED SPINAL ASSOCIATION, NATIONAL COUNCIL ON INDEPENDENT LIVING, NOT DEAD YET, INSTITUTE FOR PATIENTS' RIGHTS, PROGRESS CENTER FOR INDEPENDENT LIVING, CHICAGO ADAPT, and NOOSHIG LUZ SALVADOR, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> THE HONORABLE JAY ROBERT PRITZKER, in his official capacity as Governor of the State of Illinois, ILLINOIS DEPARTMENT OF PUBLIC HEALTH, THE HONORABLE SAMEER VOHRA, M.D in his official capacity as Director of the Illinois Department of Public Health, <br><br> Defendants. | Case No. _____ |

## COMPLAINT

### NATURE OF THE CASE

1.      The individual Plaintiffs Ebony Payne and Pam Heavens, both of whom have life-threatening disabilities – and the members of the Plaintiff disability rights organizations - are especially vulnerable to harm from a state-imposed scheme of assisted suicide, for the taking of life with no guard rails or protections. Plaintiffs bring this action to stop enforcement of the Illinois End of Life Options Act ("EOLA"), 410 ILCS 22/1 *et seq*, which takes effect on

[6010987.5]

September 12, 2026. EOLA is a law for physician assisted suicide, for the taking of life. It upends millennia of protections for Illinois patients in their relationships with their doctors by ending the ethical obligation to do no harm. EOLA also ends the protection of Illinois state agencies and medical boards to enforce that obligation. EOLA changes the legal basis of every physician-patient relationship, as it eliminates the historic legal right of patients to hold their caregivers to that obligation. EOLA instead substitutes a new medical standard allowing doctors to prescribe lethal drugs for the specific purpose of helping their patients die by suicide. EOLA embarks on this reckless experiment with no guardrails and no adequate legal framework to prevent the erroneous taking of life. Without any such safeguards, or objective parameters for eligibility, there will be an inevitable evolution from EOLA's "right to die" to a "duty to die" for individuals whose disabilities are a costly burden or who lack the resources for extended medical care. Under EOLA, people with life-threatening disabilities, as a discrete class, will be highly vulnerable to pressure from insurers and hospitals and even physicians to consent to the early loss of their lives.

2.     The individual Plaintiffs Payne and Heavens – and the Plaintiff disability rights organizations seeking to protect their members – challenge EOLA and its program of physician assisted suicide for individuals with disabilities like Plaintiffs who can be classified in an often arbitrary and inconsistent manner as having a "terminal illness" and likely to die in six

[6010987.5]                                        2

months. For the reasons set forth below in Counts I, II and III, EOLA discriminates against individuals with disabilities, qualifying them for death on the basis of a disability that is life threating, and it allows unsupervised private parties to participate in the taking of the lives of these individuals, without any judicial hearing or other prior review to prevent such lives to be taken in error. All persons who qualify for EOLA are necessarily persons with disabilities protected under federal law. By singling out only these individuals for assisted suicide, with no protections, EOLA devalues their lives and stigmatizes and discriminates against Plaintiffs because they have life-threatening disabilities and should be placed in a lower tier of care. For that reason, as well as others, EOLA is in violation of Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 (Count I), Section 1557 of the Affordable Care Act, 42 U.S.C. § 18001 (Count II), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count III).

3. The individual Plaintiffs and members of the Plaintiff organizations – people with life-threatening disabilities - will suffer an immediate injury as soon as the law goes into effect, even if not immediately solicited to consent to suicide.

4. First, EOLA removes – at once and as a matter of law - an ethical obligation of every physician to do no harm, for this obligation is no longer binding on any physician treating them now or whom they may later encounter.

[6010987.5]

3

EOLA inflicts an immediate intangible injury, because it removes their legal right to hold doctors to the core ethical obligation to do no harm. In doing so, EOLA nullifies the fiduciary-type duty at the heart of every physician-patient relationship, not just to do no harm, but actively prevent the patient from self-harm, including suicide. Such an intangible injury or harm is closely related to other fiduciary-type harms that have been historically recognized in American courts as providing a basis for lawsuits. Such intangible injury to each individual Plaintiff and each Illinois member of the Plaintiff organizations entitles them to seek redress under Article III of the Constitution. *See TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021) (Article III standing may be based on intangible harms that bear a close relationship to a traditional harm given redress in courts at common law); *Packer v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 50 (2d Cir.), *cert. denied sub nom. Raging Cap. Mgmt., LLC v. Packer*, 145 S. Ct. 550 (2024).

5. Second, EOLA inflicts immediate and significant emotional distress on Plaintiffs, whose conversations with their doctors must now include testing the doctors' commitment to do no harm when EOLA abolishes that ethical obligation, and the burden is now on Plaintiffs to protect themselves. It is especially difficult for those who have struggled with suicidal ideation. EOLA inflicts such emotional distress by requiring them, as their bodily functions decline, to have painful conversations that they do not wish to have about the value of their lives. Nor can these conversations and decisions be avoided as

physician assisted suicide without guardrails becomes part of the culture. Individuals with life-threatening disabilities such as Plaintiff Ebony Payne are frequently in intensive care and emergency rooms, and revisiting these decisions will become a part of their lives as part of their consent to a course of treatment, as presented in the menu of "options."

6.     Finally, EOLA leaves Plaintiffs without any knowledge as to whether the State will continue to seek to prevent suicide and suicidal ideation under existing suicide prevention programs or will instead classify Plaintiffs under EOLA as eligible for early death, thereby encouraging Plaintiffs to engage in suicidal thoughts. Indeed, the objective parameters of these programs are now so vague that Defendant under EOLA may subject Plaintiffs to both programs simultaneously.

7.     As set forth in Count IV, EOLA makes a mockery of the procedural due process guarantee of the Fourteenth Amendment. With a patient's life at stake, EOLA provides no pre-deprivation process at all, and no post-deprivation process other than toothless and anonymized data collection, provided by the very people assisting in the suicides. The due process clause prohibits State participation in far less consequential private deprivations without at least some pre-deprivation process. *See Fuentes v. Shevin,* 407 U.S. 67 (1972) (due process requires notice and opportunity to be heard before seizure of a stove). Here, by contrast, EOLA takes the exclusive power of the Defendant

State to take a life – a power that is historically up to now an exclusive function of state sovereignty - and delegates this power to take life to private actors. EOLA does so with no prior notice or opportunity to be heard either by the person whose life is to be taken, or to that person's loved ones. To be clear, plaintiffs do not seek to "fix" EOLA with a bureaucratic agency which would just rubber stamp applications for suicide. Rather, the alternative is to not delegate the state's exclusive power of life and death to private actors without even a prior judicial hearing or adversarial-type proceeding when the Defendant State otherwise takes a human life.

8. As set forth in Count V, and in violation of 42 U.S.C. § 1983, the Defendant State Officers will deprive the individual Plaintiffs and members of Plaintiff organizations of their rights under the Equal Protection Clause. There are no objective parameters as to whether they are still in the Defendant State's suicide prevention programs or in the EOLA program for assisted suicide or in both at the same time.

9. Finally, as set forth in Count VI, Dr. Salvador as a physician brings a challenge to parts of EOLA that cause injury to her. EOLA, at 410 ILCS 22/70, prohibits professional discipline and censure of doctors who assist in suicide. By doing so, the State also unlawfully interferes with the liberty interest of physicians like herself to control the ethical norms, values, and internal practices of the profession. By doing so, EOLA interferes with a liberty interest protected

[6010987.5]

6

by the Fourteenth Amendment.

## THE PARTIES

A.   **Plaintiffs**

10.   Plaintiff Ebony Payne is an Illinois citizen and resident, and is quadriplegic, which means she is paralyzed from the neck down. Accordingly, she has a disability within the meaning of Section 3 of the ADA, 42 U.S.C. § 12132, as well as the term disability is defined under Section 504 of the Rehabilitation Act, and Section 1557 of the Affordable Care Act. Ms. Payne is a member of United Spinal Association and has received services from the Plaintiff Progress Center for Independent Living.

11.   Plaintiff Pamela Heavens is also an Illinois citizen and resident, and she lives with cerebral palsy which causes significant weakness and forces her to use a motorized wheelchair. Accordingly, like Plaintiff Ebony Payne, she has a disability within the meaning of Section 3 of the ADA, 42 U.S.C. § 12132, as well as the term disability is defined under Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act. Ms. Heavens is also a member of United Spinal Association and serves as board secretary for the Plaintiff Progress Center for Independent Living.

12.   Plaintiff United Spinal Association (United Spinal) is a national membership organization with over 70,000 members, most of whom have serious spinal cord injuries and diseases, and many of whom are wheelchair

users. These members include Illinois citizens and residents. Many of the members, at least initially, suffer from depression and some have suicidal thoughts or compulsive and involuntary thinking about suicide, known as suicidal ideation, but oppose suicide and support suicide prevention programs. United Spinal's core membership consists of persons with spinal cord injuries that are disabilities within the meaning of Section 3 of the ADA, 42 USC § 12132, as well as that term defined under Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act.

13.     Plaintiff National Council on Independent Living (NCIL) is the longest-running national cross-disability grassroots organization run by and for people living with disabilities. NCIL's members are centers for independent living (CILs), Statewide Independent Living Councils (SILCs), allied organizations, and individuals with disabilities across the United States. There are 22 CILs in Illinois including the Progress Center for Independent Living. NCIL works to advance independent living and the rights of people with disabilities. NCIL provides support to a network of CILs and SILCs across the United States, who in turn provide, among other things, peer support, individual and systems advocacy, and independent living skills training. CILs are community-based, cross-disability, non-profit organizations that are designed and operated by people with disabilities. Defendants' promotion of physician assisted suicide through EOLA poses a serious threat both to the core business

activities of NCIL and to the well-being of the individuals and communities that NCIL serves. NCIL has a direct stake in challenging EOLA because it must expend significant time, money, volunteers, and other resources to avoid imminent risk of harm for its members and other people who it serves who are placed at imminent risk of harm.

14. Plaintiff Not Dead Yet (NDY) is also a national disability rights organization formed in 1996. While its principal office is in New York, Plaintiff NDY has been active in Illinois. Over the last year, Plaintiff NDY has been active in Illinois in training, community organizing, and providing testimony against assisted suicide. The core mission is to prevent the involuntary withdrawal or withholding of life sustaining medical treatment for persons with severe disabilities. As a result of EOLA, Plaintiff NDY will be required to spend its financial resources, time, and volunteer effort to detect and stop the wrongful steering of individuals with disabilities in Illinois into physician assisted suicide.

15. Plaintiff Institute for Patients' Rights (IPR) likewise is a national organization that advocates to protect individuals' rights in numerous health care contexts wherein people are being devalued to death by public policies or practices in medicine, now including by educating individuals with life-threatening disabilities now at risk of assisted suicide. IPR will now be required to increase time and money to prevent individuals from being steered by the

state, physicians, hospitals, and insurance companies to assisted suicide. Plaintiff IPR has a direct stake in challenging EOLA because it will have to develop new courses and educational materials to protect individuals from the risks that EOLA now creates, and to expend time, money and resources to investigate and prevent the possible erroneous deprivation of life even under the standards of the law. These efforts will divert resources from other efforts to advocate for historically underrepresented people in the medical setting.

16. Plaintiff Progress Center for Independent Living (PCIL) is a 501(c)(3) non-profit corporation based in Forest Park, Illinois and serves approximately 150 active individuals with disabilities at any given time and receives about 3,000 referrals a year. These services for those living in suburban Cook County include helping find personal assistants, housing, medical benefits and healthcare resources. PCIL also advocates for disability rights. EOLA will have a direct impact on its work and require a change in its activities. EOLA will require PCIL – as it does with other Plaintiff organizations – to expend significant time, money, and redirect both staff and volunteer services from existing services to the new need of protecting its Illinois clients from discrimination and deadly harm under the new law, and to educate them about the risks, now that EOLA has changed the obligation of their physicians to do no harm.

17. Plaintiff Chicago ADAPT is a grassroots local membership

organization of people with disabilities that campaigns for people with disabilities to live independently and with the least restrictions. Chicago ADAPT especially seeks to organize members and others with disabilities to overcome social pressures to isolate themselves in nursing homes and institutions and to remove themselves from the world. Chicago ADAPT has to divert resources from this core activity to counter-act the loss of the long-standing ethical obligation of their doctors to do no harm, and to educate its Chicago area members about the risks to them from the enactment of EOLA. As a result, EOLA will require Chicago Adapt to expend financial and volunteer efforts to explain the precautions that its members must now take, the change in the patient-physician relationship, the subtle and explicit pressures from hospitals and insurance companies to the use of assisted suicide, and the risks now of being steered intentionally or not into treatment leading to assisted suicide, especially for persons without financial resources or adequate insurance.

18. Plaintiff Nooshig Luz Salvador is a physician and resident of Illinois. Her practice includes treating people with disabilities. She is a specialist in internal medicine, with a further specialty in hospice and palliative medicine.

B. **Defendants**

19. Defendant Governor J.B Pritzker is sued in his official capacity as Governor of the State of Illinois, because he is vested with the executive power of the State of Illinois (the State) and has the duty to see the State's laws,

[6010987.5]

including EOLA, are executed, and he appoints and supervises officials, including persons in the Defendant State of Illinois and the Defendant Department of Public Health who will be involved in the implementation of EOLA.

20.     The Defendant State of Illinois is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131 (1) (A) and is an entity operating programs receiving federal assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (b)(1)(A) and (B).

21.     Defendant Illinois Department of Public Health (IDPH) is also a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1) and is an entity operating programs receiving federal assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (b)(1)(A) and (B),

22.     Defendant Director Sameer Vohra is sued in his official capacity as Director of IDPH. In this position he has control over the IDPH and is appointed by the Defendant Governor to oversee the IDPH in enforcing its responsibilities in enforcing EOLA.

**JURISDICTION AND VENUE**

23.     An actual present and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), which authorizes declaratory judgment actions in challenges to a law before that law takes effect. EOLA will

take effect on September 12, 2025.

24.    This court has jurisdiction over the claims for breach of the United States Constitution by Defendant State officers pursuant to 42 U.S.C. § 1983 and 29 U.S.C. § 1331 and § 1343.

25.    This court has jurisdiction over the statutory claims against the State and State entities for violations of the ADA, Section 504 and Section 1557 of the ACA pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3).

26.    Venue in this district is proper because both the individual plaintiffs reside here, and a substantial part of the activities authorized by EOLA and challenged by this action will take place here.

## FACTUAL ALLEGATIONS

27.    Death from suicide is one of the ten leading causes of death in the United States and is especially prevalent among persons with disabilities. People with disabilities are far more likely to report suicidal ideation, which is the extended contemplation of suicide and suicidal thoughts, which is a mental health condition requiring medical treatment. Individuals with disabilities, such as members of the United Spinal, also engage more often in active suicide planning and suicide attempts. These individuals are in special need of the suicide prevention programs that are currently provided by the Defendant State of Illinois through the Illinois Suicide Alliances.

[6010987.5]

28.     As stated above, one core purpose of plaintiff organizations like United Spinal is to raise and expend funds to educate their own members and others with disabilities about the special risks to them under an assisted suicide scheme like EOLA, which immediately changes the ethical obligation of physicians to do no harm, and undermines the basis of the existing relationship between physicians and members who have life-threatening disability.

29.     An equally important purpose of the plaintiff organizations is to encourage help and treatment for suicidal ideation which especially affects individuals who have life-threatening disabilities. Help and treatment for suicidal ideation and programs to address this severe harm are at risk now that the State of Illinois has endorsed assisted suicide and eliminated the ethical obligation to do no harm to persons who struggle with it.

30.     Under EOLA, suicidal ideation and suicide are likely to increase because the Defendant State now offers suicide as a reasonable option, and even one that can be encouraged by physicians. The suicidal ideation that the Plaintiff organizations seek to prevent among its members is also likely to increase because EOLA steers persons with disabilities away from the state's suicide prevention programs and towards state-sponsored assisted suicide.

## A.     EXCLUSION FROM SUICIDE PREVENTION PROGRAMS

31.     Until now, these educational and service efforts of the Plaintiff organizations to prevent suicide and suicide ideation have had the support of the

Defendant State of Illinois, and plaintiffs have been participants or beneficiaries of various State programs to prevent suicide of all persons, with or without disabilities.

32. On September 12, 2026, when EOLA takes effect, the Defendant State and IDPH will operate a two-track system to respond to suicidal ideation, the traditional suicide prevention track, and alongside it, and only for persons with life-threatening disabilities, the state-sponsored assisted suicide track.

33. For members of Plaintiff organizations who have struggled with suicidal ideation but now qualify or will soon qualify for physician assisted suicide, EOLA replaces the state's suicide prevention programs with a suicide-facilitating program. The suicide prevention programs are built on the principle that suicidal ideation is often impulsive, and that lives can be saved by delaying action on that impulse. EOLA turns this principle on its head by licensing doctors to facilitate the impulse.

34. These suicide prevention programs of the Defendant State and Defendant IDPH include the Suicide Prevention Education and Treatment Act, 410 ILCS 53/15, which requires the Defendant IDPH to have a comprehensive strategy to combat suicide.

35. The Defendant IDPH has established a body now known as the Illinois Suicide Alliance which is a grass roots private-public partnership. This body develops what is known at the Illinois Suicide Prevention Strategic Plan.

[6010987.5]

15

The Plan seeks to integrate and coordinate all the suicide prevention programs throughout the State, reduce access to lethal means of suicide, and promote wellness programs, in which persons with suicidal ideation can participate. The Plan also seeks to promote communications that will increase knowledge of protective behaviors for those with suicidal inclinations and change attitudes and behaviors about suicide.

36. In conflict with EOLA, the Defendant State's current laws relating to suicide prevention go as far as allowing a medical provider, or any person, to petition a court for involuntary commitment of an individual to a mental health facility for 24 hours when such individual is likely to commit suicide or engage in self-harm. Such involuntary commitment is authorized under Illinois Mental Health Code, 410 ILCS 5/3- 601(a) et seq. and an additional court order can then be obtained.

37. To be clear, Plaintiffs do not support involuntary treatment. Plaintiffs support voluntary mental health treatment and services that are comprehensive, community-based, recovery oriented and culturally and linguistically competent. community-based interventions that have proven more effective, and more protective of patient autonomy than involuntary schemes. However, at least the Mental Health Code requires a hearing and court order to authorize temporary loss of liberty, while EOLA requires no hearing or any State action before the permanent taking of a human life.

[6010987.5]                                    16

38. EOLA does the opposite of the State's suicide prevention programs, including those of the Illinois Suicide Alliance. It encourages the individuals with disabilities to consider and embrace suicide. EOLA does so for the very reason that they have such disabilities that qualify them for suicide, which places these individuals with approval of the Defendant State in a special death-qualified category by reason of their life-threatening disabilities.

39. Contrary to 410 ILCS 53/15, the Suicide Prevention Alliance will now have to exempt those eligible for EOLA due to disability from its role in drafting policies and procedures related to mental health and suicide programs and in the design of proposals for mental health and suicide prevention throughout the State.

40. To facilitate and provide cover for this exclusion of persons with life-threatening disabilities from suicide prevention programs, EOLA under 410 ILCS 22/90(b) does not allow any death under EOLA to be counted as a suicide, assisted suicide, or euthanasia "for any purpose." This arbitrary redefinition of the word "suicide" is an acknowledgement by the Defendant State that it is wrongfully excluding individuals with disabilities from the Defendant State's suicide prevention programs.

B. **LACK OF DUE PROCESS AND OBJECTIVE STANDARDS**

41. EOLA was signed into law by the Defendant Governor on December 12, 2025, and will become effective on September 12, 2026. Once in

[6010987.5]

17

effect, the law will allow dispensing lethal drugs to a patient who makes two oral requests a minimum of five days apart, plus a written request. 410 ILCS22/25. If a provider in their best-guess prognosis believes that a patient has less than five days to live, EOLA permits same day dispensing of lethal drugs. See 410 ILCS 22/25(c). Before providing the lethal drugs, the provider must confirm that the patient has an "incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months," that the patient has "mental capacity," and that the patient's request "does not arise from coercion or undue influence." 410 ILCS 22/10.

42. The attending provider is supposed to refer the patient to a consulting provider to confirm the terminal diagnosis, mental capacity, and that the patient is acting voluntarily, free from coercion or undue influence. 410 ILCS 22/40(2). In jurisdictions with nearly identical assisted suicide schemes, such referrals almost never occur.

43. EOLA does not require a mental health assessment for the patient requesting assisted suicide. The attending or consulting provider must only refer a patient to a mental health professional if either provider "has doubts whether the individual has mental capacity and if either one is unable to confirm that the individual is capable of making an informed decision." 410 ILCS 22/45(a).

44. However, EOLA does not provide any standards to guide providers in making this determination, nor does it require training in mental capacity

[6010987.5]                                    18

assessment. EOLA assumes that a request for assisted suicide is not an indication of a mental disorder, when other Illinois laws make precisely the opposite assumption for everyone else, and those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition, which Plaintiffs do not condone, but which is both law and standard of care in other circumstances, showing the inherent irrationality of EOLA.

45. In determining whether a person's condition meets the definition of "terminal disease," EOLA has no requirement that the attending or consulting provider consider the effect of treatments, counseling, or other supports on survival rates. See 410 ILCS22/10. People who would otherwise survive beyond six months if provided treatment or other supportive services will still be eligible for assisted suicide regardless of whether those treatments or supports are denied by their insurance company, refused, or otherwise not available. As a result, conditions that would not otherwise be considered "terminal" with treatment— such as spinal cord injuries, diabetes, complications from falls, hernias, eating disorders, and kidney disorders requiring dialysis—can and will qualify people for assisted suicide under the Act.

46. In addition, a patient who is not currently within six months of death can simply make themselves eligible by exercising their right to refuse medical treatment or by voluntarily stopping eating and drinking (VSED). Proponent doctors and lawyers have advocated using VSED as a "bridge" to

assisted suicide when a patient comes in saying they want to die, but they have no condition that is fatal within six months. The doctor can simply say, start VSED and come back in a week. Thus, people with non-terminal conditions such as depression, or even just fear of getting sick someday, have received lethal medications.

47. The attending and consulting providers need not ever see the suicidal patient in person, as EOLA does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely.

48. EOLA fails to require that the medical providers it licenses to assist their patients in suicide to meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including concurrent or additional treatment options, comfort care, palliative care, hospice care, and pain control. The statute only requires a mere mention of such "feasible alternatives." The Act directs providers to advise the patient of alternative treatment options, but the requirement is only to "inform" the patient of "feasible" alternatives, not actually offer options such as hospice and palliative care or that Defendant State require the funding and provision of such alternatives. 410 ILCS 22/35(a)(4). The Act requires that provider only provide a "referral" if alternative care is both requested by the patient and clinically indicated. 410 ILCS 22/35(a)(6).

49. EOLA permits physician-shopping, such that if one physician finds

the person ineligible, the person can contact additional providers until they get approval for assisted suicide. The same person can be deemed eligible plausibly by one physician and not eligible with equal plausibility by another and still be eligible for physician assisted suicide. EOLA lacks any independent oversight for the decision to grant an assisted suicide request (i.e., review by a probate court, as with civil commitments) or to assure consistent application of a law which can plausibly deem a person eligible and not eligible for assisted suicide at one and the same time. The ability to "shop" physicians combined with the lack of oversight, have the effect of rendering the protections of EOLA not just arbitrary and capricious but meaningless. EOLA requires physicians to assist with this doctor-shopping as it requires doctors who object to assisted suicide to select the "relevant" medical records to transfer to the doctor who is willing to prescribe the lethal drugs. 410 ILCS 22/60(e).

50.     EOLA requires that the patient self-administer the drugs but does not provide for oversight at the time of administration. There are no witness requirements at time of ingestion, no requirements that the attending provider be present or informed of the person's death, and no obligation to document the true manner or cause of death. There is no way of knowing whether the drugs were administered voluntarily or without coercion, whether the patient's judgment was impaired at the time of ingestion, whether the patient is still "terminal" at the time of ingestion, or if they pursued treatment or cured their condition but

chose to ingest the drugs anyway. EOLA does not require any evidence that the person ingested the lethal drugs themselves, that is, whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, physician, other healthcare provider, or friend) administered the medication or physically assisted the person. The time that the person ingests the lethal drugs may be days, weeks, months, or even years after the request for assisted suicide was approved and when such approval has no medical validity.

51.     EOLA then compels coroners to falsify the cause of death: rather than accurately identify the cause of death as suicide, a coroner is statutorily required to instead list the putative "terminal disease." 410 ILCS. 22/90(b). In addition to compelling coroners to falsify official records, this provision is designed to hide information regarding the occurrence and rate of assisted suicide by ensuring such information never exists. Under EOLA, assisted suicide "do[es] not, for any purposes, constitute suicide, assisted suicide, euthanasia, mercy killing, homicide, murder, manslaughter, elder abuse or neglect, or any other civil or criminal violation under the law." 410 ILCS 22/100(b).

52.     This use of Orwellian double speak to deny that the euphemistic terms, "end of life options," "medical aid in dying," and others like them mean what is in fact assisted suicide shows the inability of the state to reconcile EOLA with the states' criminal law which classifies such an act as a criminal felony,

and continues to do so except when used for persons with life-threatening disabilities.

## C.     THE INDIVIDUAL PLAINTIFFS WITH DISABLITIES

53.     Plaintiff Ebony Payne is a quadriplegic paralyzed from the neck down. She cannot move her extremities and needs assistance with eating, bathing, going to the store, and going to doctor's appointments. She also requires special breathing treatment because of her disabilities. She is a person with a disability under the ADA as defined in 42 U.S.C. § 12102 and under Section 504 of the Rehabilitation Act as defined in 29 U.S.C. § 705(20).

54.     Just within the last eight days prior to the filing of this complaint, Plaintiff Ebony Payne was in the emergency room (ER) and then the intensive care unit (ICU) of Northwestern Memorial Hospital in Chicago.

55.     She has been in such serious life-threatening situations in hospitals repeatedly.

56.      In December 2025 she was in such pain from an infection that it affected her mental state. She was later told by doctors that while she was in pain, she had asked doctors to end her life. She has no memory of this and is astonished that she made such request.

57.     She is opposed to EOLA because it will inflict injury upon her by removing the ethical obligation of a physician to do no harm and removing a core legal basis of every physician relationship she has had until now.

58. Two to three years ago when she was severely ill again, a doctor told Ms. Payne's mother that the facility did not want to keep intubating her and recommended letting her die with comfort care. Luckily, Ms. Payne's mother, who has the power of attorney, did not give her consent.

59. Ms. Payne abhors the idea of assisted suicide and feels demeaned by being classified as someone who can be counselled about assisted suicide. She will suffer emotional distress now and hereafter from the likely prospect of conversations forced on her by EOLA to restate her rejection of assisted suicide and assert the dignity and value of her life.

60. Like Ms. Payne, Pam Heavens is also a plaintiff bringing this legal challenge to EOLA. Like Ms. Payne, she is disabled. Ms. Heavens is a 69-year-old woman who was born with cerebral palsy. Her support needs have increased with age. She now requires a motorized wheelchair, and requires assistance to eat, buy groceries, get dressed, and travel. She is a person with a disability as defined under the ADA and Section 504.

61. Any lapse in her current medical support, or even placement in a lower tier of medical care, would make Ms. Heavens likely to die well before six months, and thus qualify her for assisted suicide under EOLA.

62. Because she is severely disabled, Ms. Heavens suffers and will suffer emotional distress of being stigmatized by the State by virtue of that disability, and subject to solicitation by physicians, hospitals, and insurance

[6010987.5]                                    24

companies to consider the option of assisted suicide.

63.     Both Plaintiffs Payne and Heavens will suffer the same immediate and irreparable injury from EOLA. First, they will suffer injury from the law's erasure of the ethical obligation of the physician to do no harm, even when they are in extreme medical situations. Second, they suffer emotional distress now from the certain prospect that they will have to prepare for painful conversations about assisted suicide. Third, they will be placed in a second tier class of medicine, as the designation of "terminal illness" under EOLA gives official license to a lower standard of care.

64.     Now that Plaintiffs Payne and Heavens no longer have the protection of the ethical obligation of every physician to do no harm, Plaintiffs will have to act diligently to ensure such commitment from physicians who formerly had the ethical obligation not to encourage or solicit them to commit suicide and cannot rest assured their providers will not help them kill themselves in a dark moment. Both plaintiffs have suffered a concrete and individual injury from the loss of a fiduciary obligation that was a norm or practice of the medical profession, but that EOLA has taken away for no other reason than eligibility for suicide because of their life-threatening disabilities.

## D.     THE PLAINTIFF ORGANIZATIONS

65.     The Plaintiff membership organizations – United Spinal Association, National Council on Independent Living, Not Dead Yet, Institute

for Patients' Rights, Progress Center for Independent Living, and Chicago Adapt – seek to promote the disability rights of their respective members.

66. 64. All the Plaintiff organizations are advocates for people living with disabilities.

67. All the Plaintiff organizations oppose assisted suicide laws, and EOLA especially, because the injury that the individual plaintiffs above will suffer is typical of the injury that many in their respective memberships will suffer.

68. All the Illinois members of the Plaintiff organizations who have life-threatening disabilities will suffer the same intangible injury that Plaintiffs Payne and Heavens will suffer – the injury from the erasure of the ethical obligation of the physician to do no harm to them, not even to suggest suicide, and to actively protect them from such an act of self-harm.

69. All of the Plaintiff organizations must now increase their financial efforts and service programs not just to educate their Illinois members about the new risks of the physician-patient relationship – but also to discourage suicide ideation which afflicts so many of these members and other individuals with life-threatening disabilities. Such suicidal ideation – which the Plaintiff organizations already have programs to treat – will only be worsened among members by the very fact that the State of Illinois now sanctions physician assisted suicide. Whether or not all Illinois members of Plaintiff organizations are immediately

[6010987.5]                                    26

eligible for EOLA, all the Illinois members of the plaintiff organizations who have life-threatening disabilities are immediately subject to a two-track state system to respond to suicidal ideation—one to save lives, and another, only for persons with life-threatening disabilities, to facilitate their deaths. The second, inferior track, operates by ending the ethical obligation of physicians to do no harm.

## E.     PLAINTIFF DR. NOOSHIG LUZ SALVADOR

70.     Dr Salvador is a physician whose practice consists entirely of treating people with disabilities, especially at the end-of-life stage. She is a specialist who is Board certified in internal medicine, palliative care and integrative medicine.

71.     She has ample experience with patients who receive an end-of-life diagnosis. In her own experience and expert medical opinion, such individuals often upon receiving a devastating diagnosis have no adequate warning of the diagnosis and are in a state of shock. They may also be under the care of surgeons who are inadequately trained to communicate end-of-life options that will ease suffering and protect a genuine quality of life for such patients.

72.     Because of EOLA, physicians who are inadequately trained or qualified to provide integrative medicine of this kind will be empowered to assist in suicide because the medical profession of which they are a part is no longer

able to prohibit it.

73. EOLA recognizes that its program of physician assisted suicide is likely to be difficult or impossible to implement unless the Defendant State prevents the physicians who engage in it from being disciplined by their medical associations.

74. EOLA, in 410 ILCS 22/60(c) bars a health care entity or licensing board through which physicians like Dr. Salvador regulate the profession from "censure, discipline, suspension, loss of license, loss of privileges, loss of membership, or other penalty," to discourage physicians from breaching the ethical norm that the physician shall do no harm, and not engage in killing a patient.

75. Likewise, EOLA, in 410 ILCS 22/70(e) further states: "A physician is not subject to… professional discipline, if, at the request of the qualified patient the physician is present outside the scope of the physician's employment contract and off the entity's premises when the qualified patient self-administers medication pursuant to this Act, or at the time of death."

76. EOLA thereby seeks to prevent the medical profession as a whole and physicians like Dr. Salvador from continuing to control the internal norms and practices of the medical profession. EOLA unlawfully interferes with their liberty interest in doing so.

77. The American Medical Association, for example, opposes

physician assisted suicide in general and thereby opposed the enactment of EOLA.

78. Until now, the Illinois State Medical Board has enforced and not attempted to override the internal norms and practices that the medical profession itself has collectively developed and that are still in effect for patients not disabled and not qualified for assisted suicide.

79. Under EOLA, the State Medical Board will now override such internal norms or practices and the ability of the medical profession to enforce them.

80. For over a century, since the landmark decisions of *Pierce v. Society of Sisters,* 268 U.S, 510 (1925) and *Meyer v. Nebraska*, 262 U.S. 390 (1923) the U.S. Supreme Court has protected the autonomy of private associations to establish the norms and values of its members.

81. By overriding this liberty interest of the medical profession – to enforce ethical norms that it has collectively developed for those who practice medicine – the enactment of EOLA is a concrete injury to Dr. Salvador and other members of the profession. There is no legal basis for interfering with their own control over the norms and internal practices of the profession.

## COUNT I

### DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

82. By the facts set forth above, EOLA is in violation of the ADA, 42 U.S.C. § 12132 in at least three respects,

83. EOLA engages in direct and intentional discrimination against the individual Plaintiffs and the Illinois members of the Plaintiff organizations by deeming them eligible for early death because they have a life-threatening disability and thereby stigmatizing them and devaluing their lives. By limiting physician assisted suicide to those whose disability has become life threatening, EOLA purposefully sets them apart from other Illinois citizens. In such discriminatory fashion, EOLA relieves their physicians of the obligation to provide life extending care, which they are obliged to provide to other citizens.

84. Though EOLA may purport to prohibit undue pressure from insurers on Plaintiffs to consent to suicide, there is no means to enforce this prohibition as there is no transparency to this loss of life. In that way, despite statutory cant, EOLA has no prior due process that is required and does nothing to guarantee that consent will be free and not coerced.

85. For the same reasons EOLA inflicts both disparate treatment of individuals with life-threatening disabilities and has an especially disproportionate adverse and harmful impact on individuals who have extended and severe disabilities that are a costly burden to insurers and hospitals and make

them especially vulnerable to being pressured into assisted suicide

86.     EOLA further discriminates against individuals with disabilities just by deeming it unnecessary to have any due process or prior State review of this irrevocable decision and taking a virtual laissez-faire approach to the taking of life by another. Without prior due process, EOLA allows individuals to obtain assisted suicide on an unreasonably short timetable and when that request may be due only to a temporary depression or mood disorder.

87.     EOLA also provides for discriminatory and disparate treatment of Plaintiffs and other individuals with life-threatening disabilities by removing for them, and *only for them* the legal duty of the doctor to do no harm.

88.     By removing such duty, EOLA effects a breach of trust previously inherent in the physician-patient relationship, and undermines the basis of that relationship, only for those with a life-threatening disability.

89.     There is a second and separate violation of the ADA because EOLA necessarily excludes Plaintiffs, by virtue of their disabilities, from the Defendant State's suicide prevention programs.

90.     These State programs and activities for which the Defendant State receives federal assistance are conducted by the Defendant IDPH through the Illinois Suicide Alliance are no longer applicable to Plaintiffs.

91.     By excluding individual Plaintiffs and others with life-threatening disabilities from these suicide prevention programs, EOLA denies them the

unequivocal obligation to be counselled against suicide and in favor of life extending treatments. This potentially leaves such individuals with only cursory knowledge of these options when they would have far greater knowledge if still beneficiaries of these suicide prevention programs. Individuals are often disoriented when receiving a fatal diagnosis and in special need to be in these programs; this is the worst possible time to be excluded from them.

92.    Such programs range from education and counselling against suicide to treatment of suicidal ideation as a mental health disorder. These programs offer information about hospice care and treatment to relieve suffering as the preferred options, as it is for citizens without life-threatening disabilities.

93.    As to the third violation of the ADA in this case, and because there is no due process or safeguard to protect these vulnerable individuals with severe disabilities, EOLA denies reasonable accommodation to the needs of plaintiffs and other individuals with disabilities as required by the ADA when operating such programs.

94.    Such reasonable accommodation would include, at a minimum, the safeguards as are required by the Due Process Clause of the Fourteenth Amendment as set forth below in Count IV. Such safeguards are equally required under the ADA and would include, at a minimum, a prior judicial hearing with an independent prior mental health evaluation and other protections.

95. For all three distinct violations of the ADA set forth here, Plaintiffs seek temporary and permanent injunctive relief against the enforcement of EOLA by the Defendant State and Defendant IDPH.

96. In the alternative, if injunctive relief is not available, Plaintiffs seek a declaratory judgment that the prospective enforcement of EOLA by the Defendant State and IDPH would violate the ADA, 42 U.S.C. § 12132, as described above.

## COUNT II

## DISCRIMINATION IN VIOLATION OF AFFORDABLE CARE ACT SECTION 1557, 42 U.S.C. § 18116

97. Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under … section 794 of title 29 [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a).

[6010987.5]

33

98. Defendants State and IDPH operate health programs or activities receiving federal financial assistance for purposes of Section 1557. Such health programs or activities include but are not limited to suicide prevention, including suicide prevention programs facilitated by the Illinois Suicide Prevention Alliance within Defendant IDPH.

99. Defendants' suicide prevention services in Illinois are health programs or activities within the meaning of Section 1557 of the ACA and must comply with Section 1557's antidiscrimination requirements. The Medical Board's regulation of the medical profession and enforcement of rules and laws applicable to medical professionals are health programs or activities within the meaning of Section 1557 of the ACA.

100. Defendants violate Section 1557 of the ACA in the same manner they violate the ADA as alleged forth in Count I, and such violations are realleged in this Count II.

101. Defendants violate Section 1557 in the manner alleged in Count I by stigmatizing them and devaluing their lives because of their disabilities, and by not deeming it necessary to prevent any due process from the State before private persons can assist in taking their lives.

102. Defendants also violate Section 1557 in the manner alleged in Count I by excluding them from programs and activities to prevent suicide.

103. Finally, Defendants also violate Section 1557 in the manner

described in Count I by failing to provide reasonable accommodation to the needs of the individual Plaintiffs and members of the Plaintiff organizations and failing to address their reasonable emotional distress and fear arising from State-sanctioned physician assisted suicide. Such reasonable and justifiable distress comes from the reasonable fear of those with life-threatening disabilities that without the safeguard of prior judicial hearing and much stronger procedural checks that they may consent to being prompted or steered by physicians and others into the option of assisted suicide.

104.    For all these violations of Section 1557, Plaintiffs seek temporary and permanent injunctive relief against the enforcement of EOLA by the Defendant State and Defendant IDPH.

105.    In the alternative, if injunctive relief is not available, Plaintiffs seek a declaratory judgment that the prospective enforcement of EOLA by the Defendant State and Defendant IDPH would be in violation of Section 1557.

## COUNT III

## DISCRIMINATION IN VIOLATION OF SECTION 504 OF REHABILITATION ACT OF 1973

106.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that "an individual shall not. be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

107. Defendants State and Defendant IDPH operate health programs or activities receiving federal financial assistance for purposes of Section 504. Such health programs or activities include but are not limited to suicide prevention, including suicide prevention programs sponsored by the Illinois Suicide Prevention Alliance within Defendant IDPH

108. Defendants' suicide prevention services in Illinois are health programs or activities within the meaning of Section 504 of the Rehabilitation Act and must comply with Section 504's antidiscrimination requirements.

109. Defendants State and IDPH violate Section 504 as well in the various ways as alleged in Count I and these allegations of unlawful discrimination under the ADA are incorporated here as violations of Section 504 as well, including the allegations of discriminatory intent or purpose, disparate treatment, and disparate adverse impact

110. Defendants State and IDPH also violate Section 504 as alleged in Count I by stigmatizing and devaluing the lives of the individual Plaintiffs and members of the Plaintiff organizations by singling them out for early death eligibility for assisted suicide solely on the basis of their disability and deeming the taking of their lives as a matter of such indifference as not to be worthy of meaningful safeguards or meaningful procedural checks.

111. Defendant State and Defendant IDPH also violate Section 504 in the manner described in Count I by excluding the individual Plaintiffs and

Illinois members of the Plaintiff organizations from the Defendants' programs and activities to prevent suicide, including active counselling against suicide and interventions to prevent suicide.

112. Finally, Defendants also violate Section 504 by failing to provide reasonable accommodation to the individual Plaintiffs and members of the Plaintiff organizations. There are no meaningful safeguards to ensure that such individuals are not pushed or steered into assisted suicide. Nor do the Defendants provide a prior hearing or other procedural checks to ensure that the taking of life is not the result of pressures from physicians, hospitals, and public and private insurers that regard Plaintiffs as a costly burden because of their disabilities.

113. For all these reasons, Plaintiffs seek temporary and permanent injunctive relief against the enforcement of EOLA by the Defendant State and Defendant IDPH

114. In the alternative, if injunctive relief is not available, Plaintiffs seek a declaratory judgment that enforcement of EOLA by the Defendant State and Defendant IDPH would violate Section 504.

## COUNT IV

## VIOLATION OF 42 U.SC. § 1983: DENIAL OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

115. By the acts set forth above, and in violation of 42 U.S.C. § 1983,

and by implementing EOLA and establishing its scheme of assisted suicide, the Defendant Governor and Defendant IDPH Director have acted under color of law to deprive the individual Plaintiffs and members of the Plaintiff organizations of their rights under the Due Process Clause of the Fourteenth Amendment.

116. By setting up a scheme for assisted suicide without any prior hearing or procedural check on the taking of life of another by a private party, and not the State, EOLA is an unconstitutional deprivation of the right to such Due Process.

117. As stated above, EOLA unlawfully delegates to a private party what has been an exclusive function of State sovereignty until now – the taking of life of a citizen of the defendant State, or for that matter, any other state government. Such delegation of that function by EOLA necessarily turns the participating physician into a state actor. Physician-assisted suicide is a form of state action requiring the same or similar Due Process that would be required of the Defendant State were it to take a human life.

118. By delegating such an exclusive state function to private parties and in violation of 42 U.S.C. § 1983, the Defendant State officers have unlawfully deprived individuals with life-threatening disabilities of their rights under the Due Process Clause.

119. By setting up such a scheme of state action to take life without any

[6010987.5]                                          38

due process, the defendant State officers have inflicted an immediate injury upon Plaintiffs and members of the Plaintiff organizations, as such a delegation of that power to their physicians is causing and will cause understandable emotional distress.

120. First, the Defendant State officers have inflicted this immediate injury by removing the ethical obligation of the physicians not to do harm, or actively protect them from suicide, and this injury transforms the physician-patient relationship now.

121. Second, the Defendant State officers have placed the individual Plaintiffs and members of the Plaintiff organizations in reasonable fear of their lives because the physicians are now authorized to perform what only the State can do, and to do so without the due process required by the State.

122. The absence of any State engagement to protect them from assisted suicide - the lack of any guard rails – inflicts severe mental and emotional stress on the individual Plaintiffs and other individuals with life threatening disabilities. The lack of any involvement by the State to protect them from outside pressures by hospitals and insurers justifies them in such distress, for EOLA is a program about taking the lives of those with life threatening disabilities. People in medical crisis who may or may not have access to the gold standard of care deserve the Due Process the Fourteenth Amendment promises, even in a dark moment, especially when they are expressing a desire to die by

suicide.

123. For all these reasons, the individual Plaintiffs and Plaintiff organizations seek temporary and permanent injunctive relief against the enforcement of EOLA by the Defendant Officers and the taking of human life under color of such law without the same constitutional due process that the Defendant State itself would have to follow if it sought to take a life.

124. EOLA's delegation of the power to take life to private actors, and its erasure of the physician's duty to do no harm, put Plaintiffs and the constituents of Plaintiff organizations in a situation of state-created danger, in manner that shocks the conscience, in violation of substantive due process protections of the Fourteenth Amendment.

125. In the alternative, if injunctive relief is not available, Plaintiffs seek a declaratory judgment that in violation of 42 U.S.C. § 1983, by prospective enforcement of EOLA, the Defendant Officers will deprive the Plaintiffs and other Illinois citizens with life threatening disabilities of their right to Due Process under the Fourteenth Amendment.

## COUNT V

**VIOLATION OF 42 U.S.C. § 1983: DENIAL OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT**

126. By the acts set forth above, and in violation of 42 U.S.C. § 1983, and by implementing EOLA's scheme for physician-assisted suicide without

objective parameters as to who is eligible, or that can be applied consistently, the Defendant Governor and Defendant IDPH Director have acted under color of law to deprive the individual Plaintiffs and Illinois members of the Plaintiff organizations of their rights under the Equal Protection Clause of the Fourteenth Amendment.

127. As set forth above, EOLA has no objective and fixed parameters or possibility of consistent application as to who is eligible for the suicide-assistance program and who is eligible for the Defendant State's suicide prevention programs.

128. The parameters for eligibility are arbitrary and indeterminate and dependent on *ad hoc* subjective judgments that will necessarily vary from one health care provider to the next. That includes especially determinations of terminal illness and mental capacity that are hopelessly vague and can be made by physicians without any expertise in such determinations. Yet under EOLA, under one determination the State facilitates suicide, and under another, the State attempts to prevent it. Any individual with life-threatening disabilities can be in both classifications at the same time depending on the provider's definition of "terminal illness" and "mental capacity," and subject to conflicting standards.

129. EOLA fails to require even mental health evaluations by qualified experts to determine eligibility for assisted suicide.

130. Nor is there any process to determine whether the individual being

[6010987.5]                                                41

considered for suicide has been subject to unlawful outside pressures.

131. For that reason, EOLA's scheme for physician assisted suicide, with no objective parameters for who is eligible, cannot be consistently applied, and is arbitrary, capricious, and dangerous to the Plaintiffs and others with life-threatening disabilities.

132. After EOLA takes effect, they have no knowledge as to what may happen to them should their own mental capacity decline and they are then prompted or steered without their knowing consent into physician assisted suicide.

133. Nor is there any requirement of a prior judicial hearing to provide some objective determination of eligibility under full mental health evaluations and standards consistently applied.

134. For the above reasons, EOLA leaves eligibility for physician-assisted suicide without objective parameters, and leaves Plaintiffs in immediate doubt as to how the Defendant State officers will act toward them once the law becomes effective on September 12, 2026.

135. Because of the lack of objective parameters, Plaintiffs cannot know whether after September 12, 2026, the Defendant State Officers will seek to prevent Plaintiffs from committing suicide or suicidal ideation as they do now under existing State programs or instead will encourage Plaintiffs to indulge suicidal thoughts and even help them die by suicide. EOLA is so vague as to

[6010987.5]                                    42

leave Defendant State Officers free to take both approaches at the same time and to leave Plaintiffs without any knowledge of their rights.

136.    Plaintiffs seek temporary and permanent injunctive relief against the enforcement of EOLA as a violation of their rights the Equal Protection Clause to be free of arbitrary and inconsistent State action and incompatible and conflicting standards with respect to the taking of life.

## COUNT VI

## VIOLATION OF 42 U.S.C. § 1983: INTERFERENCE WITH LIBERTY INTEREST AND SPEECH

137.    Plaintiff Dr Salvador is the sole Plaintiff on this count.

138.    As set forth above, by implementing EOLA after September 12, 2026, the Defendant State Governor and Defendant Director of IDPH must necessarily override the norms and internal practices collectively developed by the medical profession of which Dr. Salvador is a member as to the ethical obligation of every physician to do no harm and not to kill.

139.    Specifically, as set out in EOLA at 410 ILCS 22/70, the Defendant State Governor and Defendant Director of IDPH will implement specific provisions that prevent any censure or discipline of physicians who violate this obligation by assisting the suicide of their patients when eligible under the law.

140.    Such an interference by Defendants with the liberty interest of Plaintiff Dr. Salvador and other members of the medical profession to censure or

discipline physicians who violate the ethical norms of the profession is an interference with the right of the Plaintiff and other members of the profession to control their own norms and internal practices that have been collectively developed as an essential part of the practice of medicine.

141. In violation of 42 U.S.C. § 1983, and in repudiating and seeking to block the ability of Dr. Salvador and other members of the medical profession from censuring and professional discipline of physicians who assist in taking the lives of their patients, the Defendants have deprived Dr. Salvador and other members of their rights under the Due Process Clause of the Fourteenth Amendment to enforce their own norms and practices that define or are inherent to the practice of medicine.

142. Accordingly, Plaintiff Salvador seeks preliminary and permanent injunctive relief against the implementation of EOLA to the extent it seeks to override the liberty interest of members of the medical profession to censure and discipline and cause loss of hospital privileges for physicians who violate the core ethical obligation to do no harm.

**WHEREFORE Plaintiffs pray this Court to:**

A. Declare that as set forth in Count I above EOLA violates the ADA, 42 U.S.C. § 12132, on its face and as applied to the individual Plaintiffs and

Illinois members of the Plaintiff organizations.

B.     Declare that as set forth in Count II above EOLA violates Section 1557 of the Affordable Care Act on its face and as applied to the individual Plaintiffs and Illinois members of the Plaintiff organizations.

C.     Declare that as set forth in Count III above EOLA violates Section 504 of the Rehabilitation Act on its face and as applied to Plaintiffs and Illinois members of Plaintiff organizations.

D.     Declare that as set forth in Count IV above, and in violation of 42 U.S.C. § 1983, EOLA deprives the individual Plaintiffs and members of the Plaintiff organizations of their rights the Fourteenth Amendment's Due Process Clause.

E.     Declare that as set forth and Count V, and in violation of 42 U.S.C. § 1983, EOLA deprives Plaintiffs and members of the Plaintiff organizations of their rights under the Fourteenth Amendment's Equal Protection Clause.

F.     Declare that EOLA at 410 ILCS 22/70 unlawfully interferes with the liberty interest and right of Dr. Salvador and other members of the medical profession under the Due Process Clause of the Fourteenth Amendment to enforce their own norms and internal practices that have been collectively developed by the medical profession to define as essential to the practice of

[6010987.5]

45

medicine.

G.   Preliminarily and permanently enjoin Defendants from enforcing EOLOA; and

H.   Grant such other and further relief as this Court may deem just and proper, including an award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses.

Date: June 11, 2026                                        Respectfully submitted,

By:   _____ *Thomas H. Geoghegan*
Thomas H. Geoghegan
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeohegan@dsgchicago.com
*Attorney for Plaintiffs*

Michael W. Bien,
Ernest Galvan,
Kara J. Janssen,
Rosen Bien Galvan & Grunfeld, LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Tel.:   (415) 433-6830
Fax.:   (415) 433-7104
egalvan@rbgg.com

[6010987.5]                             46

mbien@rbgg.com
kjanssen@rbgg.com

*Attorneys for Plaintiffs*
*(Pro Hac Vice Applications Pending)*

[6010987.5]
47