# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EBONY PAYNE, PAM HEAVENS, UNITED SPINAL ASSOCIATION, NATIONAL COUNCIL ON INDEPENDENT LIVING, NOT DEAD YET, INSTITUTE FOR PATIENTS' RIGHTS, PROGRESS CENTER FOR INDEPENDENT LIVING, CHICAGO ADAPT, and NOOSHIG LUZ SALVADOR, M.D.,

Plaintiffs,

v.

THE HONORABLE JAY ROBERT PRITZKER, in his official capacity as Governor of the State of Illinois, ILLINOIS DEPARTMENT OF PUBLIC HEALTH, THE HONORABLE SAMEER VOHRA, M.D. in his official capacity as Director of the Illinois Department of Public Health,

Defendants.

Case No. 1:26-cv-06886
District Judge John J. Tharpe, Jr.
Magistrate Judge David Weisman

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page


INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

I. EOLA'S ELIGIBILITY AND PROCEDURES ....................................................2

II. EOLA'S REMOVAL OF ETHICAL OBLIGATION TO DO NO HARM ..........5

III. EBONY PAYNE ..............................................................................................5

IV. THE PLAINTIFF ORGANIZATIONS ...............................................................6

LEGAL STANDARD ................................................................................................8

ARGUMENT ...........................................................................................................8

I. PLAINTIFF PAYNE HAS ARTICLE III STANDING DUE TO THE CONCRETE INJURY EOLA WILL WORK ON THE DOCTOR-PATIENT RELATIONSHIP ....................................................................................8

II. UNITED SPINAL AND PCIL HAVE STANDING TO SEEK INJUNCTIVE RELIEF ON BOTH ORGANIZATIONAL STANDING AND ASSOCIATIONAL STANDING GROUNDS ...............................................11

III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THE CLAIMS THAT IMPAIRING THE PHYSICIAN PATIENT RELATIONSHIP ON THE BASIS OF DISABILITY VIOLATES FEDERAL ANTIDISCRIMINATION STATUTES. ...............................................................12

IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THE CONSTITUTIONAL CLAIMS .............................................................................16

A. EOLA Violates the Due Process Clause of the Fourteenth Amendment ..............16

B. EOLA Violates the Due Process Rights of the Organizational Plaintiffs to Exercise Their Fundamental Rights of Free Speech to Save the Lives of Their Members. .......................................................................................17

C. EOLA Violates the Equal Protection Clause of the Fourteenth Amendment ........17

V. PLAINTIFFS HAVE ADEQUATELY DEMONSTRATED IRREPARABLE INJURY .....................................................................................................18

CONCLUSION .........................................................................................................20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) .................................................. 17

*Christian Legal Soc'y v. Walke*r,
453 F.3d 853 (7th Cir. 2006) .................................................. 17

*City of Chicago v. U.S. Dep't of Justice*,
822 F. Supp. 3d 873 (N.D. Ill. 2026) .................................................. 8

*City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) .................................................. 17, 18

*Ctr. for Individual Freedom v. Madigan*,
697 F.3d 464 (7th Cir. 2012) .................................................. 8, 12, 17

*Elrod v. Burns*,
427 U.S. 347 (1976) .................................................. 17

*Ewing v. MED-1 Solutions, LLC*,
24 F.4th 1146 (7th Cir. 2022) .................................................. 10

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................. 8

*Florence v. Order Express, Inc.*,
674 F. Supp. 3d 472 (N.D. Ill. 2023) .................................................. 10

*Foodcomm Int'l, Inc. v. Barry,*
328 F.3d 300 (7th Cir 2003) .................................................. 18

*Fuentes v. Shevin*,
407 U.S. 67 (1972) .................................................. 16

*Halczenko v. Ascension Health, Inc.*,
37 F.4th 1321 (7th Cir. 2022) .................................................. 8

*Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*,
570 F.3d 811 (7th Cir. 2009) .................................................. 16

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974) .................................................. 16

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir 2021) .................................................. 18

*Love v. Westville Corr. Ctr.*,
103 F.3d 558 (7th Cir. 1996) .......... 12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 8

*Mack v. Resurgent Capital Servs., L.P.*,
70 F.4th 395 (7th Cir. 2023) .......... 8

*Martinez v. City of Chicago*,
534 F. Supp. 3d 936 (N.D. Ill. 2021) .......... 9

*O'Donnell v. Bailey & Associates*,
2023 Ill. App. (1st) 221736 (Ill. App. Ct. Dec. 22, 2023) .......... 15

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) .......... 14

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) .......... 14

*Petrillo v. Syntex Labs., Inc.*,
148 Ill. App. 3d 581 (Ill. App. Ct. 1986) .......... 10

*Reed v. Columbia St. Mary's Hosp.*,
915 F.3d 473 (7th Cir. 2019) .......... 13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2023) .......... 19

*Saldana v. Cook Cnty. Health & Hosps. Sys.*,
No. 19 CV 6178, 2024 WL 4792113 (N.D. Ill. Jan. 5, 2024) .......... 13

*Scanlan v. Eisenberg*,
669 F.3d 838 (7th Cir. 2012) .......... 11

*Scholl v. Ill. State Police*,
776 F. Supp. 3d 701 (N.D. Ill. 2025) .......... 8, 9

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 10

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 2, 9, 10

*United States v. N. Ill. Special Recreation Ass'n*,
168 F. Supp. 3d 1082 (N.D. Ill. 2016) .......... 12

*Wagoner v. Lemmon*,
778 F.3d 586 (7th Cir. 2015) .......... 12

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ........................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................ 8

*Wis. Right to Life, Inc. v. Barland*,
751 F.3d 804 (7th Cir. 2014) ........................................ 17

*Wis. Voter All. v. Mills*,
166 F.4th 627 (7th Cir. 2026) ........................................ 11

**STATUTES**

29 U.S.C. § 794 ........................................ 13

405 ILCS 5/3 ........................................ 15

410 ILCS 22/10 ........................................ passim

410 ILCS 22/15 ........................................ 6, 19

410 ILCS 22/25 ........................................ 3

410 ILCS 22/35 ........................................ 3, 4

410 ILCS 22/45 ........................................ 4

410 ILCS 22/5 ........................................ 6, 19

410 ILCS 22/60 ........................................ 5

410 ILCS 22/70 ........................................ 5

410 ILCS 22/95 ........................................ 7, 17

42 U.S.C. § 12102 ........................................ 3, 13, 14

42 U.S.C. § 12132 ........................................ 13

42 U.S.C. § 18116 ........................................ 13

720 ILCS 5/12 ........................................ 16

745 ILCS 70 ........................................ 7

745 ILCS 70/6.1 ........................................ 7

**OTHER AUTHORITIES**

AMA Code of Medical Ethics, Opinion 5.7, Physician-Assisted Suicide, https://code-medical-ethics.ama-assn.org/sites/amacoedb/files/2025-11/AMA%20Code%20of%20Medical%20Ethics5.7_0.pdf............................................ 9

**TREATISES**

11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2023) .......................................................................................................... 19

Austin W. Scott & Mark L. Ascher, Scott and Ascher on Trusts §24.24.1 (5th ed. 2025) .......... 10

Lois Snyder Sulmasy and Paul S. Mueller, *Ethics and the Legalization of Physician-Assisted Suicide: An American College of Physicians Position Paper*, Annals of Internal Medicine, Vol. 167, No. 8, Sept. 19, 2017.......................................................................................................... 10

**REGULATIONS**

28 C.F.R. § 35.130 .......................................................................................................... 14

45 C.F.R. § 84.68 .......................................................................................................... 14

# INTRODUCTION

Based on the Complaint and attached Declarations, Plaintiffs Ebony Payne, United Spinal Association ("United Spinal") and Progress Center for Independent Living ("PCIL") seek a preliminary injunction to prevent implementation of the Illinois law for physician-assisted suicide. The new law, the End-of-Life Options for Terminally Ill Patients Act ("EOLA"), 410 ILCS 22/1 et seq., which takes effect on September 12, 2026, singles out only individuals with life threatening disabilities for early death. The law is discriminatory, stigmatizing, and extremely dangerous, as it has no meaningful procedural safeguards to prevent loss of life. It also unlawfully removes the physician's obligation to do no harm only for those with life threatening disabilities. EOLA discriminates against individuals with life threatening disabilities in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. 12132; Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. 18001; and Section 504 of the Rehabilitation Act., 29 U.S.C. Section 794. EOLA also violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. EOLA confers State authority to take life on private individuals, without any meaningful procedural protections from the State. EOLA creates a dual system of State response to risk of suicide, one for those qualified for physician assisted suicide, and one for those not so qualified. The distinction between these two groups is arbitrary and consigns the death-qualified group to a system that devalues their right to life, in violation of the Equal Protection Clause. The law directly threatens United Spinal and PCIL with civil and criminal penalties for engaging in their core business activities of dissuading their members from dying by suicide.

Once EOLA takes effect, Plaintiffs Payne and others like her will suffer an injury that even if intangible, is immediate and irreparable. EOLA expressly repudiates the physician's fiduciary obligation to do no harm, which has been a condition for becoming a doctor for

centuries. To inflict that grave legal injury just on individuals with life threatening disabilities is *expressly* disparate treatment of them under the law by virtue of their disability, in violation of the ADA, Section 1557 and Section 504 cited above. For Ebony Payne, as set out in her Declaration, EOLA is stigmatizing and humiliating, as well as frightening, because it changes the basis of every patient-physician relationship she will have.

Ms. Payne has Article III standing to litigate this discriminatory injury to the physician-patient relationship. Congress prohibited such discrimination in the ADA, the Rehabilitation Act, and Section 1557 of the ACA. Ms. Payne's immediate injury from this discrimination is loss of a relationship of trust with the medical profession. The current Article III test for standing to enforce a federal statute is an injury that bears a close relationship to the sort of harms traditionally recognized as a basis for lawsuits by American courts. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Impairment of a fiduciary relationship is just such an injury. EOLA imposes this harm only on persons with disabilities because, as discussed below, any person who meets EOLA's eligibility requirements will also necessarily meet the definition of disability under federal anti-discrimination laws, and conversely no people without disabilities can access EOLA.

This Court should issue preliminary injunctive relief because this intangible injury is inflicted only on individuals like Ms. Payne by virtue of their disability, denies them the physician's obligation to do no harm only *because* they suffer from a life-threatening disability, and leaves them scared as to what will happen under a statutory process that has few guardrails.

## FACTUAL BACKGROUND

### I. EOLA'S ELIGIBILITY AND PROCEDURES

On its face, EOLA is a program, service, or activity of the State that is offered solely to people with disabilities. Any person who meets EOLA's definition of having a "terminal

disease" is also a person with a disability because their terminal illnesses are physical impairments that substantially limit major life activities including operation of major bodily functions, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. § 12102(2)(B). These conditions also substantially limit people in other major life activities including caring for oneself, performing manual tasks, eating, sleeping, walking, and breathing. 42 U.S.C. § 12102(A). Thus, EOLA is only available to people with disabilities. Ms. Payne has other disabilities as well, including medical conditions that would make her likely to die within six months without ongoing medical treatment and support. This is also true of many of the members of organizational plaintiffs United Spinal and PCIL.

Under EOLA, a physician who receives a request for assisted suicide shall evaluate whether the patient has a terminal disease or has been diagnosed with one, whether the patient "has mental capacity," and whether the request arises from coercion or undue influence. 410 ILCS 22/35(a)(1)-(3). The physician must then inform the patient of the diagnosis, prognosis, potential risks and benefits, and probable results of taking lethal drugs, the potential benefits and risks of feasible alternatives, the right to rescind the request, and the option not to fill the prescription or take the drugs. *Id.* at (a)(4), (5). If the patient so requests, the doctor must provide a referral for other end of life services. *Id.* at (a)(6).

The law ordinarily requires the patient make two requests to the attending physician at least five days apart. The attending physician, may, however, waive the 5-day waiting period, if the physician determines that the individual will die within 5 days of the first request, and approve the lethal prescription in a single visit. 410 ILCS 22/25(a), (c). The law includes a

requirement for a report from a second, "consulting" physician as to eligibility and mental capacity, but it is not clear that this consultation is required if the attending physician waives the 5-day waiting period. 410 ILCS 22/35(a)(7) & 22/40.

The law does not require any mental health evaluation of the patient unless the attending or consulting physician "has doubts" about capacity. 410 ILCS 22/45. Even then, the statute does not require an evaluation of the patient's mental condition other than a determination of whether the patient is suffering from a disorder causing impaired judgment. *Id.* There is no guideline for mental capacity other than a circular definition in the statute, which defines it as "the ability to make and communicate an informed decision," while an "informed decision" is defined as "a decision by a patient with mental capacity." 410 ILCS 22/10.

There is no process by which the State, a family member, a physician who disagrees as to the patient's prognosis or eligibility, or a public guardian is alerted or has an opportunity to contest the finding of mental capacity.

The direction to the physician to screen for coercion or undue influence is undermined by the open-ended definition in 410 ILCS 22/10 of these terms as meaning "deception, intimidation, or any other means" to cause a patient to request suicide *or* to prevent a patient from obtaining or self-administering lethal medication under EOLA. The statute does not require the physician to have any expertise in making that kind of judicial determination and there is no fact finder or contested hearing procedure to determine whether the individual has acted freely, and not under duress. Additionally, while the statue does include a discussion of alternatives to suicide, the State itself takes no responsibility for providing the alternatives or making them available to those who are underinsured or not insured at all.

## II. EOLA'S REMOVAL OF ETHICAL OBLIGATION TO DO NO HARM

EOLA says: "A health care professional shall not be subject to civil or criminal liability for participating or refusing to participate in the provision of aid-in-dying care to a patient in good faith compliance with this Act." 410 ILCS 22/60(b). This means that physicians with no expertise in making mental capacity determinations or no expertise in determining how long a patient may live—and no knowledge at all as to the state of art alternatives—need only be in "good faith" when they are taking the life of an individual who is not eligible or not with the mental capacity to consent to his or her death.

EOLA removes the ethical obligation of the physician to do no harm. EOLA, in 410 ILCS 22/60(c), bars a health care entity or licensing board from "censure, discipline, suspension, loss of license, loss of privileges, loss of membership, or other penalty" for a physician who takes part in assisted suicide. In 410 ILCS 22/70(e), EOLA states: "A physician is not subject to … professional discipline if, at the request of the qualified patient, the physician is present outside the scope of the physician's employment contract and off the entity's premises, when the qualified patient self-administers medication pursuant to this Act, or at the time of death."

## III. EBONY PAYNE

Ebony Payne is a quadriplegic who meets the 410 ILCS 22/10 definition of a person with a "terminal" disease because, given her baseline condition, she would die well within six months; but for the extensive medical support she now receives. She thus qualifies for lethal drugs under EOLA. She has a life-threatening disability that requires continued active medical intervention to keep her alive. Declaration of Ebony Payne ("Payne Decl.") ¶¶ 3-6. She was most recently in the ER, and then in the Intensive Care Unit at Northwestern Memorial Hospital, just a few weeks prior to the filing of this action. *Id.* ¶ 4. She has had other near-death experiences. *Id.* ¶¶ 7-8. Being in and out of ERs, she does not know what physician she may encounter. It is crucial to

her that any such physician comes to her with an ethical obligation to save her life, and not to help her end it, or even to treat it as an option if she requests it out of frustration or depression. *Id.* ¶¶ 9. Nor when she is in the ER or the ICU does she want painful conversations forced upon her as she reasonably fears now that EOLA makes suicide a standard option for the treatment of her life-threatening condition, that can be revisited at any time, even when she is most vulnerable and in a state of at least temporary depression. *Id.* ¶ 10. Her fear is reasonable because EOLA expressly states: "Medical aid in dying is part of general medical care and complements other end-of-life options," and requires that doctors provide patients with information "regarding all appropriate end of life care options." 410 ILCS 22/5(a)(1); 410 ILCS 22/15(b). Ms. Payne does not want to be subject to assisted suicide—she wants to live—but she is well acquainted with brief periods of despair and pain. At these times she depends on the ethical and legal obligation of the physician to save and not to kill her or urge suicide upon her. For Ms. Payne, not just legally but emotionally, the physician's obligation to do no harm is a back stop on which she counts. For example, during one stay in the ICU in December 2025, she is informed by others that she called out that she should be left to die. Payne Decl. ¶ 8.

Removal of the physician's obligation to do no harm will transform the relationship she has with every physician she may encounter. Nor is it practical that Ms. Payne can anticipate what physician she may encounter to contract out of assisted suicide, so long as EOLA lists it as an option. So long as she may be forced to consider it again as an option during a period of depression or mental impairment, it is impractical for her to provide any substitute for the physician's ethical obligation to do no harm.

## IV. THE PLAINTIFF ORGANIZATIONS

Ms. Payne is a member of United Spinal and has received services at PCIL. Declaration of Stephen Lieberman on behalf of United Spinal ("United Spinal Decl.") ¶ 16; Declaration of

Horacio Esparza on behalf of PCIL ("PCIL Decl.") ¶ 14. Each of these organizations has the core mission of helping its members live full lives while navigating the societal and medical obstacles placed in the path of persons with serious disabilities. The organizations help their members address disability discrimination in medical care, including prejudice against the disabled guised as concern that disabled patients have "a low quality of life" and would be better off foregoing expensive medical care in favor of low-cost pathways to early death. United Spinal Decl. ¶¶ 7-12; PCIL Decl. ¶¶ 9-11.

EOLA directly threatens these organizations with civil and criminal prosecution if they attempt to fulfil their core business functions by discouraging members from using physician assisted suicide. The statute expressly prohibits trying to dissuade a patient from physician assisted suicide—not just by "coercion" or "undue influence," but by "any other means."

> "Coercion or undue influence" means the willful attempt, whether by deception, intimidation, or *any other means* to: (1) cause a patient to request, obtain, or self-administer medication pursuant to this Act with intent to cause the death of the patient; or (2) prevent a qualified patient, in a manner that conflicts with the Health Care Right of Conscience Act[[1]], from obtaining or self-administering medication pursuant to this Act.

410 ILCS 22/10 (emphasis added). EOLA's "Liabilities and Penalties" section aggravates this chilling effect, as it provides that nothing in the act limits civil or criminal liability for "coercing or exerting undue influence on a patient with a terminal disease to request medication pursuant to this Act or to request or use or *not use* medication pursuant to this Act." 410 ILCS 22/95(a)(2) (emphasis added). *See* United Spinal Decl. ¶ 15; PCIL Decl. ¶ 13.

[1] The Health Care Right of Conscience Act, 745 ILCS 70, allows medical professionals to refrain from participating in care for reasons of conscience. The Health Care Right of Conscience Act, however, like EOLA, requires even objecting providers to make a referral to non-objecting providers. 745 ILCS 70/6.1(2).

EOLA will have, and is intended to have, a chilling effect on the ability of the Plaintiff organizations to carry out their core mission, which is to prevent their members and other individuals from "obtaining or self-administering medications pursuant to this Act." 410 ILCS 22/10. This leaves speech and speech related activity by the Plaintiff organizations subject to challenge by groups that favor assisted suicide. This interferes with the core mission of United Spinal and PCIL to engage in the same suicide prevention activities in which the State will continue to engage, presumably, for those who do not have life threatening disabilities.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he (*sic*) is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### I. PLAINTIFF PAYNE HAS ARTICLE III STANDING DUE TO THE CONCRETE INJURY EOLA WILL WORK ON THE DOCTOR-PATIENT RELATIONSHIP

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Mack v. Resurgent Capital Servs., L.P.*, 70 F.4th 395, 403 (7th Cir. 2023); *Scholl v. Ill. State Police*, 776 F. Supp. 3d 701, 708 (N.D. Ill. 2025). A plaintiff does not have to await the consummation of threatened injury to obtain preventive relief. *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473-474 (7th Cir. 2012); *City of Chicago v. U.S. Dep't of Justice*, 822 F.

Supp. 3d 873, 883 (N.D. Ill. 2026). A plaintiff may secure relief from a threatened injury where there is a substantial risk that the harm will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Scholl*, 776 F. Supp. 3d at 710; *Martinez v. City of Chicago*, 534 F. Supp. 3d 936, 943 (N.D. Ill. 2021).

By removing the physician's legal obligation to do no harm, EOLA inflicts at least four types of injury on Ebony Payne, all of which have an analogue to fiduciary type breaches for which she could seek redress at common law. *See TransUnion,* 594 U.S. at 425. EOLA (1) deprives Payne of her *legal* right to the physician's ethical obligation to do no harm, (2) changes the legal and real-life basis of the patient-physician relationship, (3) excludes Payne from the full force of suicide prevention programs and activities of the State, which were previously intended for her, and (4) subjects her to have painful conversations about suicide now that suicide is a standard treatment under EOLA. All the above, and the very uncertainty of what might now happen to her, have inflicted or will inflict emotional suffering and distress upon Payne.

The physician's obligation to do no harm has long been a condition for practicing medicine at all. Participation in the killing of a patient, even indirectly, is a breach of that obligation, and the principal medical associations in the country have affirmed that obligation. As stated by the American Medical Association: "Physician-assisted suicide is fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks."[2] The American College of Physicians in 2017 reaffirmed its position that physician assisted suicide "is problematic given the nature of the patient–physician

[2] AMA Code of Medical Ethics, Opinion 5.7, Physician-Assisted Suicide, *available at* https://code-medical-ethics.ama-assn.org/sites/amacoedb/files/2025-11/AMA%20Code%20of%20Medical%20Ethics5.7_0.pdf.

relationship, affects trust in the relationship and in the profession, and fundamentally alters the medical profession's role in society."[3] The purpose of EOLA is to repudiate these obligations, which for centuries have stood as fundamental conditions for the practice of medicine. At the heart of this disability discrimination case is the stark fact that EOLA leaves these ethical obligations in place for every other Illinois citizen, except those with disabilities that threaten continued life, such as Ms. Payne and the organizational plaintiffs' other constituents.

Plaintiff Payne's intangible injuries satisfy Article III's concreteness requirement because they bear a close relationship to harms that courts have traditionally recognized as providing a basis for suit. *See TransUnion*, 594 U.S. at 424–25; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016). The Seventh Circuit has confirmed that the close-relationship inquiry looks for a close historical or common-law analogue but does not require an exact duplicate. *Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022); *accord Florence v. Order Express, Inc.*, 674 F. Supp. 3d 472, 479 (N.D. Ill. 2023). Here, the harm worked by EOLA bears the necessary close relationship to breach of fiduciary duty, a harm long recognized as a basis for lawsuits in the physician-patient context. *See, e.g.*, *Petrillo v. Syntex Labs., Inc.*, 148 Ill. App. 3d 581, 588 (Ill. App. Ct. 1986) (describing "the fiduciary relationship, recognized by courts in Illinois as well as courts throughout the United States, which exists between a patient and his treating physician"). There has long been redress at common law for the express repudiation of a fiduciary duty, even before any tangible economic or medical harm has occurred. By itself, the injury from such a repudiation itself, without more, is immediate, and the beneficiary who has suffered that loss can sue. *See* Austin W. Scott & Mark L. Ascher, Scott and Ascher on Trusts

---

[3] Lois Snyder Sulmasy and Paul S. Mueller, *Ethics and the Legalization of Physician-Assisted Suicide: An American College of Physicians Position Paper*, Annals of Internal Medicine, Vol. 167, No. 8, Sept. 19, 2017, *available at* https://www.acpjournals.org/doi/10.7326/M17-0938.

§24.24.1 (5th ed. 2025) (repudiation of duties gives rise to action against trustee); *Scanlan v. Eisenberg*, 669 F.3d 838, 846 (7th Cir. 2012) (holding that trust beneficiary's Article III standing arises from breach of trust itself even without showing of reduced distributions to beneficiary).

To be clear, Ms. Payne is not here to sue her doctors for breach of fiduciary duty. She is suing the State to prevent implementation of a statute, EOLA, that deprives her of the fiduciary duties of a physician to do no harm, and that does so only on the basis of her life-threatening disabilities. For reasons discussed below, EOLA's imposition of this harm on the basis of disability violates the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the ACA. Ms. Payne has standing to seek judicial redress because these violations harm her in a way that is analogous to the breaches of fiduciary duty that are ordinary recognized as the basis for lawsuits in American courts.

## II. UNITED SPINAL AND PCIL HAVE STANDING TO SEEK INJUNCTIVE RELIEF ON BOTH ORGANIZATIONAL STANDING AND ASSOCIATIONAL STANDING GROUNDS

Organizational plaintiffs satisfy associational standing when at least one member would have standing to sue in their own right, the lawsuit protects interests germane to the organization's purpose, and the participation of individual members is not necessary. *Wis. Voter All. v. Mills*, 166 F.4th 627, 638 (7th Cir. 2026). Alternatively, organizational plaintiffs can establish standing by showing that defendants' actions directly affect and interfere with their core business activities. *Id.* at 637. United Spinal and PCIL meet both tests.

United Spinal and PCIL have members who share Ms. Payne's injuries described above, including Ms. Payne herself. United Spinal Decl. ¶ 9-10; PCIL Decl. ¶ 11. The injuries are germane to the organization's purposes of ensuring that persons with disabilities can navigate a complex and hostile system of medical care to live full lives. Participation of each individual member is not necessary to adjudicate the harms caused by EOLA.

United Spinal and PCIL meet the organizational standing test because the EOLA assisted suicide scheme directly interferes with the core business activity of assisting persons with disabilities overcome the prejudices of medical providers and medical care systems that devalue them based on misguided notions of their quality of life. Such prejudices and misguided notions have historically deprived United Spinal and PCIL members of the medical supports they need to live, and these harms will now be aggravated by a state-endorsed path out of medical care and to early death. United Spinal Decl. ¶ 11-14; PCIL Decl. ¶¶ 9-10.

United Spinal and PCIL are also directly threatened by EOLA's declaration that dissuading a person from assisted suicide is a form of coercion and undue influence for which civil and criminal penalties are permitted. 410 ILCS 22/10, 22/95(a)(2). These provisions of the statute will have a chilling effect on United Spinal's and PCIL's core business activities of persuading members to meet the challenges of living rather than giving in to societal prejudices that their lives are not worth living. United Spinal Decl. ¶ 15; PCIL Decl. ¶ 13; *see Madigan,* 697 F.3d at 474 (7th Cir. 2012) (chilling of protected speech alone qualifies as cognizable Article III injury).

## III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THE CLAIMS THAT IMPAIRING THE PHYSICIAN PATIENT RELATIONSHIP ON THE BASIS OF DISABILITY VIOLATES FEDERAL ANTIDISCRIMINATION STATUTES.

To establish a Title II ADA claim, a plaintiff must prove: (1) that she is a qualified individual with a disability; (2) that she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was "by reason of" her disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996); *United States v. N. Ill. Special Recreation Ass'n*, 168 F. Supp. 3d 1082, 1091 (N.D. Ill. 2016);

*see also* 42 U.S.C. § 12132. A Section 504 Rehabilitation Act claim requires the same showing, with one additional element: the plaintiff must also establish that the program or activity receives federal financial assistance. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019); *see also* 29 U.S.C. § 794(a).

Plaintiff's ACA § 1557 disability claim is analyzed under the same framework as her § 504 claim, because § 1557 expressly incorporates § 504's prohibited grounds and enforcement mechanisms for disability discrimination. 42 U.S.C. § 18116(a); *Saldana v. Cook Cnty. Health & Hosps. Sys.*, No. 19 CV 6178, 2024 WL 4792113, at *3 (N.D. Ill. Jan. 5, 2024) ("[F]or disability-discrimination claims, 'the ACA incorporates the substantive analytical framework of the [Rehabilitation Act]'") (internal citation omitted).

Under the ADA, "disability" means a physical or mental impairment that substantially limits one or more major life activities—including, among others, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, working, and the operation of major bodily functions—a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1)–(2). The definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

Ms. Payne, a quadriplegic, is a person with a disability under the ADA. In fact, all persons eligible for assisted suicide under EOLA are also persons with disabilities. EOLA eligibility turns on diagnosis of a "terminal disease." 410 ILCS 22/10. All "terminal diseases" under EOLA are conditions that meet the statutory definition of "disability" under the ADA and Rehabilitation Act. Any medical condition that would result in death within six months would

also be considered a physical impairment that necessarily substantially limits major life activities including operation of major bodily functions, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions, as defined in the ADA. 42 U.S.C. § 12102(2)(B). These conditions also substantially limit people in other major life activities including caring for oneself, performing manual tasks, eating, sleeping, walking, and breathing. 42 U.S.C. § 12102(A). EOLA is thus available only to people with disabilities.

EOLA intentionally discriminates against Ms. Payne and against all EOLA-eligible people on the basis of disability because it sets up two systems of medical care—a superior system with full enjoyment of the physician's fiduciary duty to do no harm, and an inferior system where that duty is stripped away and the physician is free to participate in helping the patient die by suicide and where eligibility for each turns on disability status. If the ADA's non-discrimination mandate were not clear enough to prohibit such separate systems based on disability, regulations enacted under the Rehabilitation Act and ADA make it crystal clear. Both regulations prohibit public entities from providing separate public services to the disabled that are not as effective as those provided to the non-disabled. *See* 45 C.F.R. § 84.68(b)(1); 28 C.F.R. § 35.130(b)(1). The ADA and Rehabilitation Act apply broadly to all public services and activities and include an integration mandate prohibiting the separation of disabled people into inferior systems of public services. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 (1999). EOLA removes the backstop, the original safeguard, which is the physician's legal and ethical obligation not to kill or help with suicide at all, and provides no substitute to protect Ms. Payne and others from being wrongfully

steered into assisted suicide, from lack of mental capacity, mental illness, or just lack of knowledge of alternatives.

In addition, EOLA openly violates ADA and Section 504 as well as Section 1557 of the ACA because EOLA necessarily excludes Ms. Payne and others like her from the full force of existing State programs and activities to prevent suicide. There is a whole infrastructure to persuade other citizens not to die by suicide, including interventions up to and including involuntary hospitalization, but from which Ms. Payne is now excluded by her specific disability.[4] *See also* Complaint, ¶¶ 28-37.

Illinois law even places an obligation on physicians to prevent suicide. Physicians may be liable for negligence or wrongful death for failing to anticipate and prevent the suicide of a patient. *See, e.g.*, *O'Donnell v. Bailey & Associates*, 2023 Ill. App. (1st) 221736 (Ill. App. Ct. Dec. 22, 2023). Under the Illinois Mental Health Code, 405 ILCS 5/3-601 and 607, individuals who are at risk of harming themselves may be involuntarily committed on an emergency basis for 24 hours. Physicians may have an obligation to seek such emergency involuntary commitment under current law. *They will still have that obligation,* except for those like Payne who have a life-threatening disability. There is no longer any right to be in State programs to address suicidal ideation, the compulsive thinking about suicide. To the contrary, EOLA encourages suicidal thoughts, for which there were previously programs to prevent.

---

[4] Plaintiffs support voluntary mental health treatment and services that are comprehensive, community-based, recovery-oriented, and culturally and linguistically competent. Nothing in this complaint should be construed as recommending or supporting involuntary treatment of any kind.

## IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THE CONSTITUTIONAL CLAIMS

### A. EOLA Violates the Due Process Clause of the Fourteenth Amendment

EOLA delegates to private individuals, even if doctors, the decision to take the life of another, and does so without requiring any procedural or prior due process, which would be at a minimum some judicial type hearing. In *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974), Supreme Court states: "We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." These are powers "traditionally associated with sovereignty." *Id.* at 353. *See also, e.g.*, *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 816-17 (7th Cir. 2009). For the purpose of participating in the deliberate taking of human life—what under other circumstances would be a crime, 720 ILCS 5/12-34.5—EOLA necessarily turns those individuals into state actors, subject to the same due process constraints that apply to any formal state action. Plaintiffs do not propose to "fix" the lack of due process, or state what would be sufficient before taking a human life. The delegation itself shocks the conscience, and thus violates the Due Process Clause no matter what procedural patches could be imagined.

In its present form, EOLA does not even attempt a procedural patch. There is no prior notice or opportunity to be heard either for the patient herself, or for loved ones and family members who would seek to prevent death by lethal medication. Even the deprivation of a driver's license by the State—or repossession of a welfare check—requires more due process than the deprivation of the life of an EOLA eligible patient. *See Fuentes v. Shevin*, 407 U.S. 67, 96 (1972).

**B. EOLA Violates the Due Process Rights of the Organizational Plaintiffs to Exercise Their Fundamental Rights of Free Speech to Save the Lives of Their Members.**

United Spinal and PCIL, as well as the other organizational plaintiffs, exist for the purpose of helping their members live full lives despite a prejudiced and hostile system of medical care that tries at every turn to divert them away from expensive medical supports and toward the cheaper option of early death based on misconceptions about their quality of life. United Spinal and PCIL attempt to save their members' lives through various forms of speech and persuasion. EOLA defines such speech and persuasion to dissuade patients from assisted suicide as a form of "coerc[ion]" and "undue influence," for which EOLA reserves the full range of civil and criminal penalties. 410 ILCS 22/95(a)(2). EOLA thus deprives United Spinal and PCIL of the fundamental right to free speech. When a statute implicates First Amendment freedoms, courts apply heightened vagueness scrutiny and closely police overbreadth to prevent chilling protected expression. *Madigan*, 697 F.3d at 478–80; *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014). And the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury supporting injunctive relief. *Christian Legal Soc'y v. Walke*r, 453 F.3d 853, 859 (7th Cir. 2006); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). EOLA must be enjoined to prevent irreparable injury to United Spinal, PCIL, and their members.

**C. EOLA Violates the Equal Protection Clause of the Fourteenth Amendment**

The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of its laws. The Equal Protection Clause requires "persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). A "classification whose relationship to an

asserted goal is so attenuated as to render the distinction arbitrary or irrational" is improper. *Id.* at 446.

EOLA discriminates between those who have "terminal diseases" and those who do not. This two-tier scheme is arbitrary because the EOLA definition is so broad as to have no limiting factor. The six-months-to-death prognosis is not a limiting factor at all because any person who voluntarily stops eating and drinking, or life-sustaining medical treatment, can make themselves likely to die well before six months. Nor is there any reasonable fit between EOLA's stated purpose of alleviating suffering and the six-months-to-death prognosis. Many people with no such prognosis suffer great pain and anxiety; and many with such prognoses have no pain. This imprecision has led to the expansion of assisted suicide in Canada and other jurisdictions to include persons with no medical diagnosis at all, merely based on an assertion that they are suffering. The EOLA distinction thus cannot even survive rational basis scrutiny because it is wholly arbitrary.

## V. PLAINTIFFS HAVE ADEQUATELY DEMONSTRATED IRREPARABLE INJURY

There is irreparable injury because there is no adequate remedy at law to restore Plaintiff Payne's right to the physician's obligation to do no harm, and to value adequately and recover damages for the emotional distress she is suffering. "Harm is irreparable if legal remedies are inadequate to cure it," meaning "the remedy must be seriously deficient compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir 2021) (quoting *Foodcomm Int'l, Inc. v. Barry,* 328 F.3d 300, 304 (7th Cir 2003). Ms. Payne has stated such harm. In her Declaration, at paragraph 9, after recalling that once in a delirium she asked doctors to end her life, she states:

> "Being in and out of hospitals so often, I depend on the ethical obligation of every physician that I encounter to do no harm. As a patient, I need to trust these

> physicians because my disability is life-threatening. The new Illinois assisted suicide law means that I can no longer depend on this obligation, especially during serious flare-ups in my condition. I am worried what will happen now that this obligation that I used to take for granted will be removed.

In paragraph 10, she states: "I am also worried about being pressured into considering suicide as an alternative treatment by my doctor, hospital, and insurer. I know that algorithms will identify me as a possible candidate for assisted suicide and I will have to refuse suggestions by health care providers to end my life … I feel especially anxious about having to talk about suicide as part of the informed consent process for treatment." This fear is well-founded because EOLA requires doctors to provide information about "medical aid in dying" as part of a statutory duty to address end-of-life options. 410 ILCS 22/5(a)(1); 410 ILCS 22/15(b).

Ebony Payne may well be in ICU care again during this case, and the absence of preliminary injunctive relief—and any procedural safeguards from the State—leaves her vulnerable and scared. She is a member of United Spinal and PCIL, which represents other individuals with disabilities as severe as Ms. Payne's. Deprivations of constitutional rights often amount to "irreparable harm," in far less traumatic circumstances. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2023); *see also* 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2023) ("When there is an alleged deprivation of a constitutional right to free speech … many courts find that no further showing of irreparable harm is necessary."). There is no harm from the State more irreparable than the loss of one's life. The fear of Ms. Payne and others for what may happen to them after EOLA describes harm for which there is no legal remedy as well.

As stated above, United Spinal and PCIL will suffer irreparable harm from EOLA's prohibitions on their efforts to dissuade their members from killing themselves. This is either a

direct threat of prosecution, or it is so overbroad and vague as to chill the organizations' core business activities.

The other factors favor injunctive relief, including the balance of hardships. The State will suffer no hardship from a preliminary injunction, and the U.S. Supreme Court long ago decided that those who might seek assisted suicide have no constitutional or inherent right to such a remedy. *See Washington v. Glucksberg*, 521 U.S. 702 (1997). As to the public interest, that surely favors a determination, as always, as to whether EOLA is consistent with federal and statutory law.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

Date: July 22, 2026

Respectfully submitted,

By: */s/ Ernest Galvan*

Michael W. Bien*
Ernest Galvan*
Kara J. Janssen*
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Tel.: (415) 433-6830
Fax.: (415) 433-7104
mbien@rbgg.com
egalvan@rbgg.com
kjanssen@rbgg.com

*Attorney for Plaintiffs*

Thomas H. Geoghegan
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeohegan@dsgchicago.com

*Attorney for Plaintiffs*