**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Ebony Payne, *et al.*,

Plaintiffs,

v.

Governor Jay Robert Pritzker, in his official capacity, *et al.*,

Defendants.

Case No. 1:26-cv-6886

District Judge John J. Tharp, Jr.
Magistrate Judge David Weisman

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

KWAME RAOUL
*Attorney General of Illinois*

Elizabeth Morris, ARDC #6297239
Elena S. Meth, ARDC # 6346041
Office of the Illinois Attorney General
Special Litigation Bureau
115 S. LaSalle Street, 35th Floor
Chicago, IL 60603
312-814-3000

*Counsel for Defendants*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

OVERVIEW OF THE ACT ........ 2

A. Patients that qualify for the Act voluntarily opt in and fully control their care. ........ 2

B. The Act was written to prevent undue coercion from medical professionals and interested parties. ........ 4

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. Plaintiffs are unable to demonstrate a likelihood of success on the merits ........ 5

A. Plaintiffs cannot establish standing. ........ 6

1. Ms. Payne does not meet the requirements for individual standing. ........ 7

2. The Organizational Plaintiffs cannot establish standing under any theory. ........ 11

a. Organizational Plaintiffs have not shown they have a cognizable injury required for organizational standing. ........ 11

b. Neither Organizational Plaintiff has identified a member who meets the standards for associational standing ........ 14

B. Plaintiffs fail to state a claim under the Americans with Disabilities Act, the Rehabilitation Act, or the Affordable Care Act. ........ 15

C. Plaintiffs fail to state any due process claim under the Fourteenth Amendment ........ 20

1. Plaintiffs have not established a substantive due process claim. ........ 20

2. Plaintiffs have not established a procedural due process claim. ........ 22

D. Plaintiffs fail to state an equal protection claim. ........ 23

E. Certain defendants are not proper parties in this action. ........ 25

II. The Act does not irreparably harm Plaintiffs. ........ 26

III. Plaintiffs also fail to balance the equities in their favor and demonstrate how an injunction would benefit the public interest. ........ 27

CONCLUSION ........ 29

## TABLE OF AUTHORITIES

### Cases

*A.H. v. Ill. High Sch. Ass'n*,
881 F.3d 587 (7th Cir. 2018) ........ 15, 16

*Ameritech Corp. v. McCann*,
297 F.3d 582 (7th Cir. 2002) ........ 25

*Anderson v. Edwards*,
514 U.S. 143 (1995) ........ 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 15, 19

*Basta v. Novant Health Inc.*,
56 F.4th 307 (4th Cir. 2022) ........ 16

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ........ 5, 27

*Brooklyn Center for Independence of the Disabled v. Hochul*,
Case no. 26-CV-3492, 2026 WL 2198870 (E.D.N.Y., July 30, 2026) ........ 7, 9, 29

*Bryman v. Murphy*,
161 F.4th 174 (3d Cir. 2025) ........ 21

*Campos v. Cook Cnty.*,
932 F. 3d 972 (7th Cir. 2019) ........ 20

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) ........ 5, 26, 28

*Center for Individual Freedom v. Madigan*,
697 F.3d 464, 479 (7th Cir. 2012) ........ 22

*City of Cleburne v. Cleburne Living Ctr*,
473 U.S. 432 (1985) ........ 24

*Clapper v. Amnesty Int'l U.S.A.*,
568 U.S. 398 (2013) ........ 8

*Coachman v. Gateway Foundation, Inc.*,
No. 25 CV 2754, 2026 WL 1533847 (N.D. Ill. June 1, 2026) ........ 16

*Common Cause Indiana v. Lawson*,
937 F.3d 944 (7th Cir. 2019) ........ 13

*Conners v. Wilkie*,
984 F.3d 1255 (7th Cir. 2021) ... 18

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ... 13

*Cruzan v. Director., Mo. Dep't. of Health*,
497 U.S. 261 (1990) ... 21, 24

*Curran v. Meyer*,
Case no. 25-1475-GBW, 2025 WL 3763413 (D. Del., Dec. 30, 2025) ... 7, 9, 21

*Daveri Dev. Grp., LLC v. Vill. of Wheeling*,
934 F. Supp. 2d 987 (N.D. Ill. 2013) ... 17

*Democratic Party of Wisconsin v. Vos*,
966 F.3d 581 (7th Cir. 2020) ... 13

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
926 F.3d 235 (6th Cir. 2019) ... 16

*Doe v. Univ. of S. Ind.*,
43 F.4th 784 (7th Cir. 2022) ... 26, 27

*Edelman v. Jordan*,
415 U.S. 651 (1974) ... 25

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ... 11, 12

*Francois v. Our Lady of the Lake Hosp. Inc.*,
8 F.4th 370 (5th Cir. 2021) ... 16

*GEFT Outdoors, LLC v. City of Westfield*,
922 F.3d 357 (7th Cir. 2019) ... 27

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ... 21

*Goodpaster v. City of Indianapolis*,
736 F.3d 1060 (7th Cir. 2013) ... 21

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ... 12

*Hayden v. Greensburg Cmty. Sch. Corp.*,
743 F.3d 569 (7th Cir. 2014) ... 20

*Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*,
157 F.3d 500 (7th Cir. 1998) .......... 28

*Ill. League of Advocates. for the Developmentally Disabled v. Quinn*,
No. 13 C 1300, 2013 WL 5548929 (N.D. Ill. Oct 8, 2013) .......... 26

*Ill. Republican Party v. Pritzker*,
974 F.3d 760 (7th Cir. 2020) .......... 5

*Jaros v. Ill. Dep't. of Corr.*,
684 F.3d 667 (7th Cir. 2012) .......... 16

*Legal Aid Chicago v. Hunter Properties, Inc.*,
Case no. 23-cv-4809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) .......... 12, 13

*Lujan v. Defs. Of Wildlife*,
504 U.S. 555 (1992) .......... 6, 7, 10, 11, 15

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 28

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 22

*Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985) .......... 21

*Minocqua Brewing Co. LLC v. Hess*,
160 F.4th 849 (7th Cir. 2025) .......... 5

*Munaf v. Geren*,
553 U.S. 674 (2008) .......... 6

*Nat'l Inst. of Family & Life Advocates v. Rauner*,
No. 16 C 50310, 2017 WL 11570803 (N.D. Ill. July 19, 2017) .......... 25

*Nelson v. Colorado*,
581 U.S. 128 (2017) .......... 22

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 5, 27

*Orr v. Shicker*,
953 F.3d 490 (7th Cir. 2020) .......... 26

*Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*,
95 F. 4th 501 (7th Cir. 2024) .......... 8

*Pavlock v. Holcomb*,
35 F.4th 581 (7th Cir. 2022) ........ 25

*Petrillo v. Syntex Labs., Inc.*,
148 Ill. App. 3d 581 (1st Dist. 1986) ........ 8

*Plotkin v. Ryan*,
239 F.3d 882 (7th Cir. 2001) ........ 13

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
2 F.4th 1002 (7th Cir. 2021) ........ 6, 14, 15

*Protect Our Parks, Inc. v. Buttigieg*,
39 F.4th 389 (7th Cir. 2022) ........ 5

*Raines v. Byrd*,
521 U.S. 811 (1997) ........ 6

*Robbin v. City of Berwyn*,
108 F.4th 586 (7th Cir. 2024) ........ 20, 21

*Simic v. City of Chi.*,
851 F.3d 734 (7th Cir. 2017) ........ 6, 7

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ........ 10

*Srail v. Vill. of Lisle*,
588 F.3d 940 (7th Cir. 2009) ........ 23

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ........ 5

*Stevens v. Ill. DOT.*,
210 F.3d 732 (7th Cir. 2000) ........ 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 9

*United Spinal Ass'n v. California*,
Case No. 2:23-cv-03107, 2024 WL 1671167 (C.D. Cal. Mar. 27, 2024) ........ 7, 23

*United Spinal Ass'n v. Colorado*,
No. 25-CV-2014, 2026 WL 2138235 (D. Colo. Mar. 31, 2026) ........ 7

*United States v. Harris*,
197 F.3d 870 (7th Cir. 1999) ........ 24

*United States v. Salerno*,
481 U.S. 739 (1987) ........ 17

*Vaughn v. Walthall*,
968 F.3d 814 (7th Cir. 2020) ........ 15

*Wagoner v. Lemmon*,
778 F.3d 586 (7th Cir. 2015) ........ 16, 19

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ........ 21

*Washington v. Ind. High Sch. Ath. Ass'n.*,
181 F.3d 840 (7th Cir. 1999) ........ 15

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ........ 5, 27

*Wis. Voter All. v. Millis*,
166 F.4th 627 (7th Cir. 2026) ........ 11

**Constitutional Provisions**

U.S. Const. amend. XIV § 1 ........ 22, 23

**Statutes and Rules**

42 U.S.C. §18116 (a) ........ 16
Fed. R. Civ. P. 12(h)(3) ........ 26, 29

410 ILCS 2/45(a), (b) ........ 3
410 ILCS 22/1 *et seq.* ........ 1
410 ILCS 22/5(a)(1) ........ 20
410 ILCS 22/5(a)(4) ........ 28
410 ILCS 22/5(b) ........ 20, 21
410 ILCS 22/10 ........ passim
410 ILCS 22/15 ........ 4
410 ILCS 22/15(b) ........ 4, 17
410 ILCS 22/20 ........ 4, 10, 18
410 ILCS 22/25(a) ........ 2, 3
410 ILCS 22/25(a)(1) ........ 3
410 ILCS 22/25(a)(2) ........ 3
410 ILCS 22/25(a)(3) ........ 3
410 ILCS 22/25(a)(4) ........ 3
410 ILCS 22/25(d) ........ 3
410 ILCS 22/25(e) ........ 2
410 ILCS 22/30 ........ 2
410 ILCS 22/30(a) ........ 3
410 ILCS 22/30(b) ........ 3

410 ILCS 22/30(c) .... 3
410 ILCS 22/30(e) .... 2
410 ILCS 22/35(a)(5) .... 2, 4
410 ILCS 22/40 .... 3, 4, 25
410 ILCS 22/45 .... 4
410 ILCS 22/45(a) .... 3
410 ILCS 22/45(d) .... 3
410 ILCS 22/60 .... 23
410 ILCS 22/75 .... 5
410 ILCS 22/80(c) .... 4
410 ILCS 22/85 .... 4
410 ILCS 22/95 .... 5, 18, 20
410 ILCS 22/95(a) .... 1
745 ILCS 70/1 *et seq.* .... 14
745 ILCS 70/2. .... 14
745 ILCS 70/4. .... 14
745 ILCS 70/5. .... 14

Cal. Health and Safety Code § 443 .... 28
Colo. Rev. Stat. §§ 25-48-101 *et seq.* .... 28
D.C. Code §§ 7-661.01 *et seq.* .... 28
16 Del. C. ch. 2501C *et seq.* .... 28
Haw. Rev. Stat. §§ 327L-1 *et seq.* .... 28
Me. Rev. Stat. tit. 22 § 2140 .... 28
Mont. Code Ann.§ 50-9-101 .... 28
N.J. Stat. Ann. § 26:16 .... 28
N.M. Stat. Ann. §§ 24-7c-1 *et seq.* .... 28
N.Y. Public Health Law § 2899-d *et seq.* .... 28
Or. Rev. Stat. §§ 127.805–.995 .... 28
18 V.S.A. § 5281 *et seq.* .... 28
Rev. Code Wash. § 70.245.030 .... 28

## INTRODUCTION

Illinois, like several other states, has recently enacted a medical aid in dying statute, the Illinois End-of-Life Options for Terminally Ill Patients Act (the "Act"), 410 ILCS 22/1 *et seq*. The Act enables individuals facing terminal illness to undertake a multi-step, carefully regulated process to end their lives through self-administered, physician-prescribed medication.

Plaintiffs seek to invalidate Illinois's new law, but they have no legal claims to support that relief. Plaintiffs, individuals with long-term disabilities and aligned advocacy organizations, claim Illinois's new law will inevitably subject individuals like themselves to coercion from health care professionals to end their lives involuntarily. Yet Plaintiffs' theory is untethered to the Act itself. The Act specifically prohibits the coercion that Plaintiffs fear from anyone, whether or not they are a health care professional. 410 ILCS 22/95(a)(2)&(3). It merely preserves patients' right to control when and how they die.

In addition to the infirmity of Plaintiffs' theory, they fail to plead or argue concrete facts. Instead, they rely on highly attenuated speculation, which cannot provide a basis for standing. And even if Plaintiffs had standing (they do not), the Act does not discriminate against individuals with disabilities—facially or as-applied—and thus does not conflict with the statutes Plaintiffs have identified. Nor is the Act unconstitutional under any claim under the Fourteenth Amendment.

Fundamentally, Plaintiffs cannot prevail because the Act is entirely voluntary; no one is forcing anyone to do anything. For this reason, none of the claims here is likely to succeed because anyone who qualifies as a patient under the Act can choose their own path. For the same reason, Plaintiffs will not face irreparable harm. Because they cannot fulfill either element, the equities do not tip in their favor. However, the public at large faces significant harm if the Act is

enjoined, which would prevent interested and qualified Illinois residents from controlling their end of life choices. Such a result runs directly counter to the intent of the General Assembly and cannot stand. Accordingly, Movant-Plaintiffs' motion for preliminary injunction must be denied.

## OVERVIEW OF THE ACT

### *A. Patients that qualify for the Act voluntarily opt in and fully control their care.*

The Act provides that a "qualified patient"—someone who is "an adult Illinois resident with the mental capacity to make medical decisions" and who has a terminal disease and six months left to live—may request "a prescription for medication to bring about a peaceful death." 410 ILCS 22/10; 22/25(a). A "terminal disease" is defined as "an incurable and irreversible disease that will, within reasonable medical judgment, result in death in 6 months," based upon an in-person examination by the patient's doctor and the concurrence of a second physician. 410 ILCS 22/10. In keeping with the goals of the Act, the General Assembly carefully crafted the law to ensure that "[n]o person will be considered a 'qualified patient' under this Act solely because of advanced age, disability, or a mental health condition, including depression." 410 ILCS 22/10.

Nothing in the Act permits *anyone*—besides the qualified patient—from seeking medical aid in dying. 410 ILCS 22/25(e). They must also presently possess mental capacity to make their own medical decisions. 410 ILCS 22/10; 22/30. The patient cannot confer decision-making to anyone else, nor can they request medical aid in dying via an advance health care directive. *Id*. The patient must also have the capacity to self-administer any medication and cannot utilize a parenteral injection or infusion. 410 ILCS 22/10. Indeed, the patient controls the entire process, including whether to rescind the decision to seek medical aid in dying, at any time. *See*, *e.g.*, 410 ILCS 22/30(e), 22/35(a)(5).

Should a qualified patient elect to seek medical aid in dying, the Act mandates a lengthy process, both to ensure that the patient qualifies and to give the patient sufficient time to confirm or withdraw their decision. First, the patient must make an oral request to their attending physician, who then documents it. 410 ILCS 22/25(a)(1)&(2). The patient shall then provide a written request. 410 ILCS 22/25(a)(3). The written request must be witnessed by at least 2 people who are not the attending physician. 410 ILCS 22/30(a)&(c). One of the witnesses cannot be a relative, an individual who would inherit from the patient's estate, or affiliated with the health care entity where the patient is receiving treatment. 410 ILCS 22/30(b). The patient must then make a second oral request to the attending physician, at least five days after the first.[1] 410 ILCS 22/25(a)(4). At that time, the attending physician shall provide the patient an opportunity to rescind the request. 410 ILCS 22/25(d).

After the patient has made these written and oral requests, a second consulting physician then evaluates the patient, reviews their medical records, and, if appropriate, confirms in writing that the patient has requested a prescription for medical aid in dying; has a documented terminal disease; has mental capacity to make such decision; and is acting voluntarily without coercion or undue influence. 410 ILCS 22/40. Critically, if neither physician can determine whether the patient has the requisite mental capacity to decide to end their life, the patient is then referred to a licensed mental health professional. 410 ILCS 22/45(a). The mental health professional shall determine if the patient lacks mental capacity to seek medical aid in dying or has a psychiatric or

[1] Plaintiffs note that there is an exception to the "five-day rule," which condenses the procedure for successive requests for patients who are likely to die within 5 days. 410 ILCS 22/25(c). (Dkt. 26-1 at pp. 3-4.) However, Plaintiffs do not make any arguments or allegations that the 5-day rule would apply to any of them and is therefore not germane. Even if it were, the remainder of the process remains unchanged, including requiring input from at least a consulting physician and in some cases a mental health professional.

psychological disorder causing impaired judgment. 410 ILCS 2/45(a)&(b). If so, then the patient is not qualified to receive a prescription pursuant to the Act. 410 ILCS 22/45(d).

If the patient is deemed qualified at the conclusion of this lengthy process, then the attending physician can prescribe medication for the patient to self-administer to bring about the end of their life. However, the patient must be advised by their attending physician that there is no obligation to fill the prescription or to take the medication. 410 ILCS 22/35(a)(5).

*B. The Act was written to prevent undue coercion from medical professionals and interested parties.*

Importantly, in addition to making the process entirely voluntary for qualified patients, medical professionals carry significant obligations. They must ensure that the patient possesses the mental capacity to make their own medical decisions, has been diagnosed with a terminal illness, and has provided informed consent. 410 ILCS 22/15. To achieve informed consent, "[a]n attending physician must provide sufficient information to a patient regarding *all* appropriate end-of-life care options, including comfort care, hospice care, palliative care, and pain control, as well as the foreseeable risks and benefits of each, so that the patient can make a voluntary and affirmative decision regarding the patient's end-of-life care." 410 ILCS 22/15(b) (emphasis added). Attending physicians are also not permitted to arrive at these decisions alone; the Act ensures they will consult with at least one other medical professional in providing treatment to the qualified patient. *See* 410 ILCS 22/40; 22/45. The Act also does not diminish the standard of care that a health care professional provides. 410 ILCS 22/20.

Moreover, the General Assembly carefully worked to remove sources of coercion by (1) requiring the patient to have the capacity to make their own decision; (2) requiring non-interested parties to participate in the medical aid in dying process to remove bias or influence; (3) requiring patients to self-administer any medication prescribed; (4) not permitting insurance

companies to reduce or remove coverage because a patient has a terminal illness, 410 ILCS 22/80(c), 410 ILCS 22/85; (5) not diminishing the standard of care for a patient, 410 ILCS 22/20; (6) ensuring reporting requirements for physicians that provided medical aid in dying, 410 ILCS 22/75; and (7) permitting civil and criminal liability for coercion, undue influence, intentional medical misconduct, or forging or altering a patient's request, 410 ILCS 22/95.

## LEGAL STANDARD

"A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (citation modified). Therefore, "[a] plaintiff seeking a preliminary injunction must establish a likelihood of success on the merits, a likelihood of suffering irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest." *Minocqua Brewing Co. LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). "The party seeking the injunction bears the burden of showing that this type of relief is warranted." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)). Put another way, a preliminary injunction is "an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 9 (2008)).

## ARGUMENT

### I. Plaintiffs are unable to demonstrate a likelihood of success on the merits.

To obtain an injunction, "a 'strong' showing of likelihood of success" is required. *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022) (quoting *Ill. Republican Party v. Pritzker*, 974 F.3d 760, 762-63 (7th Cir. 2020)). Of all the factors a plaintiff seeking a

preliminary injunction must establish, "the likelihood of success on the merits ordinarily carries the most weight." *Minocqua Brewing*, 160 F.4th at 855.

Plaintiffs cannot meet the critical threshold to maintain an action, much less file this motion, because they have not adequately established standing.[2] Lack of standing creates "[a] difficult question as to jurisdiction" and makes likelihood of success "more *unlikely* due to potential impediments to even reaching the merits." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). But even if Plaintiffs could establish standing, they have failed to state a claim for any of their causes of action. Therefore, success on the merits is not possible.

### A. Plaintiffs cannot establish standing.

As a threshold matter, Plaintiffs have not established that they have standing in this lawsuit. Like the Supreme Court, the Seventh Circuit has "always insisted on strict compliance with this jurisdictional standing requirement." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1010 (7th Cir. 2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Plaintiff always has the burden to establish standing. *See*, *e.g.*, *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017).

To plead Article III standing, Plaintiffs must allege facts demonstrating three requirements: (1) they "have suffered an injury in fact—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable to the challenged action of Defendant(s) and not the result of independent action by a third party not before the Court;" and (3) it is likely, not

[2] This Opposition only addresses the likelihood of success on the merits as it applies to the three Movant-Plaintiffs. Defendants intend to file a separate motion to dismiss the case in its entirety and do not waive any arguments that are available to parties that are not movants here.

merely speculative, that the injury will be redressed by a favorable decision from the Court. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified).

When Plaintiffs establish standing, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof[.]" *Id*. at 561. In the context of a motion for preliminary injunction, "a plaintiff must face a real and immediate threat of future injury as opposed to a threat that is merely conjectural or hypothetical." *Simic*, 851 F.3d at 738 (citations and internal quotation marks omitted). Failure to adequately plead any element of Article III standing is grounds for dismissal. *See Lujan*, 504 U.S. at 561.

Crucially, there are four recent cases with similarly situated (and in some cases, the same) plaintiffs, where courts have considered the same concerns raised by Plaintiffs here. All held that plaintiffs did not have standing because they could not assert an injury in fact on the same kinds of issues. See *Curran v. Meyer*, Case no. 25-1475-GBW, 2025 WL 3763413, at *6 (D. Del., Dec. 30, 2025) (dismissing in part because plaintiff could not satisfy Act's eligibility requirements); *United Spinal Ass'n v. California*, Case No. 2:23-cv-03107, 2024 WL 1671167, at *4–5 (C.D. Cal. Mar. 27, 2024) (finding individual plaintiffs failed to demonstrate imminent or impending injuries); Recommendation of Magistrate Judge, *United Spinal Ass'n v. Colorado*, No. 25-CV-2014, 2026 WL 2138235, *6-*7 (D. Colo. Mar. 31, 2026) (finding individual plaintiffs failed to demonstrate imminent or impending injuries); *Brooklyn Center for Independence of the Disabled v. Hochul*, Case no. 26-CV-3492, 2026 WL 2198870, at *5-6 (E.D.N.Y., July 30, 2026) (same). The case here is no different, and this court should also deny a preliminary injunction.

**1. Ms. Payne does not meet the requirements for individual standing.**

A plaintiff need not be injured at the time they file suit. However, a threatened injury "must be *certainly impending* to constitute injury in fact . . . [a]llegations of *possible* future

injury" are insufficient to establish standing. *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 409 (2013) (citation modified). A threatened harm that "relies on a highly attenuated chain of possibilities" is not certainly impending and is not an injury in fact for Article III standing. *Id*. at 410; *see also Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 506 (7th Cir. 2024).

Ms. Payne is the only individual plaintiff who has moved for injunctive relief. Due to a spinal injury, she is a quadriplegic who "requires continued active medical intervention to keep her alive." (Dkt. 26-1 at 12; Dkt. 25-1 at ¶ 3.) She has asthma and requires special breathing treatment three times a day. (Dkt. 25-1 at ¶ 3.) Ms. Payne requires 24-hour home care for assistance with "eating, bathing, going to the store, and doctor's appointments." (*Id*. at ¶ 5.) She asserts that the Act has caused her to suffer "intangible injuries" because it severs the traditional fiduciary relationship between the physician and patient. (Dkt. 26-1 at 10.)

Ms. Payne does not cite any cases supporting the notion that a law's hypothetical breach of the fiduciary relationship between a doctor and a patient somehow confers Article III standing. The one Illinois cases she relies on, *Petrillo v. Syntex Labs., Inc.*, 148 Ill. App. 3d 581 (1st Dist. 1986), merely stands for the proposition that physician-patient communications are confidential.

Eligibility under the Act is determined in part by whether a patient has a "terminal disease," which is "an incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months." 410 ILCS 22/10. Based on Plaintiffs' filings, Ms. Payne does not fit this definition; she states that she is "likely to die within six months *without* ongoing medical treatment and support." (Dkt. 26-1 at 17 (emphasis added).) The Act's definition of a terminal disease, however, does not extend to a disease that would result in death within 6 months if the patient withdraws treatment. In fact, other courts have rejected such an

argument, stating that their state's own versions of these statutes do not "broadly confer eligibility to anyone with a condition that would, as a medical probability, die within six months *without medical intervention*." *Curran*, 2025 WL 3763413, at *6 (emphasis in original); *see also Brooklyn Center for Independence of the Disabled*, 2026 WL 2198870 at *6.

Moreover, Plaintiffs' interpretation of the Act is not common sense and would lead to absurd results, "such as rendering eligible for [medical aid in dying] those with medical ailments that can live long and vigorous lives with regular medical assistance, like type I diabetics that require insulin injections." *Curran*, 2025 WL 3763413, at *6. Although Ms. Payne requires support in her daily life, she has not alleged that she faces a prognosis, within reasonable medical judgment, of death within six months with continued treatment and support. Therefore, she is not an eligible qualified patient and has no standing to challenge the Act.

Even if Ms. Payne could show that the Act applies to her, her alleged injuries are too speculative to constitute injuries-in-fact. Ms. Payne asserts that the Act harms her because she will be coerced into unwelcome discussions of medical aid in dying or, worse, physically harmed by her physicians. Nothing in the language of the Act gives rise to this speculative harm. While Ms. Payne relies on *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) for the notion that a fiduciary duty fills the requisite square for an injury, (*see* Dkt. 26-1 at 9), she fails to sufficiently allege facts that would support that she has suffered or is likely to immediately suffer such a harm. She claims her most immediate injury is the "loss of [] relationship of trust with the medical profession," a harm Plaintiffs allege will result based on their erroneous belief that the Act removes medical professionals' ethical obligation to do no harm. (Dkt. 26-1 at 9, 16.)

First, the Act says no such thing. Section 20 of the Act explicitly provides that "[n]othing contained in this Act shall be interpreted to lower the applicable standard of care for the health

care professionals participating under this Act." 410 ILCS 22/20.[3] The Act contains numerous procedural safeguards that prevent either a patient or a physician from making the type of discriminatory, snap-judgment decisions that Ms. Payne's lawsuit is supposedly trying to address. And second, as alleged, Ms. Payne's loss of trust in the medical profession is nothing more than a moral objection to the Act. The harm is abstract, generalized, and not particularized to Ms. Payne or any of the other Plaintiffs. Without a concrete, particularized injury that is fairly traceable to Defendants, Ms. Payne has no Article III standing. *Lujan*, 504 U.S. at 560.

Ms. Payne's concerns about the Act stem, in part, from a recent personal experience. She has spent time in and out of emergency rooms throughout her life. (Dkt. 26-1 at 12; Dkt. 25-1 at ¶ 4.) After a recent hospitalization, Ms. Payne experienced such pain from an infection that she "called out that she should be left to die" during an ICU stay in December 2025. (Dkt. 26-1 at 13; Dkt. 25-1 at ¶ 8.) Ms. Payne did not recall making this statement and was "shocked to learn that [she] had asked for this while under the delirium of the infection." (Dkt. 25-1 at ¶ 8.) Importantly, even in the scenario Ms. Payne describes, she would not be considered a qualified patient under the Act for multiple reasons. First, Ms. Payne admits that her mental state was impacted by the circumstances she describes and, in fact, does not recall making the statements she made. Individuals that do not have mental capacity to make their own medical decisions cannot be qualified patients pursuant to the Act. *See* 410 ILCS 22/10. Second, even if Ms. Payne's statement would constitute a request to initiate the process under the Act, that request

---

[3] Further, an injury in fact also requires a causal connection—the injury must be "fairly…trace[able] to the challenged action of the defendant, and not…th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28, 42 (1976)). To the extent that any medical professional may act unethically in the future and would cite the Act as his or her basis for doing so, that is not a harm fairly traceable to the State and does not confer Article III standing.

alone would not be sufficient for her to receive the medication that would end her life. *See supra* at pp. 2-4. The Act does not permit, let alone require, medical aid in dying in the circumstances described by Ms. Payne.

In short, Ms. Payne's concerns are hypothetical, and hypothetical injuries do not constitute injury in fact for Article III standing. *Lujan*, 504 U.S. at 561.

**2. The Organizational Plaintiffs cannot establish standing under any theory.**

**a. Organizational Plaintiffs have not shown they have a cognizable injury required for organizational standing.**

"As with every plaintiff who sues in federal court, an issue-advocacy group must show it has Article III standing. That can arise from concrete injuries to its members or because the defendant 'directly affected and interfered' with the group's 'core business activities.'" *Wis. Voter All. v. Millis*, 166 F.4th 627, 629 (7th Cir. 2026) (cert. pet. filed May 11, 2026) (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)), petition for cert. filed (May 11, 2026) (No. 25-1288). Organizational Plaintiffs here have the same standing requirements as Ms. Payne and "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Wis. Voter All.*, 166 F.4th at 636 (citation omitted).

Here, Organizational Plaintiffs do not provide any facts suggesting that Defendants or the Act "threaten the integrity of this group's advocacy business, so [Plaintiffs] cannot establish organizational standing." *Id.* at 638 (citation modified). Specifically, they have failed to identify a direct harm that they have suffered as a result of the Act that is justiciable. In their motion, they note that the Act "interferes with the core business activity of assisting persons with disabilities overcome the prejudices of medical providers and medical care systems that devalue them based on misguided notions of their quality of life." (Dkt. 26-1 at 12.) Even if the facts alleged in their

declarations are accepted as accurate, though, such economic and resource-based injuries alone do not automatically create an injury.

As the Supreme Court set forth in *FDA v. Alliance for Hippocratic Medicine*, an organization does not achieve standing because a defendant has "impaired" its "ability to provide services and achieve their organizational mission." *Id.* at 394; *accord Legal Aid Chicago v. Hunter Properties, Inc.*, Case no. 23-cv-4809, 2024 WL 4346615, at *14 (N.D. Ill. Sept. 30, 2024) (citing *All. for Hippocratic Med.*, 602 U.S. at 394). "A plaintiff must show far more than simply a setback to the organization's abstract social interests." *Legal Aid Chicago*, 2024 U.S. WL 4346615, at *10 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Standing cannot exist simply because a defendant frustrates a group's 'general legal, moral, ideological, and policy concerns.'" *Legal Aid Chicago*, 2024 WL 4346615, at *10 (citing *All. for Hippocratic Med.*, 602 U.S. at 386).

The Complaint alleges that the Organizational Plaintiffs "must now increase their financial efforts and service programs not just to educate their Illinois members about the new risks . . . but also to discourage suicide ideations which afflicts so many of these members and other individuals with life-threatening disabilities." (Dkt. 1 at ¶ 69.) Devoting more resources alone is not enough to establish standing, though. Otherwise "that would mean any nonprofit organization would have standing to challenge a private party that makes achievement of the nonprofit's end goals more difficult or unlikely. Standing cannot rely on such abstractions." *Legal Aid Chicago*, 2024 WL 4346615, at *12 (citation omitted). Indeed, Plaintiffs have not shown that there is "a perceptible impairment of [their] *ability* to provide its services. [Their] allegations are closer to ordinary program costs than to a concrete injury." *Id.* (citation modified).

If an organization bases its injury on resources that are diverted from its other activities to fight defendant's actions, "the question is whether that is an 'ordinary program cost' of the organization . . . or whether it is an 'extra effort[]' that 'add[s] to their workload.'" *Id.* at *10 (comparing *Democratic Party of Wisconsin v. Vos*, 966 F.3d 581, 587 (7th Cir. 2020) with *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007)). Here, Plaintiffs describe the normal baseline activities of their organizations, including keeping their members educated about new laws in Illinois. That is simply an ordinary expenditure. And "[o]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing." *Legal Aid Chicago*, 2024 WL 4346615, at *10 (citing *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001)). In fact, "[i]t's not even 'an impairment of its ability to do work *within* its core mission. . . . It is what creates and deepens the need for the job." *Legal Aid Chicago*, 2024 WL 4346615, at *10 (citing *Common Cause Indiana v. Lawson*, 937 F.3d 944, 954 (7th Cir. 2019)).

Finally, any concerns Plaintiffs allege about their organizations' vulnerability to civil and criminal penalties are not supported by the language of the Act, and Plaintiffs have not pled facts that suggest otherwise. (*See* Dkt. 26-1 at 1, 7, 12, 17.) In their brief, they cite penalties in the Act for discouraging patients from seeking medical aid in dying and claim these penalties could have a chilling effect on their speech. (Dkt. 26-1 at 12, 17.) However, such prohibitions on "coercion or undue influence" that would "prevent a qualified patient . . . from obtaining or self-administering medication pursuant to this Act," only apply to health care professionals.[4] *See* 410

---

[4] The definition of "coercion or undue influence" in the End-of-Life Act is "the willful attempt, whether by deception, intimidation, or any other means to (1) cause a patient to request, obtain, or self-administer medication pursuant to this Act with intent to cause the death of the patient; or (2) prevent a qualified patient, in a manner that conflicts with the Health Care Right of Conscience Act, from obtaining or self-administering medication pursuant to this Act." 410 ILCS

ILCS 22/10. Organizational Plaintiffs have not indicated that they are health care professionals; rather, from the facts provided, it is readily apparent that they serve as advocates and provide resources to their members. Accordingly, they are not under any threat of prosecution or civil suit for their advocacy, and an injunction is not warranted.

**b. Neither Organizational Plaintiff has identified a member who meets the standards for associational standing.**

Organizational Plaintiffs also fail to establish associational standing. Associational standing "is derivative of—and not independent from—individual standing." *Prairie Rivers Network*, 2 F.4th at 1008 (citation omitted). "To sue on behalf of its members, an association must show that: (1) at least one of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Id.* (citation omitted). This requirement "guarantees the satisfaction of Article III by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Id.* (citation modified).

Ms. Payne is affiliated with both movants United Spinal Association and Progress Center for Independent Living. (Dkt. 25-1 at ¶ 12.) However, since she has failed to establish individual

---

22/10. Subsection (1) of the definition applies to everyone and prohibits anyone from coercing a patient into requesting, obtaining, or self-administering medication that would end the life of a patient. Subsection (2), however, only applies to health care personnel and entities, because it references the Health Care Right of Conscience Act, (the "Conscience Act") 745 ILCS 70/1 *et seq.* The Conscience Act protects health care personnel and entities with conscience objections to health care services from discrimination and liability. *See* 745 ILCS 70/2, 70/4, and 70/5. Therefore, the End-of-Life Act prohibition on preventing patients from obtaining or self-administering medication, unless the objector complies with the Conscience Act, would necessarily only apply to health care professionals and health care entities. By contrast, Organizational Plaintiffs are not health care professionals or health care entities, so this prohibition does not apply to them and would not impact their advocacy efforts.

standing, the Organizational Plaintiffs cannot rely on her to establish associational standing. Neither organization proffers any additional facts about any of their members but offers generalized information about them. Essentially, Plaintiffs' "associational standing allegations are akin to impermissible speculation rather than permissible presumption, thus 'stop[ping] short of the line between possibility and plausibility.'" *Prairie Rivers Network*, 2 F.4th at 1010 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). As *Lujan* establishes, "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.

### B. Plaintiffs fail to state a claim under the Americans with Disabilities Act, the Rehabilitation Act, or the Affordable Care Act.

Separate from Plaintiffs' standing infirmities, their claims cannot prevail on the merits, either. To begin, their statutory claims unsuccessfully rely on disability discrimination. At its core, disability discrimination exists when "(1) the defendant intentionally acted on the basis of the disability; (2) the defendant refused to provide a reasonable modification; or (3) the defendant's rule disproportionately impacts disabled people." *A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018) (citing *Washington v. Ind. High Sch. Ath. Ass'n.*, 181 F.3d 840, 847 (7th Cir. 1999)). Plaintiffs have not alleged or provided facts that suggest that Defendants have done any of these things. Therefore, the statutory claims are not likely to succeed to the merits.

Rehabilitation Act and Americans with Disability Act ("ADA") claims can be considered simultaneously as "there is no material difference between these two laws." *Vaughn v. Walthall*, 968 F.3d 814, 819 (7th Cir. 2020) (citation omitted). "The relevant provisions and implementing regulations of the Rehabilitation Act and the ADA are materially identical . . . [a]s a result, courts

construe and apply them in a consistent manner." *A.H.*, 881 F.3d at 592 (citation modified). Moreover, "[t]he relief available to [Plaintiffs] under these provisions is coextensive." *Jaros v. Ill. Dep't. of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).

"To establish a violation of Title II of the ADA, the plaintiff[s] must prove that [they are] qualified individual[s] with a disability, that [they were] denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of [their] disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotation marks and citations omitted). "The Rehabilitation Act is functionally identical: it requires the plaintiff[s] to allege that (1) [they are] a qualified person (2) with a disability and (3) the [state agency] denied [them] access to a program or activity because of [their] disability."[5] *Id.* (citation modified).

In addition, "stating a claim under Section 1557 of the Affordable Care Act has the same standard as a claim under Section 504 of the Rehabilitation Act." *Coachman v. Gateway Foundation, Inc.*, No. 25 CV 2754, 2026 WL 1533847, at *5 (N.D. Ill. June 1, 2026) (citing *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020)).[6] Section 1557 specifically prohibits discrimination on the same grounds articulated in Section 504 of the Rehabilitation Act. *See* 42 U.S.C. §18116 (a).

---

[5] The Rehabilitation Act also mandates that the relevant state agency also receive federal funds. *Wagoner*, 778 F.3d at 592. Defendants do not contest that the Illinois Department of Public Health receives federal funding.

[6] Other circuits concur with the Ninth Circuit that ACA claims pursuant to Section 1557 share an analysis with Section 504 of the Rehabilitation Act. *See, e.g.*, *Basta v. Novant Health Inc.*, 56 F.4th 307, 314 (4th Cir. 2022); *Francois v. Our Lady of the Lake Hosp. Inc.*, 8 F.4th 370, 378 (5th Cir. 2021); *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019).

Plaintiffs here have not pled that Defendants have denied them anything on the basis of their disability.[7] Indeed, the fundamental flaw with Plaintiffs' suit is that the Act is a voluntary participation statute. It *adds* an end-of-life option for all patients in Illinois; if patients receive information about the Act, it is only the context of learning about *all* of their appropriate end-of-life care options. *See* 410 ILCS 22/15(b). Plaintiffs have personal objections to that statute and do not want to participate in the care it offers. Yet they already have the right not to participate in the statute by not opting in to the Act's lengthy multistep process. Nothing requires any Illinois resident—with a disability or otherwise—to avail themselves of the Act's provisions.

For these reasons, Plaintiffs' facial challenge "to prevent implementation of the Illinois law for physician-assisted suicide," (Dkt. 26-1 at 1), must fail. "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenge must establish that no set of circumstances exists under which the Act would be valid." *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 996 (N.D. Ill. 2013) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[8] "Except in the First Amendment context, facial challenges to statutes are disfavored." *Daveri*, 934 F. Supp. 2d at 996 (citation omitted).

Plaintiffs cannot meet this weighty burden. The thrust of their argument is that the statute will force the Act upon them against their will. The Act does not operate in this fashion, though, and in practice does the opposite. The threshold requirement is *any* patient, regardless of disability, with a terminal illness and six months or less to live, who has the mental capacity to make their own medical decisions. It does not preclude Plaintiffs from participation on the basis

---

[7] This remains true even if we assume that the Organizational Plaintiffs are pleading on behalf of their members, for the reasons stated *supra* at Section I.A.2.b.

[8] The Supreme Court has established that the *Salerno* principles also apply to facial challenges of state laws under federal statutes. *See Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995).

of their disability or limit any end-of-life planning. As the Rehabilitation Act has a strict causation requirement that discrimination *solely* arises on the basis of disability, *see Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021), it does not have a chance of success in this lawsuit—which necessarily means the ACA claim must fail, too.

The ADA offers some latitude, with the plaintiff's disability only needing to be a reason for the challenge. *Id*. Even with that flexibility, though, Plaintiffs' arguments still fall short. The Act was specifically designed so a qualified patient retains control, including opting out at any time, while eliminating the possibility of coercion or undue influence. It is undeniably clear that the fact of having a disability in and of itself is not a sufficient reason for a patient to become qualified to avail themselves of the Act. *See* 410 ILCS 22/10.

Plaintiffs describe their concerns that individuals with disabilities will be pushed towards death against their will. But as described throughout the brief, the Act was carefully written to ensure that a qualified patient—and only a qualified patient—can control whether to even consider the provisions of the Act as a potential end-of-life option. Nor can the Act be used to bring about death against the will of any person and was specifically written to prevent such an outcome. If the patient does not want to pursue options permitted under the Act, then they will not. And despite Plaintiffs' concerns to the contrary, the Act does not nullify standards of care for medical professionals and ensures they are not diminished. 410 ILCS 22/20. In fact, the Act permits pursuit of civil and criminal penalties for those medical professionals that do not abide by standards of care. 410 ILCS 22/10, 22/95.

While Plaintiffs allege in their Complaint that "the [Illinois] Suicide Prevention Alliance will now have to exempt those eligible for EOLA due to disability," (Dkt. 1 at ¶ 39), nothing in the Act prohibits patients who are eligible for medical aid in dying from seeking support from

this resource. Neither does the Act preclude individuals experiencing suicidal ideation from accessing Illinois's robust suicide prevention programs. In fact, the Act's guardrails protect any individual who is more predisposed towards suicidal ideation. If a patient either lacks mental capacity or has an underlying illness or disorder impairing their judgment (that may make them more vulnerable to suicide apart from having a terminal illness), then they cannot avail themselves of the Act. *See* 410 ILCS 22/10. ("mental capacity" is "the ability to make and communicate an informed decision" in the opinion of a medical professional). The Act also does not preclude individuals experiencing suicidal ideation from accessing Illinois's suicide prevention programs.

Plaintiffs have not cited a statute or provided any facts that even remotely suggest that discrimination or a denial of service would occur for anyone. *See Wagoner*, 778 F.3d at 593. Mere suppositions that something *could* occur are not sufficient to show that the Act *will* create issues, especially here when the Act has so many safeguards in place. Plaintiffs have failed to nudge their claims of discrimination "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (citation omitted).

Any pursuit of an as-applied challenge must also fail for the same reasons that standing fails. Plaintiffs have all averred facts that would disqualify them from utilizing it. As such, discrimination cannot occur when Plaintiffs are not even qualified to avail themselves of the Act.

Further, Plaintiffs' argument also fails because the coercive effects that they describe are specifically prohibited by the Act. Plaintiffs claim that they are more likely to be coerced into the Act's protocol because of their disabilities. But the Act is specifically designed to protect vulnerable patients from coercion and undue influence into medical aid in dying by *anyone*, including medical professionals, and is clear that a patient who solely has a disability will not be

considered a qualified patient under the Act. *See* 410 ILCS 22/10. Health care personnel and entities that violate this prohibition can face civil or criminal liability and penalties. 410 ILCS 22/95. Far from lowering the bar for "do no harm," (*see* Dkt. 26-1 at 18), the Act ensures that the highest quality medical care stays intact for all patients, whether or not they pursue medical aid in dying. 410 ILCS 22/5(b).

### C. Plaintiffs fail to state any due process claim under the Fourteenth Amendment

#### 1. Plaintiffs have not established a substantive due process claim.

To succeed on a due process claim, a plaintiff must demonstrate that a fundamental right has been violated by the State in an arbitrary and irrational manner. *See Campos v. Cook Cnty.*, 932 F.3d 972, 975 (7th Cir. 2019). Only "the most egregious and outrageous government action" will survive a due process challenge. *Id*. However, the Supreme Court has been reluctant to establish "guideposts" or to provide an exhaustive list of rights protected by the Fourteenth Amendment, *id*. at 975, and has called for the "utmost care" in deciding to recognize a new fundamental right, advice courts heed. *See Robbin v. City of Berwyn*, 108 F.4th 586, 590 (7th Cir. 2024) (citing *Hayden v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 575 (7th Cir. 2014)).

Regardless of the right Plaintiffs are asserting, Defendants have not infringed on any fundamental right and as such, Plaintiffs have failed to allege a substantive due process violation. The Act's stated intent is to provide individuals with an "end-of-life experience aligned with their beliefs and values." 410 ILCS 22/5(a)(1). In service of that intent, the Act's protocols and qualifications are designed to ensure that only the individual diagnosed with a terminal illness has the power to end their own life. If an individual elects to receive aid in dying care, that individual has exercised their own liberty interest to determine when to end their life—no one

else has made that decision for them or otherwise infringed on that individual's liberty interests. *See Cruzan v. Director., Mo. Dep't. of Health*, 497 U.S. 261, 274-75 (1990).

Without the deprivation of a fundamental right, Defendants only need to show that the Act is rationally related to a legitimate state interest. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). The stated purpose of the Act is to "uphold both the highest standard of medical care and the full range of options for each individual, particularly at the end of life." 410 ILCS 22/5(b). The State plainly has a legitimate interest in ensuring that medical care provided to its residents meets the highest standards. It is long established that states have wide latitude over the practice of medicine under their police powers "to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (*quoting Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)).

This latitude includes the State's right to ensure residents have the full range of treatment options available to them, including the right to refuse unwanted lifesaving medical treatment. *Cruzan*, 497 U.S. at 274-75. These are facially legitimate state interests—as other courts that have considered the issue have agreed. *See Bryman v. Murphy*, 161 F.4th 174, 182 (3d Cir. 2025) (holding New Jersey's medical aid in dying statute satisfied rational basis review); *Curran*, 2025 WL 3763413, at *10. Because the Act survives rational basis review, Plaintiffs' substantive due process claim cannot survive. *See Robbin*, 108 F.4th at 591; *Washington v. Glucksberg*, 521 U.S. 702, 722-23 (1997).

Plaintiffs United Spinal Association and Progress Center for Independent Living additionally argue that the Act deprives their organizations of the "fundamental right to free speech" in violation of the First Amendment by penalizing speaking out against medical aid in dying. (Dkt. 26-1 at 24.) A successful facial challenge under the First Amendment requires a

court to find "the enactment reaches a substantial amount of constitutionally protected conduct." *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). Here, the Act does not prevent Organizational Plaintiff from speaking out against medical aid in dying, nor does the Act prevent Organizational Plaintiff from discussing other alternatives to aid in dying care with their members. Because the Act does not reach a substantial amount of protected speech, Plaintiffs' argument fails.

**2. Plaintiffs have not established a procedural due process claim.**

The Fourteenth Amendment also prohibits deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. However, not every deprivation triggers due process protections. A court must determine whether there has been a violation of procedural due process by evaluating (1) "the private interest affected;" (2) "the risk of erroneous deprivation of that interest through the procedures used;" and (3) "the governmental interest at stake[.]" *Nelson v. Colorado*, 581 U.S. 128, 135 (2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Plaintiffs allege the Act violates procedural due process because the Act creates a high risk of erroneous deprivation of Plaintiffs' right to life and provides inadequate precautions to prevent that deprivation. (Dkt. 1 at ¶¶ 117-118.) Plaintiffs further allege the Act "unlawfully delegates to a private party what has been an exclusive function of State sovereignty." (*Id.*) Plaintiffs see this delegation as "a form of state action requiring the same or similar Due Process that would be required of the Defendant State were it to take a human life." (*Id.* at ¶ 117.)

This argument, like Plaintiffs' substantive due process argument, fails because there is no government action. The Act permits individuals to make voluntary decisions about their own medical care. The State is not deciding whether a person should request aid in dying care or

whether that individual has to follow through once the care has been requested. Similarly, the Act does not require health care professionals to provide aid in dying care. 410 ILCS 22/60.

Plaintiffs contend that even if the choice is voluntary, the Act provides insufficient procedural safeguards to ensure patients are not coerced. (Dkt. 1 at ¶ 50.) However, "[t]he stringent hurdles a requesting patient must overcome before receiving aid in dying medication is incompatible" with a finding that the Act violates procedural due process. *United Spinal Ass'n v. California*, 2024 WL 1671167, at *7.

> [F]or a patient to relinquish involuntarily his or her right to life, . . . the following would have to occur: (1) a terminally ill patient, mistakenly or under coercion, makes [an] oral request[] and a written request on a specific legislative form for aid-in-dying medication; (2) two witnesses to the patient's signing of the written form fail to recognize that the patient is incapable of making a voluntary and informed decision; (3) the patient's attending and consulting physicians both misdiagnose him or her as being capable of making an informed decision; and (4) after receiving the life-ending medication, the patient self-administers it against his or her own free will.

*Id*. Because Plaintiffs have not shown an elevated risk of erroneous deprivation or that such a risk is a State-created danger, their procedural due process claim also fails.

**D. Plaintiffs fail to state an equal protection claim.**

The Equal Protection Clause of the Fourteenth Amendment requires that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. This does not, however, mean that any state action based on classification is automatically unlawful discrimination. When state action discriminates on the basis of a suspect classification or restricts a fundamental right, the action will only be upheld if it is narrowly tailored to serve a compelling state interest. *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). Otherwise, state action is lawful if it is rationally related to a legitimate state interest. *Id*.

Plaintiffs categorize themselves as "people with life-threatening disabilities," (Dkt. 1 at ¶ 3), and allege that the Act incorrectly singles them out with "approval of the Defendant State in a special death-qualified category." (*Id*. at ¶¶ 28, 40). That does not make them members of a suspect class, as illness and disability are not suspect classes. *See City of Cleburne v. Cleburne Living Ctr*, 473 U.S. 432, 449-50 (1985); *United States v. Harris*, 197 F.3d 870, 875 (7th Cir. 1999). Nor has a fundamental right been denied such that elevated scrutiny should apply.

Therefore, to succeed on their facial challenge, Plaintiffs must show that the State's claimed purpose for enacting the Act is illegitimate, or that the means used to achieve the purpose of the Act are irrational. *Stevens v. Ill. DOT*, 210 F.3d 732, 738 (7th Cir. 2000). Plaintiffs argue that because the Act has no "objective parameters" as to who is eligible for physician-assisted end-of-life care, determinations of "terminal illness" and "mental capacity" will be made inconsistently and with danger toward Plaintiffs as a class. (*See* Dkt. 1 at ¶¶ 126-135.)

Plaintiffs' argument misses the mark, though, because life-threatening injury is not the basis on which eligibility under the Act is made. As Plaintiffs acknowledge, eligibility is determined by terminal illness—a diagnosis that anybody may receive, at any time, depending on their own health situations. Simply having a life-threatening or chronic disability is insufficient to spur eligibility. And terminal illness is not a suspect classification.

Therefore, classifications made on the basis of terminal illness are evaluated under rational basis review in the same manner as a due process claim. *See supra* at Section I.C. As the Supreme Court has held, the State has a legitimate interest in protecting a patient's autonomy to decide if and when to withdraw care. *See Cruzan,* 497 U.S. at 281. The distinction between terminally ill and non-terminally ill individuals is rationally related to that interest. The terminal illness designation is not dispensed at random; it is determined by a qualified attending physician

who has used their reasonable medical judgment to determine that the patient will die within six months, even with continued treatment, in conjunction with a second consulting physician. 410 ILCS 22/10, 22/40. Just like with the due process analysis, the State is furthering the legitimate interest in providing an additional, voluntary option for the health and safety of its residents with a terminal illness at the end of their lives.

**E. Certain defendants are not proper parties in this action.**

Finally, even if Plaintiffs had established likelihood of the success on the merits, only one of the defendants here, Dr. Vohra, operating in his official capacity, would be appropriate. The others included in the complaint are not proper parties and cannot provide the relief requested, even if an injunction was entered. And when a state defendant does not have the power to confer requested relief, then "[n]o injunction [the court] enter[s] can fix that problem." *Pavlock v. Holcomb*, 35 F.4th 581, 589 (7th Cir. 2022).

As a State agency, the Illinois Department of Public Health ("IDPH") cannot be sued, undercutting any possible likelihood of success on the merits. "[T]he Supreme Court 'has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" *Ameritech Corp. v. McCann*, 297 F.3d 582, 585 (7th Cir. 2002) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)).[9] Similarly, Governor Pritzker does not have a sufficiently close connection to the enforcement or implementation of the statute at issue that is required to sue a state official. *See, e.g.*, *Nat'l Inst. of Family & Life Advocates v. Rauner*, No. 16 C 50310, 2017 WL 11570803, at *4 (N.D. Ill. July

[9] For the sake of clarity, in the Complaint, Plaintiffs also list the State of Illinois as a defendant in this suit in the Complaint at Paragraph 20. This appears to be a typographical error, as the State of Illinois is not included in the caption or as a party on the docket, and no summons has issued to serve the State. Nonetheless, in the event the State of Illinois is a party in this lawsuit, dismissal is appropriate for the same reasons as IDPH.

19, 2017); *Ill. League of Advocates. for the Developmentally Disabled v. Quinn*, No. 13 C 1300, 2013 WL 5548929, at *4 (N.D. Ill. Oct 8, 2013). Therefore, Plaintiffs are unlikely to succeed on claims against those Defendants.

## II. The Act does not irreparably harm Plaintiffs.

Because Plaintiffs are unlikely to establish standing or state a viable claim, this shortcoming is "decisive": Plaintiffs are not entitled to a preliminary injunction, and the Court "need not address the remaining elements" necessary to secure one. *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022). Indeed, their failure to establish Article III standing alone begs the question whether Plaintiffs have even established that this Court has subject matter jurisdiction, which would warrant dismissal. *See* Fed. R. Civ. P. 12(h)(3).

Nonetheless, even assuming Plaintiffs could show a likelihood of success (and they cannot), they cannot show irreparable harm. Irreparable harm is "defined as harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (citation modified). And because Plaintiffs' likelihood of success on the merits is so low, they have a heightened burden to show that they will suffer irreparable harm. *See Cassell*, 990 F.3d at 545.

Yet Plaintiffs have failed to show that they would suffer any irreparable harm because they do not have any interest in medical aid in dying care and would not meet the Act's requirements to be considered qualified patients. Their concerns that they will be treated differently because of their disability are based on conjecture and propose hypotheticals prohibited by the statute, both explicitly and in the several guardrails previously described.

Further, any speculation that the Act prohibits them from participating in the Illinois Suicide Prevention Alliance is unfounded. They have not provided any reasons why they (or

anyone) would be excluded from seeking support to prevent suicide. Organizational Plaintiffs also have not reasonably suggested that the Act would interrupt their advocacy efforts. Such speculation does not rise to the level of requiring a preliminary injunction. "A mere possibility of irreparable harm will not suffice." *Bevis*, 85 F.4th at 1188 (citing *Nken*, 556 U.S. at 434-35 and *Winter*, 555 U.S. at 24. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Plaintiffs have not—and cannot—meet this weighty burden.

## III. Plaintiffs also fail to balance the equities in their favor and demonstrate how an injunction would benefit the public interest.

The Court does not need to weigh the equitable factors because Plaintiffs have not demonstrated they would have success on the merits or suffer irreparable harm. *See Univ. of S. Ind.*, 43 F.4th at 791. If the Court does consider the balance of hardships, the Seventh Circuit uses a "sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation modified).

Plaintiffs cannot meet this burden. Fundamentally, they generally allege that the equities balance in their favor because of speculation concerning how the Act could operate. (Dkt. 26-1 at 18-19.) As set forth above, though, speculations are not sufficient when considering a motion for preliminary injunction. Without anything more, the equities do not tip in Plaintiffs' favor.[10]

[10] Plaintiffs set forth a belief that "algorithms" could identify Ms. Payne as a potential qualified patient. (Dkt. 26-1 at 19.) It is not readily apparent what "algorithm" is being described here as

Considering the public interest does not aid Plaintiffs, either. In the context of a preliminary injunction, the public interest "refers to the interests of people and institutions that are not parties to the case." *Cassell*, 990 F.3d at 545 (citation omitted). Plaintiffs' only argument is a sentence surmising that an injunction is favored to determine whether the Act is consistent with law, without even citing a case. (Dkt. 26-1 at 20.)

In fact, entering an injunction here would cause irreparable harm for Illinois residents. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation modified). Put another way, when the party "opposing" an injunction "is the representative of the political branches of a government[,] the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). That is undoubtedly the case here. The statute was enacted in response to Illinois residents who were seeking to create such an option for end-of-life care. *See* 410 ILCS 22/5(a)(4).

Nor is Illinois alone in permitting medical aid in dying. It joins 12 states and the District of Columbia in permitting terminally ill patients to exercise control over the end of their lives.[11] Moreover, Plaintiffs cannot purport to speak for the entire community of people living with

---

Plaintiffs do not provide any additional facts. The Act does not establish any sort of mechanization for determining who can be a qualified patient.

[11] Oregon, Washington, Montana, Vermont, California, Colorado, Hawaii, Maine, New Jersey, New Mexico, Delaware, New York, and the District of Columbia also have statutes providing for medical aid in dying. *See* Or. Rev. Stat. §§ 127.805–.995; Rev. Code Wash. § 70.245.030; Mont. Code Ann.§ 50-9-101; 18 V.S.A. § 5281 *et seq.*; Cal. Health and Safety Code § 443; Colo. Rev. Stat. §§ 25-48-101 *et seq.*; Haw. Rev. Stat. §§ 327L-1 *et seq.*; Me. Rev. Stat. tit. 22 § 2140; N.J. Stat. Ann. § 26:16; N.M. Stat. Ann. §§ 24-7c-1 *et seq.*; 16 Del. C. ch. 2501C *et seq.*; N.Y. Public Health Law § 2899-d *et seq.*; and D.C. Code §§ 7-661.01 *et seq.*

disabilities, as others have come forward to support such laws. For example, disabled individuals who support medical aid in dying laws have sought to intervene in lawsuits that enjoin medical aid in dying. *See*, *e.g.*, Motion to Intervene, *Brooklyn Center for Independence of the Disabled v. Hochul*, Case no. 1:26-cv-03492-OEM-JAM, at Docket No. 20 (E.D.N.Y. June 22, 2026) (attached as Exhibit A).

Importantly, denying an injunction does not change the status quo, as those who oppose the Act do not have to do anything; by not opting in, the Act does not have any impact on their lives. But enjoining this Act would take away something valuable from Illinoisans with terminal illnesses at the end of their lives. An injunction removes an option for interested and qualified patients to have complete control over their end-of-life care. And in denying this decision to a vulnerable population, the harm to those patients likely cannot be undone if they ultimately pass away in such a manner that is inconsistent with their beliefs and personal wishes to end prolonged pain and suffering. The General Assembly was trying to avoid such a result in passing this law, and that intent should not be interrupted now, either.

## **CONCLUSION**

WHEREFORE Defendants respectfully request that this Court: (1) deny Plaintiffs' Motion for Preliminary Injunction; (2) dismiss Movant-Plaintiffs Ebony Payne, United Spinal Association, and Progress Center for Independent Living from this matter pursuant to the Court's power under Federal Rule of Civil Procedure 12(h)(3); and (3) grant any other relief that is equitable and just.

Dated: August 18, 2026

KWAME RAOUL
*Attorney General of Illinois*

*/s/ Elizabeth Morris*
Elizabeth Morris, ARDC #6297239
Elena S. Meth, ARDC # 6346041
Office of the Illinois Attorney General
Special Litigation Bureau
115 S. LaSalle Street, 35th Floor
Chicago, IL 60603
312-814-3000
elizabeth.morris@ilag.gov
elena.meth@ilag.gov

*Counsel for Defendants*