# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,<br><br>Defendants. | Case No. 1:26-cv-03492-OEM-JAM |

**MOTION TO INTERVENE AS DEFENDANTS OF**
**JEREMY BOAL, IRIS DUDMAN, STACEY GIBSON, ANNE GURNETT BANDER,**
**NANCY MURPHY, AND BENNY POLLAK**

Pursuant to Federal Rule of Civil Procedure 24, Dr. Jeremy Boal, Iris Dudman, Stacey Gibson, Dr. Anne Gurnett Bander, Nancy Murphy, and Benny Pollak (collectively, "Proposed Intervenors"), by and through their undersigned counsel, respectfully move to intervene as defendants in the above-captioned action.

As set forth in the memorandum of law and supporting declarations being filed contemporaneously with this Motion, Proposed Intervenors are entitled to intervene as of right under Rule 24(a) because they (1) timely filed their motion to intervene; (2) have significant, protectable interests in this matter, (3) which stand to be impaired or affected by the resolution of this case; and (4) may not be adequately represented by the existing parties. For the same reasons and because Proposed Intervenors' claims or defenses share common questions of law and fact with the main action, permissive intervention under Rule 24(b) should be allowed.

Proposed Intervenors also respectfully request that (1) the Court allow them to file their opposition to Plaintiffs' motion for a preliminary injunction, which is also being filed contemporaneously with this Motion, in satisfaction of Rule 24(c), and that (2) Proposed Intervenors be granted leave to respond to the Complaint by the same deadline as the named Defendants or three business days after intervention is granted, whichever is later.

Counsel for Proposed Intervenors will be present at the June 25, 2026 preliminary injunction hearing and, if the Court permits, will be prepared to address this Motion and Proposed Intervenors' Proposed Opposition to Plaintiffs' Motion for a Preliminary Injunction. Proposed Intervenors respectfully request that the Court hear any opposition to Proposed Intervenors' Motion to Intervene at the June 25 hearing, or enter an expedited deadline for any written opposition to the Motion at that hearing, so that the Court may rule on Proposed Intervenors'

Motion to Intervene in time to consider Proposed Intervenors' opposition to Plaintiffs' motion for preliminary injunction in deciding Plaintiffs' motion, if intervention is granted.

Dated: June 22, 2026

Respectfully submitted,

/s/ Ryan Chabot
WILMER CUTLER PICKERING
HALE AND DORR LLP
Ryan Chabot
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6513
ryan.chabot@wilmerhale.com

COMPASSION LEGAL
THE END-OF-LIFE JUSTICE CENTER AT
COMPASSION & CHOICES
Veronica Darling, Esq. (She/Her/They)*
Jessica Pezley, Esq. (She/Her)*
8156 S. Wadsworth Blvd. E162
Littleton, CO 80128
(800) 247-7421
vdarling@compassionandchoices.org
jpezley@compassionandchoices.org

**Pro hac vice* forthcoming

*Attorneys for Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492-OEM-JAM

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS OF JEREMY BOAL, IRIS DUDMAN, STACEY GIBSON, ANNE GURNETT BANDER, NANCY MURPHY, AND BENNY POLLAK**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 2

- I. New York's Medical Aid In Dying Act ..... 2
- II. Proposed Intervenors ..... 4
- III. Procedural History ..... 9

ARGUMENT ..... 9

- I. Proposed Intervenors May Intervene As Of Right ..... 9
  - A. Proposed Intervenors' Motion Is Timely ..... 9
  - B. Proposed Intervenors Have Protectable Interests In This Matter, Which Will Be Impaired Absent Intervention ..... 11
  - C. Proposed Intervenors' Interests May Not Be Adequately Represented ..... 13
- II. The Court Should Allow Proposed Intervenors To Intervene Permissively ..... 15
- III. All Parties Are On Notice Of Proposed Intervenors' Positions, Justifying Flexibility With Rule 24(c)'s Requirements ..... 16

CONCLUSION ..... 18

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Accelerant Specialty Insurance Co. v. Big Apple Designers, Inc.*, 2025 WL 2238226 (E.D.N.Y. Aug. 6, 2025) ..... 13

*Accelerant Specialty Insurance Co. v. Big Apple Designers, Inc.*, 2026 WL 205905 (E.D.N.Y. Jan. 27, 2026) ..... 10

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2021 WL 2646349 (E.D.N.Y. June 28, 2021) ..... 17, 18

*Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022) ..... 13

*Brennan v. New York City Board of Education*, 260 F.3d 123 (2d Cir. 2001) ..... 11

*Cameron* v. *EMW Women's Surgical Center, P. S. C.*, 595 U.S. 267 (2022) ..... 14

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93 (E.D.N.Y. 1996) ..... 16

*Curran v. Meyer*, 2025 WL 3763413 (D. Del. Dec. 30, 2025) ..... 12

*Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ..... 12

*Hiscox Insurance Co. Inc. v. Cmnt LLC*, 2026 WL 1072023 (E.D.N.Y. Feb. 12, 2026) ..... 10

*In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792 (2d Cir. 2022) ..... 9, 13

*Jones v. Butz*, 374 F. Supp. 1284 (S.D.N.Y. 1974) ..... 13, 15

*Jones v. Stanford*, 525 F. Supp. 3d 420 (E.D.N.Y. 2021) ..... 15

*Long Island Trucking, Inc. v. Brooks Pharmacy*, 219 F.R.D. 53 (E.D.N.Y. 2003) ..... 11

*New York Public Interest Research Group, Inc. v. Regents of the University of the State of New York*, 516 F.2d 350 (2d Cir. 1975) ..... 11, 15

*Pennsylvania v. President of the United States*,
888 F.3d 52 (3d Cir. 2018)........................................................................................ 14, 15

*R Best Produce, Inc. v. Shulman-Rabin Marketing Corp.*,
467 F.3d 238 (2d Cir. 2006)........................................................................................ 9, 16

*Republic of the Philippines v. Abaya*,
312 F.R.D. 119 (S.D.N.Y. 2015) ........................................................................... 10, 11, 13

*Sea Tow Services International, Inc. v. Tampa Bay Marine Recovery, Inc.*,
2021 WL 327653 (E.D.N.Y. Feb. 1, 2021)...................................................................... 10

*Stutts v. De Dietrich Group*,
2005 WL 3158038 (E.D.N.Y. Nov. 28, 2005).................................................................. 10

*Tachiona ex rel. Tachiona v. Mugabe*,
186 F. Supp. 2d 383 (S.D.N.Y. 2002)............................................................................. 17

*Trbovich v. United Mine Workers of America*,
404 U.S. 528 (1972)...................................................................................................... 13

*United States v. Country Club Garden Owners Ass'n, Inc.*,
159 F.R.D. 400 (E.D.N.Y. 1995) .................................................................................. 10

*United States v. Pitney Bowes, Inc.*,
25 F.3d 66 (2d Cir. 1994)............................................................................................. 10

*Utica Mutual Insurance Co. v. Munich Reinsurance America, Inc.*,
2017 WL 9400673 (N.D.N.Y. Jan. 6, 2017)..................................................................... 17

*Windsor v. United States*,
797 F. Supp. 2d 320 (S.D.N.Y. 2011)......................................................................... 17, 18

**Statutes**

N.Y. Pub. Health Law § 2899-d *et seq.* ........................................................................ *passim*

**Other Authorities**

Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-state-law ................................................................................................ 2

**Rules**

Fed. R. Civ. P. 24(a) ........................................................................................... 9, 11
Fed. R. Civ. P. 24(b) ............................................................................................... 15
Fed. R. Civ. P. 24(c) ............................................................................................... 17

**INTRODUCTION**

Proposed Intervenors Dr. Jeremy Boal, Iris Dudman, Stacey Gibson, Dr. Anne Gurnett Bander, Nancy Murphy, and Benny Pollak submit this memorandum of law in support of their Motion for Leave to Intervene as Defendants pursuant to Federal Rule of Civil Procedure 24.

On June 11, 2026, Plaintiffs filed suit against Governor Kathy Hochul, in her official capacity as Governor of the State of New York; the New York State Department of Health; James V. McDonald, M.D., in his official capacity as Commissioner of the New York State Department of Health; the New York State Board for Medicine; Amit M. Shelat, D.O., in his official capacity as Chair of the New York State Board for Medicine; the New York State Office of Mental Health; and Ann Marie T. Sullivan, M.D., in her official capacity as Commissioner of the New York State Office of Mental Health (collectively, the "State Defendants"), seeking to permanently enjoin the New York Medical Aid in Dying Act, N.Y. Pub. Health Law § 2899-d *et seq.* (the "Act"), which is scheduled to go into effect on August 5, 2026. Compl., Dkt. 1. Plaintiffs moved for a temporary restraining order against the Act ("TRO Motion") the same day. Dkt. 2.

The Act gives New Yorkers who are terminally ill with less than six months to live the right to control how and when they die, in alignment with their personal values and beliefs. The Act is fully voluntary for patients and medical providers alike. It gives a terminally ill patient the right to request a prescription from their trusted medical provider for medication that the patient may choose to self-ingest to bring about a peaceful death. Their medical provider may approve the request only after complying with numerous requirements to ensure that the patient meets the Act's eligibility criteria, including confirming that the request is voluntarily made and well informed. Proposed Intervenors are six individuals who have significant interests in ensuring that

eligible New Yorkers will have access to the option of medical aid-in-dying ("MAID") as provided for by the Act, starting August 5, 2026.

Proposed Intervenors readily meet the requirements for intervention as of right under Rule 24(a). *First*, this request for intervention is timely. *Second*, Proposed Intervenors will be adversely affected if the Act is enjoined. Proposed Intervenors seek to ensure that they can exercise autonomy over their end-of-life circumstances and can enjoy peace of mind knowing that they will be able to access MAID if and when they so choose. *Third*, because the State Defendants are differently positioned and lack a personal stake in the Act's enactment, they may not adequately represent Proposed Intervenors' interests in defending the Act. For these reasons, Proposed Intervenors respectfully request that the Court grant their motion for intervention as of right. At a minimum, permissive intervention under Rule 24(b) should be allowed.

Proposed Intervenors also respectfully request that the Court allow the filing of their opposition to Plaintiffs' motion for a preliminary injunction, filed with this motion to intervene, pursuant to Rule 24(c); and that Proposed Intervenors be granted leave to respond to the Complaint further pursuant to Rule 24(c) by the same deadline as the State Defendants or three business days after intervention is granted, whichever is later.

## BACKGROUND

### I. New York's Medical Aid In Dying Act

After more than a decade of advocacy from New Yorkers living with terminal illnesses, grieving families, clinicians, and supporters across the state, Governor Kathy Hochul signed New York's Medical Aid in Dying Act into law on February 6, 2026. *See* Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-state-law (last visited June 22, 2026). The Act is set to go into effect on August 5, 2026. *Id.* The

Act provides a terminally ill, mentally capable adult who has a prognosis of six months or less to live with the option to request, obtain, and decide to ingest (or not) aid-in-dying medication. *Id.* To be eligible, a patient must be an adult, aged 18 or older; be a resident of New York State; have a medically confirmed terminal illness that is incurable, irreversible, and will likely cause death within six months; be mentally capable of making an informed healthcare decision; and ingest the medication by themselves. *See* N.Y. Pub. Health Law § 2899-d (defining key terms as used in the Act); *id.* § 2899-f(4) (providing that the patient "may self-administer the medication to themselves" and that a "health care professional or other person shall not administer the medication").

In addition, the Act incorporates numerous requirements to qualify for access to MAID, including the following.

*First*, a patient wishing to obtain MAID must provide their attending physician with both an oral and a written request for the medication. N.Y. Pub. Health Law § 2899-e(1). The written request must be witnessed by two people—neither of whom can be a relative, someone who stands to benefit from the person's estate, or anyone who may benefit financially from the person's death—while the oral request must be recorded by audio or video and permanently stored in the patient's medical record. *Id.* § 2899-e(1)-(3).

*Second*, a patient can withdraw their request for the medication at any time. N.Y. Pub. Health Law § 2899-g(1).

*Third*, the patient's attending physician must conduct an initial evaluation of the patient in person, unless the attending physician determines that an in-person visit would result in extraordinary hardship, in order to confirm that a patient has a terminal illness, has decision-making capacity, and has made the request voluntarily and without coercion. N.Y. Pub. Health

Law § 2899-f(1). The attending physician must inform the patient about all of their end-of-life care options, including hospice and palliative care. *Id.* § 2899-f(1)(e)-(g). The attending physician must also document diagnoses, determinations, and requests of the patient as part of the patient's medical records. *Id.* § 2899-j.

*Fourth*, the patient must also have a second, consulting physician confirm that the patient is terminally ill, is making an informed decision, has decision-making capacity, and is not being coerced. N.Y. Pub. Health Law § 2899-h.

*Fifth*, a neurologist, psychiatrist, or psychologist must conduct a mental health evaluation to confirm that the patient has the capacity to make an informed healthcare decision. N.Y. Pub. Health Law § 2899-i(1).

*Sixth*, the Act imposes a mandatory five-day waiting period between when the medication prescription is written and when it can be filled, unless the attending physician determines that the patient is not expected to survive that period. N.Y. Pub. Health Law § 2899-f(3).

*Seventh*, prescribing the medication under the Act is entirely voluntary for healthcare providers. N.Y. Pub. Health Law § 2899-m(1).

## II. Proposed Intervenors

The Act is of critical importance to New Yorkers like Proposed Intervenors.

Dr. Jeremy Boal is a 59-year-old New York resident with amyotrophic lateral sclerosis ("ALS"). Boal Decl. ¶ 2. ALS is a progressive neuro-degenerative disease that affects nerve cells in the brain and spinal cord. *Id.* The muscle weakness caused by ALS will eventually impact Dr. Boal's ability to breathe, speak, and swallow. *Id.* There is no cure for ALS, and based on the current progression of his disease, Dr. Boal's doctors believe that he has one to three years left to live. *Id.* ¶¶ 2, 6. Until his retirement in 2023 as a result of his ALS diagnosis, Dr. Boal was the Chief Clinical Officer of the Mount Sinai Medical Center in New York and spent a decade of his

career working with home-bound patients with late-stage illnesses. *Id.* ¶ 4. From his experience as a practitioner, Dr. Boal knows that for some patients, "the degree of suffering they and their caregivers experience at the end of the patient's life is beyond measure." *Id.* ¶ 9. The passage of the Act has already benefited Dr. Boal, as he has "experienced an incredible peace of mind since the MAID Act was signed into law": knowing that he will eventually be able "to have control over the manner and timing of [his] inevitable death from ALS has made this otherwise difficult part of [his] life a little easier and given [him] the freedom to fully live [his] life without fear of death and the dying process." *Id.* ¶ 19. If the Act does not go into effect as expected, "the thoughtful and emotional end-of-life planning" that Dr. Boal has engaged in with his family and providers "will be compromised," and he "will again become more focused on the uncertainties of [his] death than the joy of living whatever time [he has] left to the fullest." *Id.* ¶ 21.

The Act has similar significance for Proposed Intervenor Benny Pollak. Mr. Pollak is a 67-year-old New York resident. Pollak Decl. ¶ 2. Mr. Pollak lives with quadriplegia as a result of a car accident that caused a C5-C6 spinal cord injury in 1980. *Id.* ¶ 3. Mr. Pollak "want[s] autonomy, independence, and the ability to decide what end-of-life care works best for [him], and that is what the MAID Act provides." *Id.* ¶ 13. Mr. Pollak wishes "to protect the MAID Act, to preserve [his] end-of-life autonomy, and to contradict and challenge the paternalistic perspective that [he] cannot make [his] own informed decisions because [he] live[s] with a disability and use[s] a wheelchair." *Id.* Mr. Pollak is angered by the premise underlying Plaintiffs' suit—that all people with disabilities "think, feel, and believe the same thing." *Id.* ¶ 11. The related belief that "people with disabilities are 'weaker' or need more protection than others" is insulting to Mr. Pollak, who does "not need anybody—other than [himself] in collaboration with [his] healthcare providers—deciding what medical care [he] should or should not use." *Id.* ¶¶ 11-12. Mr. Pollak is also

offended by the idea that he is "more susceptible to coercion because [he] live[s] with a disability." *Id.* ¶ 15. Mr. Pollak "need[s] autonomy and agency, not to be patronized." *Id.* ¶ 16. The Act offers Mr. Pollak "space to live [his] life without thinking about some future with unbearable suffering from a terminal illness." *Id.* ¶ 17. If the Act did not take effect, Mr. Pollak would be stripped of his "right to decide what is best for [him] based on [his] individual circumstances." *Id.*

Dr. Anne Gurnett Bander is a 72-year-old New York resident whose husband, Jon, was diagnosed with ALS in 2017. Bander Decl. ¶¶ 2-3. In 2021, four days after his sixty-sixth birthday and just a month before his twenty-fifth wedding anniversary, Mr. Bander died at home. *Id.* ¶¶ 4-5. At the time of his death, Mr. Bander was bedridden, could not move his hands or limbs, and had been unable to speak for over a year. *Id.* ¶ 8. Two years later, Dr. Gurnett Bander began having unexpected falls, and in 2025 she, too, was diagnosed with ALS. *See id.* ¶¶ 5-6. "Knowing firsthand what the end of life with ALS looks like," Dr. Gurnett Bander feels "immense … solace" from the Act's passage. *Id.* ¶ 9. Dr. Gurnett Bander believes that "[a]ll New Yorkers deserve access to a full range of healthcare options" and that people like herself "should be allowed to choose the end-of-life healthcare option that fits best with their values and beliefs, even if others disagree." *Id.* ¶¶ 12, 18. When she faces her own death, Dr. Gurnett Bander wants "to stay in [her] home, surrounded by friends and caregivers [she] know[s] and love[s] at the end of [her] life." *Id.* ¶ 16.

The Act is likewise crucial for Proposed Intervenor Iris Dudman. Ms. Dudman is a 76-year-old New York resident who was diagnosed with a recurrence of glioblastoma in November 2025. Dudman Decl. ¶ 2. Glioblastoma is a highly aggressive, incurable brain cancer, and Ms. Dudman "likely only ha[s] months, not years, left to live." *Id.* Ms. Dudman witnessed both of her parents suffer drawn-out deaths, whereas her uncle had a peaceful death in Oregon via

MAID many years ago. *Id.* ¶ 8. Because of her uncle's positive experience with MAID, and to avoid the suffering that her parents experienced, Ms. Dudman has spent the last three years advocating for the Act. *Id.* ¶¶ 9, 13. Ms. Dudman believes that qualified New Yorkers should have access to MAID as a healthcare option and wants to be able to access it when her glioblastoma progresses to its final stages and her death is imminent. *Id.* ¶ 15. Since the Act was passed, Ms. Dudman has "experienced an increased sense of peace," knowing that she "will be able to access this healthcare option and have the medication available to [her], even if [she] ultimately decide[s] not to use it." *Id.* ¶ 17. Were the Act to be enjoined, Ms. Dudman would be deprived of her "autonomy and ability to make [her] own end-of-life decisions in accordance with [her] values, morals, and beliefs." *Id.* ¶ 20.

Proposed Intervenor Stacey Gibson is a 74-year-old New York resident who has been diagnosed with multiple cancers, including breast cancer, lung cancer, and B-cell lymphoma. Gibson Decl. ¶ 2. While Ms. Gibson's breast and lung cancers are thankfully in remission, unfortunately, her lymphoma is incurable. *Id.* Ms. Gibson was inspired to begin advocating for the Act by her experience with the death of her beloved husband, Sid, who died of spinocerebellar ataxia, a terminal progressively degenerative neurological disease similar to ALS. *Id.* ¶¶ 6-7. Spinocerebellar ataxia caused Mr. Gibson to lose much of his ability to breathe, speak, and swallow, and he would gag frequently, causing a great deal of suffering ahead of his death in 2014. *Id.* ¶¶ 9-10. Because MAID was not a healthcare option that was available to Mr. Gibson, it is important to Ms. Gibson that qualified New Yorkers have the option of MAID, "so they can choose not to endure the kind of suffering that Sid did at the end of his life." *Id.* ¶ 13. Additionally, Ms. Gibson "want[s] the option to choose medical aid in dying if" she qualifies. *Id.* ¶ 14. Ms. Gibson is not certain that she would use MAID, "but its existence as an option is a comfort to

[her] now." *Id.* ¶ 15. Should the Act not take effect, Ms. Gibson and terminally ill New Yorkers would be "without access to a full range of safe healthcare options" and made "to feel powerless." *Id.* ¶ 21.

Nancy Murphy is an 87-year-old New York resident who is currently in remission from triple-negative breast cancer ("TNBC"). Murphy Decl. ¶ 2. TNBC is extremely aggressive, with a greater than 25% chance of recurrence. *Id.* ¶ 5. Ms. Murphy has been a hospice volunteer for many years and has "witnessed death and dying." *Id.* ¶ 9. As such, Ms. Murphy "understand[s] the suffering of a long, lingering death and want[s] to avoid that." *Id.* Ms. Murphy became passionate about advocating for MAID after experiencing her sister Joan's death from terminal ovarian cancer. *Id.* ¶ 10. After receiving a prognosis of mere months to live, and because she lived in Vermont, where MAID is available, Joan began the process of obtaining a MAID prescription, wanting it on hand even if she never used it. *Id.* Joan eventually used her MAID prescription, passing peacefully at her home in Vermont. *Id.* This was "a profound, beautiful, and meaningful experience for [Ms. Murphy] and [her] family." *Id.* Ms. Murphy firmly believes that "[e]veryone should have the option to die the way Joan did." *Id.* Just like her sister, Ms. Murphy "want[s] to be in charge of when [she] die[s], where [she] die[s], and with whom [she] die[s]." *Id.* ¶ 11. And "[m]edical aid in dying gives [Ms. Murphy] that choice." *Id.* Ms. Murphy is acutely aware that the choice to use MAID or not is a personal decision and believes that "[t]hose who do not want to use the option" of MAID should not be able to "prevent other people from accessing it." *Id.* ¶ 12.

The Act is the culmination of yearslong efforts to improve and expand end-of-life care for New Yorkers like Proposed Intervenors. Plaintiffs' request to delay and eventually invalidate the

option to access MAID threatens these individuals with a loss of control over the healthcare decisions that should reflect their values, priorities, and dignity.

**III. Procedural History**

On June 11, 2026, after waiting four months after the Act was signed, Plaintiffs filed suit, Dkt. 1, and simultaneously moved for a temporary restraining order ("TRO") seeking to bar the statute's implementation, Dkt. 2. On June 15, 2026, the Court denied Plaintiffs' request for a TRO but ordered Defendants to respond to "Plaintiffs' request for preliminary injunctive relief by June 23, 2026," ahead of a preliminary injunction hearing to be held on June 25, 2026. Order to Show Cause ("O.S.C."), June 15, 2026. If Plaintiffs were to succeed, individuals like the Proposed Intervenors would be deprived of the Act's benefits, including the peace of mind that they presently enjoy from knowing that they will be able to access MAID if their conditions worsen.

## **ARGUMENT**

**I. PROPOSED INTERVENORS MAY INTERVENE AS OF RIGHT**

Under Rule 24(a)(2), the Court must permit anyone to intervene who "(1) timely file[s] an application, (2) show[s] an interest in the action, (3) demonstrate[s] that the interest may be impaired by the disposition of the action, and (4) show[s] that the interest is not protected adequately by the parties to the action." *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 799 (2d Cir. 2022) (quoting *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006)). Proposed Intervenors satisfy each requirement.

**A. Proposed Intervenors' Motion Is Timely**

Proposed Intervenors' request for intervention is plainly timely. "Relevant considerations" when assessing timeliness "include '(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating

for or against a finding of timeliness.'" *Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*, 2026 WL 205905, at *2 (E.D.N.Y. Jan. 27, 2026) (quoting *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)). Each factor weighs in Proposed Intervenors' favor.

*First*, Proposed Intervenors filed this motion to intervene only 11 days after Plaintiffs filed their Complaint. *See, e.g.*, *Hiscox Ins. Co. Inc. v. Cmnt LLC*, 2026 WL 1072023, at *5 (E.D.N.Y. Feb. 12, 2026) (noting that a delay of "between four and seven months … is not egregious either in the broad scheme of federal litigation or the specific context of this case" and that "a court in this District has granted a motion to intervene as of right after a delay of 'approximately two years' when other factors weighed in favor of intervention" (quoting *United States v. Country Club Garden Owners Ass'n, Inc.*, 159 F.R.D. 400, 402-404 (E.D.N.Y. 1995)), *report and recommendation adopted*, 2026 WL 873013 (E.D.N.Y. Mar. 30, 2026); *Stutts v. De Dietrich Grp.*, 2005 WL 3158038, at *1 (E.D.N.Y. Nov. 28, 2005) (finding motion to intervene timely even though it was filed "almost two years after plaintiffs commenced th[e] action").

*Second*, given the early stages of these proceedings, "neither the existing parties nor the progress of this case would be prejudiced by [the proposed] intervention." *Sea Tow Servs. Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*, 2021 WL 327653, at *3 (E.D.N.Y. Feb. 1, 2021) (citation omitted). "[D]iscovery has not yet commenced" and "intervention will not prejudice [Plaintiffs] by unnecessarily complicating the case or generating costly or duplicative discovery." *Id.* at *3-4. Moreover, "the parties have not engaged in dispositive motion practice." *Republic of the Philippines v. Abaya*, 312 F.R.D. 119, 123 (S.D.N.Y. 2015).

*Third*, by contrast, Proposed Intervenors will be prejudiced if their motion is denied, as they would lose the opportunity to vigorously defend their interests in this litigation and in the Act, as discussed in detail in the following section.

*Fourth*, there are no "unusual circumstances militating for or against a finding of timeliness." *Long Island Trucking, Inc. v. Brooks Pharmacy*, 219 F.R.D. 53, 55 (E.D.N.Y. 2003).

**B. Proposed Intervenors Have Protectable Interests In This Matter, Which Will Be Impaired Absent Intervention**

"The Second Circuit has explained that for purposes of Rule 24(a)(2), an intervenor must have a 'direct, substantial, and legally protectable' interest in the property or transaction that is the subject of the underlying action." *Republic of the Philippines*, 312 F.R.D. at 123 (quoting *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001)) (cleaned up). The Second Circuit has also found that such interests justify intervention where "the disposition of the action may as a practical matter impair or impede [proposed intervenors'] ability to protect their interests." *New York Pub. Int. Rsch. Grp., Inc. v. Regents of Univ. of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975).

Proposed Intervenors have significant protectable interests that could be impaired by this action's disposition.

Proposed Intervenors each has an interest in being able to obtain MAID as an end-of-life healthcare option in New York—which is directly threatened by Plaintiffs' attempt to deny them that ability. *See supra*, at 4-8. As discussed above, Proposed Intervenors want to have MAID available to them as an option at the end of their lives, which for some is approaching as their terminal illnesses continue to advance and their prognoses become increasingly shorter. By contrast, Plaintiffs have no interest in ever utilizing MAID, which is purely voluntary under the Act. Plaintiffs do not stand to lose *anything* if the Act becomes effective. Plaintiffs' Complaint and TRO Motion both emphasize Plaintiffs' desire never to use MAID, at any point in time. *See, e.g.*, Compl. ¶ 34 (Ms. Cameron "would never request assisted suicide in a right state of mind"); Dkt. 2-4, ¶ 10 (Hernandez Decl.) ("I want the Court to block the Act from going into effect[.]"); Dkt. 2-5, ¶ 10 (Cameron Decl.) ("I want the Court to block the Act from going into effect.").

Plaintiffs cannot manufacture an interest in the Act by stating, without any support, that they "are automatically qualified" for MAID, TRO Mot. at 3, particularly when the Act expressly disclaims any "automatic" qualification based on age or disability, *see* N.Y. Pub. Health Law § 2899-e(4) ("No person shall qualify for medical aid in dying under this article solely because of age or disability."). On the other hand, a healthcare option that is very important to Proposed Intervenors will be taken away if the Act is enjoined.

Proposed Intervenors have more at stake in this lawsuit than the organizational Plaintiffs too. Because the Act does not threaten to take any rights away from disabled persons, its implementation does not threaten the constituencies or missions of the organizational Plaintiffs. *Cf. Curran v. Meyer*, 2025 WL 3763413, at *7 (D. Del. Dec. 30, 2025) (holding that organizational plaintiffs lacked Article III standing to challenge Delaware MAID statute because they lacked "any plausible allegations of actual injury"), *appeal docketed*, No. 26-1001 (3d Cir. Jan. 2, 2026). Plaintiffs' own Complaint lacks any allegation that the Act itself will prevent the organizational Plaintiffs from offering the same services they already offer. To the extent that the organizational Plaintiffs allege that they *might* need to devote additional resources to efforts to advocate against using MAID, *see, e.g.*, Compl. ¶¶ 39, 43, 47, 54, these costs would not be enough to even establish standing for these organizations, let alone sustain a claim. *See, e.g.*, *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (explaining that it is "incorrect" to suggest that "standing exists when an organization diverts its resources in response to a defendant's actions"); *Curran*, 2025 WL 3763413, at *7 (rejecting organizational plaintiffs' argument that they had standing to challenge Delaware MAID law because of "some purported and minimal harm to their 'core business activities,' such as now having to spend time 'to ease the anxiety and fears regarding

members' end of life decisions'"). Proposed Intervenors, in contrast, have the direct and personal interests in the Act described in detail above, which Plaintiffs seek to impair with this lawsuit.

Because of the direct, imminent effect that the Act would have on Proposed Intervenors' lives, they "have an undoubted interest in the legislation under consideration," sufficient to justify intervention. *Jones v. Butz*, 374 F. Supp. 1284, 1287 (S.D.N.Y. 1974), *aff'd*, 419 U.S. 806 (1974); *see also In re New York City Policing*, 27 F.4th at 800 (proposed intervenors had interest in litigation that may be impaired because the "merits question before the district court is whether certain [] policies are permissible" and "[t]he answer to that question may require a change in those policies," affecting proposed intervenors' conduct and safety).

**C. Proposed Intervenors' Interests May Not Be Adequately Represented**

"The intervenor's burden of demonstrating inadequacy of representation is generally speaking minimal." *Republic of the Philippines*, 312 F.R.D. at 124 (cleaned up). "This requirement 'is satisfied if the applicant shows that representation of his interest *may be* inadequate.'" *In re New York City Policing*, 27 F.4th at 803 (emphasis in original) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Indeed, "the fact that Intervenors and [the State Defendants] desire the same *outcome* ... does not mean that [the State Defendants] adequately represents Intervenors' *interests*." *Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*, 2025 WL 2238226, at *5 (E.D.N.Y. Aug. 6, 2025) (emphasis in original). Proposed Intervenors have distinct interests that the State Defendants may not pursue, or pursue as zealously as Proposed Intervenors themselves would.

The State Defendants seek to defend the Act because they have an interest in ensuring that statutes passed through the democratic, legislative process are upheld. *See, e.g.*, *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022) ("No one questions that States possess 'a legitimate interest in the continued enforce[ment] of [their] own statutes.'" (quoting *Cameron* v.

*EMW Women's Surgical Ctr., P. S. C.*, 595 U.S. 267, 277 (2022)) (alterations in original)). The State Defendants do not otherwise stand to lose anything, such as the personal ability to access MAID, if Plaintiffs are successful here. By contrast, if Plaintiffs are successful, Proposed Intervenors would immediately be deprived of autonomy over their end-of-life care and denied access to a healthcare option that the Act made available. Courts have recognized that this type of personal stake necessarily differentiates the interests of intervenors from those of government defendants. For example, the Third Circuit has held that an intervenor's burden to show inadequate representation is "comparatively light" when a government entity defendant's "views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Pennsylvania v. President U.S.*, 888 F.3d 52, 60-61 (3d Cir. 2018) (internal citations omitted). Because the State Defendants do not face the immediate, personal deprivation of rights that Proposed Intervenors face, the State Defendants may also not need to prioritize urgency in their defense of this action in the way that Proposed Intervenors would, given the immediate harm to Proposed Intervenors that would result in, for example, setting a lengthy briefing or discovery schedule if the Act is even temporarily enjoined. By contrast, Proposed Intervenors, several of whom face unquestionably terminal diagnoses that will lead to their death and the accompanying decision of whether to use MAID or not, have a strong interest in ensuring that this case is handled with the sense of urgency that, from their standpoint, it demands.

Moreover, Proposed Intervenors each have deeply personal perspectives on the importance of the Act that they can draw on to defend against Plaintiffs' effort to invalidate it. *See supra*, at 4-8. By contrast, the State Defendants are relative newcomers to this policy area only from New York's recent legislative effort.

In short, the State Defendants may not be able to adequately defend Proposed Intervenors' interests because the State Defendants do not face the urgent, personal deprivation that Proposed Intervenors face. *Cf. New York Pub. Int. Rsch. Grp., Inc.*, 516 F.2d at 352 (granting intervention as of right where "there is a likelihood that the [intervenors] will make a more vigorous presentation of the economic side of the argument than would the" state regulatory body that issued the challenged regulation); *Butz*, 374 F. Supp. at 1287 (concluding that intervenors had a "different and distinct [interest] from the interest of the federal officials who have been named as defendants in this action and whose responsibility it is to administer the provisions of the [Humane Slaughter] Act" but who did not face the deprivation of rights that the intervenors faced if the act was invalidated). Simply put, Proposed Intervenors' "interest is personal," *Pennsylvania*, 888 F.3d at 60-61, while the State Defendants' interest is not.

## II. THE COURT SHOULD ALLOW PROPOSED INTERVENORS TO INTERVENE PERMISSIVELY

In the alternative, the Court should let Proposed Intervenors intervene under Rule 24(b). Whether to grant permissive intervention is within the "broad discretion" of the trial court. *Jones v. Stanford*, 525 F. Supp. 3d 420, 423 (E.D.N.Y. 2021). Permissive intervention is available to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). There can also be no question that Proposed Intervenors—who have an interest in accessing MAID, which would be denied if Plaintiffs are successful—have defenses that present common questions of law and fact with the main action.

Moreover, Proposed Intervenors "will bring a different perspective to the case and will contribute relevant factual variations that may assist the court in addressing the ... issue[s] raised." *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996). Proposed Intervenors offer unique perspectives that will be invaluable for the adjudication of Plaintiffs'

claims, including because they will be able to vigorously defend the interests underlying the MAID Act. Ms. Dudman, Ms. Gibson, Ms. Murphy, and Dr. Gurnett Bander have each experienced a family member's death from late-stage terminal illnesses—in Ms. Dudman's and Ms. Murphy's cases, their family members were able to access MAID and end their lives peacefully, on their own terms. Dr. Boal spent a decade of his medical career working with home-bound patients with late-stage illnesses and is intimately familiar with the suffering inherent in the end of many terminal conditions, including his own ALS. Mr. Pollak has dedicated his time and energy to challenging narratives (like those advanced by Plaintiffs) that people living with disabilities cannot make their own informed decisions and live full lives. "Considerations of fairness weigh in favor of the intervenors in light of their knowledge and strong interest in the subject matter of this action." *Id.*

When considering if Rule 24(b)'s "common question" requirement is met, courts also take into account "substantially the same factors" as under Rule 24(a). *R Best Produce, Inc.*, 467 F.3d at 240. As discussed above, this motion is timely, and "intervention will not unduly delay or prejudice adjudication," as this case is in its earliest stages, no scheduling order has been issued, and there has been no discovery. *See supra* Part I.A. Permissive intervention is warranted.

## III. ALL PARTIES ARE ON NOTICE OF PROPOSED INTERVENORS' POSITIONS, JUSTIFYING FLEXIBILITY WITH RULE 24(c)'S REQUIREMENTS

To provide the Court and parties with a comprehensive understanding of Proposed Intervenors' positions relating to the underlying matter, attached to this Motion is Proposed Intervenors' proposed brief in opposition to Plaintiffs' request for a preliminary injunction. *See* Chabot Decl., Ex. A. If the Court grants Proposed Intervenors' motion to intervene, whether as of right or permissively, Proposed Intervenors respectfully request that the Court accept the filing of Proposed Intervenors' Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

In addition, Proposed Intervenors respectfully request that they be granted leave to respond to the Complaint on the same deadline as the State Defendants or three business days after intervention is granted, whichever is later.

In general, Rule 24(c) requires interveners to submit a pleading setting out "the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). "Where, however, the position of the movant is apparent from other filings and where the opposing party will not be prejudiced, Rule 24(c) permits a degree of flexibility with technical requirements," such as waiver of intervenor's obligation to file an answer. *Windsor v. United States*, 797 F. Supp. 2d 320, 325 (S.D.N.Y. 2011) (quoting *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393 n.8 (S.D.N.Y. 2002)); *see also Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2021 WL 2646349, at *13 (E.D.N.Y. June 28, 2021) ("Courts within the Second Circuit have held that Rule 24(c) permits a 'degree of flexibility with technical requirements' and have dispensed with the pleading requirement when the proposed intervenor[']s position is 'clearly articulated' in its motion papers." (quoting *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 2017 WL 9400673, at *8 n.4 (N.D.N.Y. Jan. 6, 2017))).

There is no prejudice to Plaintiffs here because Proposed Intervenors' "position on the subject matter of the litigation"—namely Proposed Intervenors' intent to defend the Act against each of Plaintiffs' allegations, including based on Proposed Intervenors' personal experience and expertise—"is clearly articulated" above and in the attached opposition to Plaintiffs' request for a preliminary injunction. *Windsor*, 797 F. Supp. 2d at 326.

Accordingly, Plaintiffs respectfully submit that "[w]aiver of the pleading requirement is justified here." *Windsor*, 797 F. Supp. 2d at 326; *see also Barry's Cut Rate Stores Inc.*, 2021 WL 2646349, at *14 ("The Court waives the pleading requirement for Proposed Intervenors …because

their position on this litigation is clearly articulated in their motion papers, which include copies of their proposed briefing ….").

**CONCLUSION**

The Court should grant Proposed Intervenors' motion to intervene as of right under Rule 24(a) or, in the alternative, permit Proposed Intervenors to intervene under Rule 24(b). Proposed Intervenors also respectfully request that the Court accept the filing of Proposed Intervenors' Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction, attached to this Motion, and that Proposed Intervenors be granted leave to respond to the Complaint on the same date as the State Defendants or three business days after intervention is granted, whichever is later.

Dated: June 22, 2026

Respectfully submitted,

/s/ Ryan Chabot
WILMER CUTLER PICKERING
HALE AND DORR LLP
Ryan Chabot
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6513
ryan.chabot@wilmerhale.com

COMPASSION LEGAL
THE END-OF-LIFE JUSTICE CENTER AT
COMPASSION & CHOICES
Veronica Darling, Esq. (She/Her/They)*
Jessica Pezley, Esq. (She/Her)*
8156 S. Wadsworth Blvd. E162
Littleton, CO 80128
(800) 247-7421
vdarling@compassionandchoices.org
jpezley@compassionandchoices.org

**Pro hac vice* forthcoming

*Attorneys for Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,<br><br>*Defendants.* | Case No. 1:26-cv-03492 |

**DECLARATION OF JEREMY BOAL, M.D.**

I, Jeremy Boal, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained herein and, if called as a witness, could and would competently testify to each of the following facts.

2. I am 59 years old, a New York resident, and I was diagnosed with amyotrophic lateral sclerosis ("ALS") in November of 2023. ALS is a progressive neuro-degenerative disease that affects nerve cells in the brain and spinal cord. The muscle weakness will eventually impact my ability to speak, swallow, and breathe. Currently, there is no cure for ALS. ALS is universally fatal.

3. I identify as a person with a disability.

4. Until my retirement in 2023 as a result of my ALS diagnosis, I was the Chief Clinical Officer of the Mount Sinai Medical Center in New York. Prior to retirement, I spent a decade of my career working with home-bound patients with late-stage illnesses who received palliative care in their homes through the Mount Sinai Medical Center.

5. My initial ALS symptoms occurred while I was doing global health work in Nepal in August of 2023. Since ALS is a diagnosis of exclusion, it took several months to determine what was causing my symptoms.

6. Before my symptoms began, I was in good physical health and thought I had a long life ahead of me. Both of my parents are still alive, and I believed I would enjoy a long life like theirs. After my diagnosis, I realized that I am on a much shorter timeline. The vast majority of ALS patients die within three to five years of diagnosis. Based on the current progression of my disease, I expect to have 1 to 3 years of life remaining.

Case 1:26-cv-00886 Document 2 Filed 02/23/26 Page 3 of 9 PageID #: 215

7. I am constantly adapting to the progressive nature of ALS. Every few months a new muscle group is impacted.

8. While I am currently able to walk short distances around my home with the assistance of a rolling walker, I require a motorized wheelchair for any activity outside my home. I have limited energy, so I must decide what is most important on any given day and conserve my energy for that.

9. Receiving my diagnosis was incredibly challenging for me, not least because during my medical career, I had treated many patients with late-stage ALS and witnessed end-stage ALS multiple times. As a result, I was very familiar with the impact ALS has on patients and their loved ones and I knew what was in store for me. For some ALS patients, the degree of suffering they and their caregivers experience at the end of the patient's life is beyond measure. It was hard to imagine myself and my family in the situations I had observed as a physician.

10. Once I was able to process my diagnosis, and knowing the difficult end-of-life experience that many ALS patients face, I began making plans to ensure that I could access medical aid in dying in either in Vermont or New Jersey, since the option was not yet legal in New York. As soon as I had plans in place to ensure that I would not have to suffer through the end stages of ALS, my outlook on my diagnosis and the time I have remaining completely changed. I was able to focus on living instead of worrying about dying.

11. Since my retirement, I have spent my time doing the things I love and are meaningful to me: gardening and tending to my goats, chickens, and dogs; spending quality time with my wife, our two daughters, and our friends; meditating and studying Buddhism; and advocating for the passage of New York's Medical Aid in Dying Act ("MAID Act").

12. Ensuring medical aid in dying is available in my home state of New York for myself and others facing terminal illnesses is very important to me. I became involved in my advocacy work for New York's MAID Act because from my experience working with terminally ill New Yorkers, I had concerns that the vast majority of New Yorkers would not have the resources or ability to go to another state for access to medical aid in dying. No one should have to needlessly suffer at the end of life because of lack of resources.

13. I became aware of medical aid in dying when Oregon passed the Death with Dignity Act in 1997 because I cared for many patients in their late stages of illness – including through their dying and death. In my work, I saw patients with access to world-class care and significant resources nevertheless suffering through the end of their lives. I carry those patients' experiences with me to this day and think about them often.

14. My professional experience demonstrates that we cannot always eliminate suffering for terminally-ill people. However, based on my personal and professional experiences with terminal illness, I believe that mentally competent adults in New York with a terminal prognosis and the ability to self-ingest medication should have the option to access medical aid in dying to avoid suffering at the end of life.

15. With my illness, as with many other life-shortening diagnoses, I cannot know how soon my time will come. I do not want the MAID Act to be enjoined and to deprive me of this important healthcare option if and when I am eligible.

16. I understand that medical aid in dying as set out in the MAID Act is one of several end-of-life healthcare options that a terminally-ill person who meets the Act's criteria for eligibility can utilize in conjunction with other end-of-life options, such as hospice and palliative care. When my ALS progresses to its final stages and my death is imminent, I want medical aid

in dying available as one of my healthcare options in my home state of New York. Otherwise, my family and I would be forced to spend time and resources seeking this care in another state.

17. Based on my understanding of the MAID Act, my disability does not automatically or presumptively qualify me for medical aid in dying. I know that I will need to have a terminal prognosis of six months in order to access medical aid in dying. The Act contains explicit language that prevents an individual from qualifying for medical aid in dying based solely on age or disability.

18. I do not fear that I will be coerced into obtaining a prescription from my trusted healthcare provider. Because I am a doctor who specialized in caring for people at the end of life, I have been watching the implementation and impact of medical aid in dying in other states for almost thirty years. I was concerned at first that there was going to be a disproportionate use of medical aid in dying in poor communities because of lack of access to quality care; because people would feel a duty to die in order to not be a burden to their family or other caregivers; because people would feel pressured by insurance companies; or because the law would be expanded to include people who did not have a terminal prognosis. None of these fears have materialized. I have seen thirty years of data from Oregon and other states that shows that medical aid in dying laws like the MAID Act contain robust safeguards that prevent its abuse.

19. My decision to pursue medical aid in dying in the final months of my life, or not, is entirely voluntary and my decision alone. I have experienced an incredible peace of mind since the MAID Act was signed into law in February 2026, knowing that I will be able to access this healthcare option and have the medication available to me, even if I ultimately decide not to use it. The knowledge that the Act empowers me to have control over the manner and timing of my

inevitable death from ALS has made this otherwise difficult part of my life a little easier and given me the freedom to fully live my life without fear of death and the dying process.

20. I have reviewed the complaint in this case, and am deeply concerned that this important healthcare option may be taken away from me.

21. If the MAID Act does not go into effect as planned in August 2026, the thoughtful and emotional end-of-life planning I have engaged in with my medical team and my family will be compromised. I will again become more focused on the uncertainties of my death than the joy of living whatever time I have left to the fullest. I am worried the option of medical aid in dying will not be available for me if or when I choose to use it.

22. Terminally ill New Yorkers should not have to feel powerless and without access to a full range of safe healthcare options. Blocking access to medical aid in dying will deprive me and many like me of our autonomy and ability to make our own end-of-life decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 19 day of June, 2026.

Jeremy Bo…, M.D.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492

**DECLARATION OF BENNY POLLAK**

I, Benny Pollak, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained here. If called as a witness, I could and would competently testify to each of the following facts.

2. I am 67 years old and a New York state resident. I am quadriplegic and identify as a person living with a disability.

3. In 1980, I was in a car accident in Chile that caused a C5-C6 spinal cord injury. A few months after the accident, I came to New York for rehabilitative treatment.

4. I stayed in New York to finish my education at New York University, where I earned my Bachelor's and Master's in Computer Science and my Master of Business Administration. I have lived and worked in New York City ever since, and am a U.S. citizen.

5. I am still passionate about computer science after fifty years of working in the field and a self-identified technology loving geek. I am especially interested in AI and how it can be used to facilitate programming. You only need a brain and two fingers to program, and my condition has not limited my work at all.

6. I am the co-founder and sit on the Board of Directors of New York City Skeptics, an all-volunteer nonprofit that promotes critical thinking and science education. I also co-created and produced a podcast, Rationally Speaking, from my studio in Greenwich Village for over five years. The podcast explored important issues and interviewed scientists, journalists, and other thinkers such as Neil deGrasse Tyson. It stopped production in 2021.

7. I have used a wheelchair since my accident in 1980. My legs and torso are paralyzed, though I have use of my shoulders, arms, and limited use of my hands and fingers. I

use an adapted vehicle to drive around New York City, given that the subway system is generally inaccessible to people who use wheelchairs.

8. I live an independent life. As I age, I find that I need help with some morning and evening activities. I also have shifted to using an electric wheelchair most of the time. I value independence and autonomy, and I welcome any adaptations I need to continue to live my life to the fullest.

9. I travel to Chile about three times a year to visit my 96-year-old mother. Although I used to make this trip on my own, I now require assistance to travel. The hardest part of traveling with a disability is navigating airports, airplanes, and other places that have not prioritized accessibility. This has only gotten more difficult to do with age.

10. Based on my understanding of the New York Medical Aid in Dying ("MAID") Act, living with a disability does not automatically or presumptively qualify me for medical aid in dying. If I ever wanted to access medical aid in dying, I know that I will need to have a terminal prognosis of six months or less. I also understand that the MAID Act contains explicit language that prevents me from qualifying for medical aid in dying based solely on age or disability.

11. It offends and infuriates me that this lawsuit purports to represent all people who live their lives with disabilities, as if we all think, feel, and believe the same thing. This lawsuit is predicated on the idea that people with disabilities are "weaker" or need more protection than others. This offensive idea stems from the mistaken belief that a life with a disability is somehow less worth living.

12. Many people believe they would rather be dead than live like me, but they do not understand my lived experience. I live a very happy and full life. I do not want to die. And I do

not need anybody—other than myself in collaboration with my healthcare providers—deciding what medical care I should or should not use.

13. I want autonomy, independence, and the ability to decide what end-of-life care works best for me, and that is what the MAID Act provides. If I have a terminal illness, I want the agency and authority to decide if the option of medical aid in dying is right for me. I am participating in this lawsuit to protect the MAID Act, to preserve my end-of-life autonomy, and to contradict and challenge the paternalistic perspective that I cannot make my own informed decisions because I live with a disability and use a wheelchair.

14. I am a strong and outspoken advocate for the option of medical aid in dying. I volunteered with the Compassion & Choices campaign to pass the MAID Act to ensure that the perspectives of people who live with disabilities are part of the discussion.

15. I find the argument that I am more susceptible to coercion because I live with a disability insulting. Multiple procedural requirements are built into the MAID Act. If I qualify for and decide to pursue medical aid in dying in the final months of my life, my decision would be entirely voluntary and mine alone. I am not concerned that I could or would be coerced.

16. I have the right to make my own healthcare decisions. The Americans with Disabilities Act does not protect me, it empowers me —there is a difference. I need autonomy and agency, not to be patronized. The MAID Act gives me the right to exercise autonomy and agency over the end of my life if and when I qualify.

17. Knowing the option of medical aid in dying exists gives me space to live my life without thinking about some future with unbearable suffering from a terminal illness. It angers me that my right to decide what is best for me based on my individual circumstances may be taken away if the MAID Act does not go into effect as planned.

18. All New Yorkers deserve access to a full range of healthcare options, regardless of whether or not they live with a disability. Denying qualified individuals access to medical aid in dying based on offensive assumptions about the vulnerability of people living with disabilities is both harmful and offensive to those of us living with disabilities. Preventing access to medical aid in dying for qualified individuals would deprive people with terminal illnesses of their autonomy and ability to make end-of-life healthcare decisions consistent with their own values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 18 day of June, 2026.

[signature]
Benny Pollak

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492

**DECLARATION OF DR. ANNE GURNETT BANDER**

I, Dr. Anne Gurnett Bander, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained here. If called as a witness, I could and would competently testify to each of the following facts.

2. I am 72 years old and a New York state resident. I moved to New York from the United Kingdom in 1985 to work in the pharmaceutical industry after completing my doctorate in biochemistry at Cambridge. I planned to stay for two years, but have lived in New York for over 40 years. In 1996, I married my husband, Jonathan ("Jon"), and we enjoyed an active and exciting life traveling the world, skiing, hiking, and scuba diving. On one of our many trips, Jon dropped his ski pole which, while seemingly minor, was our first indication that something was wrong.

3. In 2017, Jon was diagnosed with amyotrophic lateral sclerosis (ALS). ALS is a progressive nervous system disease that affects a person's mobility, speech, and body functions, eventually causing death. Jon was very familiar with ALS because it is the disease that had ended his father's life years before. There is currently no cure for ALS.

4. Jon did not let his ALS diagnosis slow him down or keep him away from the world. We traveled as much as we possibly could, scuba diving three separate times in 2018, and traveling to India, Japan, and Europe. Even as his legs weakened, Jon was able to continue skiing by using adaptive ski braces. We enjoyed as much of life as we could before ALS prevented Jon from traveling and adventuring. In May 2021, Jon died at home, where I cared for him with the help of a professional caregiver who is now one of my closest friends.

5. Jon's death—just a month before our twenty-fifth wedding anniversary, and four days after his sixty-sixth birthday—was a huge and tragic event in my life, but I refused to let grief consume me. I continued to travel on my own and with friends, often spending a few

months in Colorado to ski during the winter. During one of my trips back to the U.K., I fell unexpectedly. While I initially blamed my bad knee, the unexpected falls continued, and I began to realize there was something wrong.

6. In August 2025, after nearly two years of working with my doctors to determine the cause of my falls, I was diagnosed with ALS. The diagnosis took so long in part because it is extraordinarily rare for both people in a marriage to have ALS.

7. Being diagnosed with ALS was overwhelming, confusing, and frightening because I was with Jon through his ALS and knew what was coming.

8. Jon was aware of all his end-of-life healthcare options, including relocating to a state where medical aid in dying was available, but decided against it. Jon chose the end-of-life path that worked best for him and I supported his decision, although it was devastating for me to experience his death so closely. When Jon died, he had been unable to speak for over a year. He was bedridden and unable to move his limbs or his hands.

9. Knowing firsthand what the end of life with ALS looks like, the autonomy to choose the manner and timing of my death gives me immense peace of mind and solace. Because medical aid in dying will be an available healthcare option for me in New York under the Medical Aid in Dying Act ("MAID Act" or the "Act"), I am able to focus on living, rather than dying.

10. I have a good support system of friends and caregivers in New York, and want to die in the place I have called home for the last 40 years—not in Switzerland, Oregon, or Vermont. Since my diagnosis, I have continued to travel the world, seeing Berlin, Paris, Florence, Rome, and Vietnam, and I plan to continue traveling for as long as I can, though I have

also had to cancel some plans due to my illness. Despite needing a walker, I am determined to enjoy life while I still can.

11. I go to an ALS clinic in New York every three months, which helps prepare me for my symptom progression over the next three months, and I am able to call my neurologist directly. I do everything I can to slow down the progression of my ALS: prescription drugs, injections, physical therapy, and occupational therapy. I am able to use a walker to move through the world right now, but I am very wobbly and am getting an electric wheelchair in the next few months.

12. Not everyone in my situation will choose medical aid in dying, and that is an important part of the Act—voluntary choice. I was raised in a very religious family. My brother, a preacher, supports my decision even though he would not make it for himself. People like me, who are facing certain death from an incurable and irreversible disease, should be allowed to choose the end-of-life healthcare option that fits best with their values and beliefs, even if others disagree.

13. I do not fear that I will be coerced into obtaining a prescription for medical aid in dying from my trusted healthcare provider. I understand the MAID Act requires at least three independent physicians to agree in order to confirm eligibility, and that the process can take time. My decision to pursue medical aid in dying in the final months of my life, if and when I ever qualify for the MAID Act, would be entirely voluntary and my decision alone.

14. My care team is focused on ensuring I have the best quality of life possible for as long as possible, while also respecting my personal healthcare decisions, including if and when I choose to use medical aid in dying.

15. I am a strong and vocal advocate for the option of medical aid in dying and volunteered with the Compassion & Choices campaign to pass the MAID Act. I have shared my story at demonstrations, and directly with Governor Hochul's staff, in order to do all that I could to ensure the MAID Act passed and is an available option for me if and when I qualify.

16. If the MAID Act does not go into effect as planned in August 2026, I am worried that the option of medical aid in dying will not be an available healthcare option for me if and when I qualify. Forcing people with six months or less to live to travel to another state or country to access the end-of-life healthcare option they need is cruel, unrealistic, and nearly impossible for most people. I want to stay in my home, surrounded by friends and caregivers I know and love at the end of my life.

17. Having the option of medical aid in dying available to me gives me space to live. It frightens me that this right could be taken away.

18. All New Yorkers deserve access to a full range of healthcare options. Denying access to medical aid in dying to qualified individuals will deprive people with an ALS diagnosis like me of our autonomy and ability to make our own end-of-life healthcare decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 17 day of June, 2026.

Anne Gett Bander

Dr. Anne Gurnett Bander

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492

**DECLARATION OF IRIS DUDMAN**

I, Iris Dudman, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained herein and, if called as a witness, could and would competently testify to each of the following facts.

2. I am 76 years old and a New York resident. I was diagnosed with a recurrence of glioblastoma in November 2025. Glioblastoma is a highly aggressive, incurable brain cancer. Surgery, radiation, and chemotherapy can ease my symptoms and slow the growth of the cancer but cannot cure me. Although I am part of a highly experimental drug trial, I likely only have months, not years, left to live.

3. I have lived in Hastings-On-Hudson for the past 40 years. I am married and have two grown children. I retired in 2017 after a career working for public radio, local news stations, and finally Consumer Reports, where I worked in their video news department for 25 years. During my retirement, I have been an active volunteer, gardener, and community member.

4. Prior to my glioblastoma diagnosis, I was an otherwise healthy and active 74-year-old. In November 2024, my eye doctor noticed a loss of my peripheral vision during a routine eye exam. Two days later, after an emergency MRI and consultation with a neurosurgeon, I underwent my first brain surgery. I began chemotherapy and radiation treatments and wore a device on my head 24 hours a day to prevent the regrowth of the glioblastoma.

5. Unfortunately, the glioblastoma returned in December 2025. Since then, I have had a second brain surgery, entered an experimental drug trial, and undergone frequent MRIs. A third tumor was discovered on May 14, 2026. I take a strictly timed regimen of medicines and work with a physical therapist to help manage my symptoms. I have regained the ability to walk unassisted, but I still cannot do certain tasks like garden, which is a huge loss for me.

6. I do not want to die, but I know that my death, hastened by my current condition, is unavoidable.

7. In what are likely the last few months of my life, I am focusing my time and energy on the things that are most important to me, and that includes advocating for New York's Medical Aid in Dying Act ("MAID Act").

8. I witnessed both of my parents suffer drawn-out deaths. My uncle, by contrast, had advanced lung cancer and was in severe pain but experienced a peaceful death in Oregon via medical aid in dying many years ago.

9. Because of my uncle's positive experience with medical aid in dying, and to avoid the painful suffering my parents experienced, I was excited to volunteer on the campaign to support the MAID Act. I strongly believe that New Yorkers like myself should have access to medical aid in dying as a healthcare option if they qualify.

10. I have looked into traveling to Vermont to access medical aid in dying there, but the process of qualifying in Vermont, arranging for a place to die, and traveling while at the end of life is arduous. Time is a very finite resource for me these days, and I do not want to spend the time and energy I have left making arrangements to die far from my beloved home.

11. I know that with my illness, as with many other life-shortening diagnoses, I will not know how fast the end will come or when I may want to access the option of medical aid in dying. But I want the option to die at home, and when I die, I want to be able to look out my windows at the trees I look at every day, and to be surrounded by family and loved ones.

12. Since the discovery of the glioblastoma, I have found an increasing appreciation of the beauty and joy life has to offer. I realize how much people love me and how much I love them. I tell people what they mean to me and that I love them, and people continue to contact me

to share with me what I mean to them. I have had the privilege of participating in meaningful conversations with people from all parts of my life that make me feel valued, appreciated, and loved. I take great pleasure in almost anything now—even simply looking at beautiful things.

13. Over the last three years, I have spent lots of time writing letters to the editor, calling my representatives' offices, and testifying before the State legislature in support of the MAID Act.

14. I hope to continue to use my voice and my story to advocate for the MAID Act, not only so that it is available to me if and when I choose to use it, but also that it is available to other mentally competent adults who have six months or less to live and the ability to self-administer the medication.

15. I feel strongly that medical aid in dying as set out in the MAID Act should be one of several end-of-life healthcare options a qualified terminally-ill person can utilize in conjunction with other end-of-life options, such as hospice and palliative care. When my glioblastoma progresses to its final stages and my death is imminent, I want the option to access medical aid in dying in my home state of New York. I do not want the MAID Act to be enjoined because it would deprive me of this important healthcare option if and when I am eligible

16. Based on my understanding of the MAID Act, my glioblastoma does not automatically or presumptively qualify me for medical aid in dying. I know that I will need to have a terminal prognosis of six months in order to access medical aid in dying. I also understand that the MAID Act contains explicit language preventing me from qualifying for medical aid in dying based solely on age or disability.

17. I do not fear that I will be coerced into using the MAID Act. Multiple safeguards are built into the law. My decision to pursue medical aid in dying in the final months of my life

would be entirely voluntary and my decision alone. I have experienced an increased sense of peace since the Act was signed into law in February 2026, knowing that I will be able to access this healthcare option and have the medication available to me, even if I ultimately decide not to use it. The knowledge that the MAID Act allows me the option to control the manner and timing of my inevitable death from glioblastoma has given me the freedom to fully live my life without fear of death and the dying process.

18. I am deeply concerned that this lawsuit could take an important healthcare option away from me.

19. If the MAID Act does not go into effect as planned in August 2026, the thoughtful and emotional end-of-life planning I have discussed with my medical team and my family will be compromised. I will again become more focused on the uncertainties of my death than the joy of living whatever time I have left to the fullest. I am worried that the option of medical aid in dying will not be available for me if or when I choose to use it.

20. Terminally ill New Yorkers like me should not have to feel powerless and without access to a full range of safe healthcare options. Blocking access to medical aid in dying will deprive me and many like me of our autonomy and ability to make our own end-of-life decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 21 day of May, 2026.

Signed by:
Iris Dudman
77502D01D524429...
Iris Dudman
5/21/2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492

**DECLARATION OF STACEY GIBSON**

I, Stacey Gibson, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained herein and, if called as a witness, could and would competently testify to each of the following facts.

2. I am 74 years old, a New York resident, and I have been diagnosed with multiple cancers including breast cancer, lung cancer, and, most recently, B-cell lymphoma. Thankfully, both my breast and lung cancers are in remission. Unfortunately, my lymphoma is incurable. B-cell lymphoma is a common type of non-Hodgkin's lymphoma, a cancer of the lymph system. I am currently under the "watch and wait" protocol, meaning that I will not begin treatment for the lymphoma until I show symptoms or my blood tests indicate that I need to begin treatment. There is no cure for this type of cancer, but there are treatments that can manage the symptoms, such as immunotherapy, chemotherapy, bone marrow transplants, and radiation.

3. I have lived in New York my entire life, except while attending American University for three years. However, I received my undergraduate degree in sociology from Pace University which is in New York. I spent most of my career with Bristol MYERS Squibb, beginning as a secretary and eventually earning my M.B.A. and working in human resources.

4. Since retiring in 2009, I have spent my time working part time and volunteering with non-profit organizations focused on mental health and substance use. I also volunteer with the Make-a-Wish Foundation. I have also been politically active my entire life, regularly attending protests and communicating with my representatives about topics I care about. In my

Case 1:25-cv-03492-GEM-JAM Document 20-6 Filed 06/22/25 Page 3 of 6 PageID #: 228

free time, I love exercising, reading, traveling, and spending time with my family and my dog, Bernie.

5. I am a widow—my husband Sid died twelve years ago—and I have one step-daughter, and a grandson and granddaughter with whom I am very close.

6. My husband Sid of 36 years, was the love of my life. My experience with Sid's death from spinocerebellar ataxia inspired me to start advocating for the passage of New York's Medical Aid in Dying Act ("MAID Act").

7. Spinocerebellar ataxia is a progressively degenerative neurological disease that is similar to amyotrophic lateral sclerosis (commonly known as ALS). Spinocerebellar ataxia is terminal and there are no known treatments.

8. Starting in 2011, Sid began to lose his lower limb function. He soon needed to use a wheelchair and we installed a stair lift in our home. Because of how rare spinocerebellar ataxia is, his physicians were unable to provide a definitive diagnosis for Sid until 2012. Although Sid's prognosis was poor, it was a relief to receive a formal diagnosis because we finally had a name for what was happening to him.

9. As the disease progressed, Sid began to lose much of his ability to breathe, speak, and swallow. He would gag frequently, which was incredibly distressing for both of us.

10. As his death was approaching, Sid suffered greatly. In 2014, Sid chose to voluntarily stop eating and drinking ("VSED") to have some control over the timing of his death.

Sid's death was difficult for him. While Sid was dying, he asked me "to figure out a better way for people" to die.

11. Sid died at home in May 2014.

12. In 2015, I participated in the very first lobby day for New York's MAID Act. Over the last decade, as a tribute to Sid, I have spent lots of time writing letters to the editor, calling State Representative Dana Levenberg and State Senator Rob Rolison's offices, meeting with New York State Assembly members and Senators throughout the state, and lobbying in support of the MAID Act in Albany consistently for years. I became part of the group known affectionately as "the yellow shirts," a group of dedicated advocates who showed up constantly in Albany to make our voices heard and who worked for years to pass the MAID Act in New York.

13. I am proud to share Sid's story to advocate for the MAID Act, not only so that it is available to me if and when I choose to use it, but also so that it is available to other mentally competent adults who have six months or less to live and the ability to self-administer the medication. Medical aid in dying was not a healthcare option available to Sid; it is important to me that qualified New Yorkers have access to this option so they can choose not to endure the kind of suffering that Sid did at the end of his life.

14. I also want the option to choose medical aid in dying if I qualify. Although my lymphoma is not currently aggressive, I have had multiple cancer diagnoses, and I know it is likely that my lymphoma or another cancer will relapse or advance and kill me. I do not want the

Case 1:26-cv-00886 Document 16 Filed 03/23/25 Page 5 of 9 PageID #: 238

MAID Act to be enjoined, which would deprive me of access to this important healthcare option if and when I am eligible.

15. I feel strongly that medical aid in dying as set out in the MAID Act is one of several end-of-life healthcare options a qualified terminally-ill person should be able to utilize in conjunction with other end-of-life options, such as hospice and palliative care. I am not sure whether I will choose to use medical aid in dying, but its existence as an option is a comfort to me now.

16. Based on my understanding of the MAID Act, my disease does not automatically or presumptively qualify me for medical aid in dying. I know that I will need to have a terminal prognosis of six months in order to begin the process of obtaining a prescription for medical aid in dying with my physician. I understand that the MAID Act contains explicit language that prevents me from being qualified for medical aid in dying based solely on age or disability.

17. I do not fear that I will be coerced into obtaining a prescription from my trusted healthcare provider. Numerous safeguards are built into the law. My decision to pursue medical aid in dying in the final months of my life would be entirely voluntary and my decision alone.

18. I have experienced incredible peace of mind since the MAID Act was signed into law in February 2026, knowing that I will be able to access this healthcare option and have the medication available to me if or when I qualify, even if I ultimately decide not to use it. The knowledge that the MAID Act affords me the option to control the manner and timing of my inevitable death has allowed me to fully live my life without fear of death and the dying process.

19. I have reviewed the complaint in this case, and am deeply concerned that this important healthcare option may be taken away from me and other people with terminal diagnoses like Sid.

20. Because of this lawsuit, I am worried the option of medical aid in dying will not be available for me if or when I choose to use it. If the MAID Act does not go into effect as planned in August 2026, the thoughtful and emotional end-of-life planning I have discussed with my medical team and my family will be compromised. I will again become more focused on the uncertainties of my death than the joy of living whatever time I have left to the fullest.

21. Terminally ill New Yorkers should not have to feel powerless and without access to a full range of safe healthcare options. Blocking access to medical aid in dying will deprive me and many like me of our autonomy and ability to make our own end-of-life decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 18 day of June, 2026.

Stacey Gibson

Stacey Gibson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492

**DECLARATION OF NANCY MURPHY**

I, Nancy Murphy, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained herein and, if called as a witness, could and would competently testify to each of the following facts.

2. I am 87 years old and a New York state resident. I am currently in remission from triple-negative breast cancer (TNBC).

3. My husband and I have lived in the Adirondacks for the past 30 years after retiring from our careers in public service in Washington, D.C. I dedicated my life and career to volunteering and public service. After working for the Philadelphia Commission on Human Relation as fair housing director in the 1960s, I began my 37-year career with the U.S. Department of Housing and Urban Development, where much of my work included the creation and management of the Section 8 voucher program which currently provides housing assistance to more than 2 million low-income families.

4. I continue to be active in my community and volunteer work in my retirement. In addition to my advocacy of Medical Aid in Dying (MAID), I am on the board of Adirondack Voters for Change, which seeks change in the issues of climate, immigration, voter education, political transparency, and abortion access, as well as MAID. I am also on the board of Historic Saranac Lake, which works to preserve Saranac Lake history and architecture through a museum, oral history, and educational activities. I have been a hospice volunteer off and on for many years. I worship with the Saranac Lake Society of Friends (Quakers).

5. In March 2025, I was diagnosed with TNBC. Since my diagnosis, I have undergone surgery, six months of chemotherapy, and a month of daily radiation therapy. My most recent PET scan in January 2026 found no signs of cancer, confirming that my treatment

was successful. While my family and I are extremely pleased that my treatment is concluded and my scans are clear, I understand that TNBC is extremely aggressive and there is a more than 25% chance of recurrence.

6. My TNBC diagnosis changed my life dramatically. The treatment, which lasted for a year, caused me extreme fatigue. Before my diagnosis, I enjoyed gardening, aqua aerobics, walking with my dog, and multiple household tasks. Gradually, throughout the treatment, I became extremely fatigued and spent much of my time reading and staying in contact with friends by phone and email. I lost a lot of strength and stamina.

7. Now that I am done with treatment, I hope to regain the mobility and strength I had before by exercise, healthy eating and adequate sleep. It is likely that I will not totally regain my energy until the end of this year.

8. Predating my TNBC diagnosis, I have also been living with a disability related to degenerative arthritis in the lumbar section of my spine that results in pressure on the nerves in my lower back for about seven years which causes me pain standing and walking. Staying physically active, including exercise and aqua aerobics, is the best way to manage the pain. I use a handicap sticker on my car because I struggle with pain after about 10 minutes of walking or standing.

9. I have been a hospice volunteer for many years and have witnessed death and dying. Because of my work as a hospice volunteer, I understand the suffering of a long, lingering death and want to avoid that. Having the option of MAID will be a comfort, whether or not I end up using it.

10. I became an advocate for New York's Medical Aid in Dying Act (the Act) after my sister Joan Kline's use of the Vermont act to end her life from ovarian cancer in 2016. Joan

lived in Vermont when she was given a prognosis of months or possibly just weeks to live. Joan had been a member of the Hemlock Society since her early adulthood and knew exactly what she wanted at the end of life. On the day of her diagnosis, she requested the prescription for MAID from her physician, just in case she might need it. Her cancer gradually took over her body until she was in a hospital bed in her living room, unable to move or help herself in any way. She decided on her final day and was surrounded by her loved ones, who toasted her and told her how much she had meant to them and how much they loved her. She said she loved us and that she was satisfied and content with her life: all the places she had been, all the people she had known and things she had done. It was a profound, beautiful, and meaningful experience for me and my family. Everyone should have the option to die the way Joan did.

11. I am a vocal advocate for the option of MAID and have spoken at a press conference in the State House in Albany, in various meetings in Saranac Lake, and, during Covid, by Zoom with legislators and their staff two dozen times, telling my sister's story. I led the Adirondack Voters for Change efforts to get the law passed, coordinating many trips to Albany to lobby, and urging letters, emails and phone calls to legislators and the Governor throughout the process. Should my cancer return and become terminal, medical aid in dying is a healthcare option I want available for myself. Just like my sister, I want to be in charge of when I die, where I die, and with whom I die. I want to be surrounded by my loved ones when I die, just like Joan was surrounded by people who loved her. Medical aid in dying gives me that choice.

12. Should my cancer return and become terminal, MAID is a healthcare option I want available for myself. Just like my sister, I want to be in charge of when I die, where I die, and with whom I die. I want to be surrounded by my loved ones when I die, just like Joan was surrounded by people who loved her. MAID will give me that choice. Whether or not I, or

anyone else, decides to use MAID is a personal choice. The Act allows a terminally ill person with a less than six-month prognosis to ask for the medication. Each step in the process of obtaining and using MAID is a personal choice. Those who do not want to use the option should not prevent other people from accessing it.

13. Because of this lawsuit, I am concerned that the option of medical aid in dying will not be available for me if or when I choose to use it. If the Act does not go into effect as planned in August 2026, the thoughtful and emotional end-of-life planning I have discussed with my family will be compromised. I will again become more focused on the uncertainties of my death than living my life.

14. All New Yorkers deserve access to a full range of healthcare options, which the Act enables. Denying access to medical aid in dying to qualified New Yorkers deprives us of our autonomy and ability to make our own end-of-life decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 18th day of June, 2026.

N. S. M

Nancy Murphy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,<br><br>*Defendants*. | Case No. 1:26-cv-03492-OEM-JAM |

**DECLARATION OF RYAN CHABOT IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS OF JEREMY BOAL, IRIS DUDMAN, STACEY GIBSON, ANNE GURNETT BANDER, NANCY MURPHY, AND BENNY POLLAK**

I, Ryan Chabot, declare as follows:

1. I am an attorney admitted to practice before this Court, a member of the New York and New Jersey State Bars, a partner of the law firm Wilmer Cutler Pickering Hale and Dorr LLP,

and counsel of record for Dr. Jeremy Boal, Iris Dudman, Stacey Gibson, Dr. Anne Gurnett Bander, Nancy Murphy, and Benny Pollak ("Proposed Intervenors").

2. I submit this declaration in support of Proposed Intervenors' Motion to Intervene as Defendants. I have personal knowledge of the matters set forth in this declaration and, if called upon, could testify competently thereto.

3. Attached as Exhibit A is a true and correct copy of the Proposed Brief of Intervenors in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 22, 2026 at New York, NY.

/s/Ryan Chabot
Ryan Chabot

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,<br><br>*Defendants*. | Case No. 1:26-cv-03492-OEM-JAM |

**[PROPOSED] BRIEF OF INTERVENORS IN OPPOSITION TO PLAINTIFFS'**
**<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 2

I. New York's Medical Aid In Dying Act ........ 2

II. Intervenors ........ 5

III. Procedural History ........ 9

LEGAL STANDARD ........ 10

ARGUMENT ........ 10

I. Plaintiffs Are Not Likely To Succeed On The Merits ........ 10

A. Plaintiffs' Disability Discrimination Claims Are Unlikely To Succeed ........ 10

B. Plaintiffs' Equal Protection Claim Is Unlikely To Succeed ........ 13

C. Plaintiffs' Due Process Claims Are Unlikely To Succeed ........ 16

II. Plaintiffs Will Not Suffer Irreparable Harm Absent Injunctive Relief ........ 20

III. The Balance Of Equities And Public Interest Strongly Weigh Against Injunctive Relief ........ 22

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Best v. Craivan*,
2025 WL 2822301 (E.D.N.Y. Oct. 5, 2025) ........ 1, 10

*City of Cleburne, Texas v. Cleburne Living Center*,
473 U.S. 432 (1985) ........ 15

*Connecticut State Police Union v. Rovella*,
36 F.4th 54 (2d Cir. 2022) ........ 10

*Copeland v. Vance*,
893 F.3d 101 (2d Cir. 2018) ........ 16

*Corporation for Public Broadcasting v. Federal Emergency Management Agency*,
792 F. Supp. 3d 67 (D.D.C. 2025) ........ 22

*Curran v. Meyer*,
2025 WL 3763413 (D. Del. Dec. 30, 2025) ........ *passim*

*Dean v. Town of Hempstead*,
2024 WL 3849688 (E.D.N.Y. Aug. 16, 2024) ........ 13

*Deide v. Day*,
676 F. Supp. 3d 196 (S.D.N.Y. 2023) ........ 14, 15

*Faiveley Transportation Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ........ 20

*FCC v. Beach Communications, Inc.*,
508 U.S. 307 (1993) ........ 15

*Goe v. Zucker*,
43 F.4th 19 (2d Cir. 2022) ........ 16

*Harlen Associates. v. Incorporated Village of Mineola*,
273 F.3d 494 (2d Cir. 2001) ........ 13

*Henrietta D. v. Bloomberg*,
331 F.3d 261 (2d Cir. 2003) ........ 10

*Hudson Shore Associates Limited Partnership v. New York*,
139 F.4th 99 (2d Cir. 2025) ........ 13, 16

*Javino v. Pergament*,
2013 WL 1952639 (E.D.N.Y. May 10, 2013) .......... 20

*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002) .......... 21

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003) .......... 16

*Marino v. City University of New York*,
18 F. Supp. 3d 320 (E.D.N.Y. 2014) .......... 15

*McElwee v. County of Orange*,
700 F.3d 635 (2d Cir. 2012) .......... 10

*Mendoza-Lebron v. Adams*,
2025 WL 1920365 (E.D.N.Y. July 11, 2025) .......... 10, 13

*National Association for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025) .......... 21, 22

*Odums v. Niblack*,
2024 WL 4665268 (E.D.N.Y. Nov. 4, 2024) .......... 13

*Purgess v. Parauda*,
2021 WL 2269540 (S.D.N.Y. June 3, 2021) .......... 21

*Siguencia-Romero v. Joyce*,
2025 WL 3090887 (S.D.N.Y. Nov. 5, 2025) .......... 21

*Squirewell v. City of New York*,
2026 WL 1284249 (S.D.N.Y. May 11, 2026) .......... 20

*Tooly v. Schwaller*,
919 F.3d 165 (2d Cir. 2019) .......... 18

*United Spinal Association v. California*,
2024 WL 1671167 (C.D. Cal. Mar. 27, 2024) .......... 12, 14, 19, 20

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 15

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 17

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) .................................................................................... 22

*Wright v. City of New York*,
2010 WL 167951 (E.D.N.Y. Jan. 6, 2010) ..................................................................... 10

**Statutes**

N.Y. Pub. Health Law § 2899-d *et seq.* ........................................................................ *passim*

**Other Authorities**

Compassion & Choices, *Medical Aid-in-Dying Utilization Report* (Mar. 31, 2026), https://compassionandchoices.org/wp-content/uploads/2024/02/final_utilization-report-3.31.26.pdf........................................................................................................... 4, 19

Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Retraction Note: Regardless of Inequities in Care, Terminal Anorexia Nervosa Exists: A Response to Sharpe et al.*, J. EATING DISORDERS (Jul. 17, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10353152/ .................................. 21

Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal Anorexia Nervosa: Three Cases and Proposed Clinical Characteristics*, J. EATING DISORDERS (Feb. 15, 2022), https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3)......................... 21

Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-state-law (last visited June 22, 2026)................................................................ 3

Sponsor's Mem., N.Y. Senate Bill S138 ......................................................................... 15, 18

**PRELIMINARY STATEMENT**

Plaintiffs—two individuals and eight organizations—seek a preliminary injunction enjoining New York's Medical Aid in Dying Act (the "Act") from going into effect on August 5, 2026.[1] The Act that Plaintiffs ask this Court to enjoin has a narrow, singular purpose: to give terminally ill New Yorkers an additional end-of-life healthcare option—medical aid in dying ("MAID"). The Act makes MAID accessible only to mentally capable adults with a terminal illness and prognosis of six months or less to live who voluntarily request the medication from their trusted physician. Those who make a request for the medication must follow the Act's stringent procedural requirements, which are designed to ensure that any decision to obtain and use MAID is informed, voluntary, and free from coercion. The Act does not require anyone to request or use the medication provided for under the Act, nor does it require any healthcare provider to prescribe this medication to a patient.

Plaintiffs fall far short of the demanding standard for the extraordinary remedy of a preliminary injunction for multiple reasons.

*First*, Plaintiffs' claims are not likely to succeed on the merits. Plaintiffs' disability discrimination claims are unlikely to succeed because the Act does not target people living with disabilities—in fact, it expressly prohibits qualifying for MAID based solely on disability—and does not exclude Plaintiffs (or anyone else) from participating in or receiving benefits from any government program. Plaintiffs' constitutional claims fare no better. The Act does not violate equal protection, because it does not treat similarly situated people differently and is rationally

---

[1] Plaintiffs initially moved for a temporary restraining order ("TRO"), Dkt. 2, which the Court denied on June 15, 2026, *see* O.S.C., June 15, 2026. The Court further ordered that Plaintiffs' motion would be treated as a request for a preliminary injunction, *see id.*, which is governed by the same standard as a request for a TRO, *see, e.g.*, *Best v. Craivan*, 2025 WL 2822301, at *1 (E.D.N.Y. Oct. 5, 2025).

related to New York State's legitimate interest in allowing mentally competent, terminally ill adults the option to obtain a prescription for medication that will bring about a peaceful death if the qualified patient chooses to self-administer it. Nor does the Act violate due process, as it does not implicate a fundamental right and does not deprive anyone of anything at all, let alone without due process.

*Second*, Plaintiffs cannot show irreparable harm. The individual Plaintiffs are adamant in their desire not to use MAID, and nothing in the Act compels them to. The organizational Plaintiffs remain free to pursue their core business activities as they currently do. Plaintiffs' asserted injuries are thus remote and speculative, not actual and imminent.

*Third*, the balance of equities and the public interest weigh decisively against preliminary injunctive relief. A ruling for Plaintiffs would deprive qualified patients of access to MAID, denying them autonomy over their end-of-life healthcare decisions and the peace of mind from being able to control the manner and timing of their death from a terminal illness if they so choose. It would also upend the extensive and well-thought-out end-of-life plans of people like Intervenors, who have relied on the passage of the Act in planning their treatment and care. Plaintiffs face no comparable consequences.

For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

## STATEMENT OF FACTS

### I. New York's Medical Aid In Dying Act

After more than a decade of advocacy by New Yorkers living with terminal illnesses, grieving families, clinicians, and supporters across the state, Governor Kathy Hochul signed New York's Medical Aid in Dying ("MAID") Act into law on February 6, 2026. *See* Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-

state-law (last visited June 22, 2026). The Act goes into effect on August 5, 2026. *Id.* The Act provides terminally ill, mentally capable adults who have a prognosis of six months or less to live with the option to request, obtain, and decide to ingest aid-in-dying medication. *See* N.Y. Pub. Health Law § 2899-d *et seq.* To be eligible, the patient must be an adult, aged 18 or older; have a medically confirmed terminal illness that is incurable, irreversible, and will likely cause death within six months; be mentally capable of making an informed health care decision; and ultimately ingest the MAID medication by themselves. *See* N.Y. Pub. Health Law § 2899-d (defining key terms as used in the Act); *id.* § 2899-f(4) (providing that the patient "may self-administer the medication to themselves" and that a "health care professional or other person shall not administer the medication"). The Act expressly provides that "[n]o person shall qualify for medical aid in dying ... solely because of age or disability." *Id.* § 2899-e(4).

In addition to these eligibility criteria, the Act incorporates numerous requirements to ensure that every patient exercising rights under the Act makes a completely voluntary choice to do so.

*First*, the patient wishing to obtain a prescription under the Act must provide the attending physician with both an oral and a written request. N.Y. Pub. Health Law § 2899-e(1). The written request must be witnessed by two people—neither of whom can be a relative, someone who stands to benefit from the person's estate, or anyone who may benefit financially from the person's death, among other restrictions—while the oral request must be recorded by audio or video and permanently stored in the patient's medical record. *Id.* § 2899-e(1)-(3).

*Second*, the patient can rescind a request for MAID medication at any time. N.Y. Pub. Health Law § 2899-g(1). This option exists without regard to the patient's decision-making

capacity. *Id.* § 2899-g(2). Moreover, there is no requirement that a patient who qualifies for, requests, and receives the medication must administer it—ever.[2]

*Third*, the patient's attending physician must conduct an initial evaluation of the patient in person, unless the attending physician determines that an in-person visit would result in extraordinary hardship, in order to confirm that a patient has a terminal illness, has decision-making capacity, and has made the request voluntarily and without coercion. N.Y. Pub. Health Law § 2899-f(1). The attending physician must discuss with the patient all available end-of-life care options, including hospice and palliative care.[3] *Id.* § 2899-f(1)(e)-(g). The attending physician must also document diagnoses, determinations, and requests of the patient as part of the patient's medical records. *Id.* § 2899-j.

*Fourth*, the patient must also have a second, consulting physician confirm in writing to the attending physician and the patient that the patient requesting MAID is terminally ill, is making an informed decision, has decision-making capacity, and is acting voluntarily, without coercion. N.Y. Pub. Health Law § 2899-h.

*Fifth*, a mental health professional must evaluate the patient requesting MAID and provide a report in writing that assesses the patient's capacity to make an informed health care decision to the attending and consulting physicians. N.Y. Pub. Health Law § 2899-i(1).

---

2 Data reported by nine of the 14 jurisdictions where MAID is authorized show that, since the first MAID law was enacted in Oregon nearly 30 years ago, over a third of individuals (up to 39%) who qualified for and obtained a MAID prescription may have never taken the medication. *See* Compassion & Choices, *Medical Aid-in-Dying Utilization Report*, 3 (Mar. 31, 2026) [hereinafter MAID Utilization Report], https://compassionandchoices.org/wp-content/uploads/2024/02/final_utilization-report-3.31.26.pdf.

3 Most terminally ill adults who utilize MAID (89%) are enrolled in hospice or palliative care services at the time of their deaths, demonstrating MAID's compatibility with other supports. *See* MAID Utilization Report at 1.

*Sixth*, the Act imposes a mandatory five-day waiting period between when the prescription is written and when it can be filled, unless the attending physician determines that the patient is not expected to survive that period. N.Y. Pub. Health Law § 2899-f(3).

*Seventh*, healthcare providers are not required to prescribe the medication provided for by the Act. N.Y. Pub. Health Law § 2899-m(1).

## II. Intervenors

The Act is of critical importance to New Yorkers like Dr. Jeremy Boal, Iris Dudman, Stacey Gibson, Dr. Anne Gurnett Bander, Benny Pollak, and Nancy Murphy ("Intervenors").

Dr. Jeremy Boal is a 59-year-old New York resident with amyotrophic lateral sclerosis ("ALS"). Boal Decl. ¶ 2. ALS is a progressive neuro-degenerative disease that affects nerve cells in the brain and spinal cord. *Id.* The muscle weakness caused by ALS will eventually affect Dr. Boal's ability to breathe, speak, and swallow. *Id.* There is no cure for ALS, and based on the current progression of his disease, Dr. Boal's doctors believe that he has two to three years left to live. *Id.* ¶¶ 2, 6. Until his retirement in 2023 as a result of his ALS diagnosis, Dr. Boal was the Chief Clinical Officer of the Mount Sinai Medical Center in New York and spent a decade of his career working with home-bound patients with late-stage illnesses. *Id.* ¶ 4. From his experience as a practitioner, Dr. Boal knows that for some patients, "the degree of suffering they and their caregivers experience at the end of the patient's life is beyond measure." *Id.* ¶ 9. The passage of the Act has already benefited Dr. Boal, as he has "experienced an incredible peace of mind since the MAID Act was signed into law": knowing that he will eventually be able "to have control over the manner and timing of [his] inevitable death from ALS has made this otherwise difficult part of [his] life a little easier and given [him] the freedom to fully live [his] life without fear of death and the dying process." *Id.* ¶ 19. If the Act does not go into effect as expected, "the thoughtful and emotional end-of-life planning" that Dr. Boal has engaged in with his family and providers "will

be compromised," and he "will again become more focused on the uncertainties of [his] death than the joy of living whatever time [he has] left to the fullest." *Id.* ¶ 21.

The Act has similar significance for Intervenor Benny Pollak. Mr. Pollak is a 67-year-old New York resident. Pollak Decl. ¶ 2. Mr. Pollak lives with quadriplegia as a result of a car accident that caused a C5-C6 spinal cord injury in 1980. *Id.* ¶ 3. Mr. Pollak "want[s] autonomy, independence, and the ability to decide what end-of-life care works best for [him], and that is what the MAID Act provides." *Id.* ¶ 13. Mr. Pollak wishes "to protect the MAID Act, to preserve [his] end-of-life autonomy, and to contradict and challenge the paternalistic perspective that [he] cannot make [his] own informed decisions because [he] live[s] with a disability and use[s] a wheelchair." *Id.* Mr. Pollak is angered by the premise underlying Plaintiffs' suit—that all people with disabilities "think, feel, and believe the same thing." *Id.* ¶ 11. The related belief that "people with disabilities are 'weaker' or need more protection than others" is insulting to Mr. Pollak, who does "not need anybody—other than [himself] in collaboration with [his] healthcare providers—deciding what medical care [he] should or should not use." *Id.* ¶¶ 11-12. Mr. Pollak is also offended by the idea that he is "more susceptible to coercion because [he] live[s] with a disability." *Id.* ¶ 15. Mr. Pollak "need[s] autonomy and agency, not to be patronized." *Id.* ¶ 16. The Act offers Mr. Pollak "space to live [his] life without thinking about some future with unbearable suffering from a terminal illness." *Id.* ¶ 17. If the Act did not take effect, Mr. Pollak would be stripped of his "right to decide what is best for [him] based on [his] individual circumstances." *Id.*

Dr. Anne Gurnett Bander is a 72-year-old New York resident whose husband, Jon, was diagnosed with ALS in 2017. Bander Decl. ¶ 3. In 2021, four days after his sixty-sixth birthday and just a month before their twenty-fifth wedding anniversary, Mr. Bander died at home. *Id.* ¶¶ 4-5. At the time of his death, Mr. Bander was bedridden, could not move his hands or limbs, and

had been unable to speak for over a year. *Id.* ¶ 8. Two years later, Dr. Gurnett Bander began having unexpected falls, and in 2025 she too was diagnosed with ALS. *See id.* ¶¶ 5-6. "Knowing firsthand what the end of life with ALS looks like," Dr. Gurnett Bander feels "immense … solace" from the Act's passage. *Id.* ¶ 9. Dr. Gurnett Bander believes that "[a]ll New Yorkers deserve access to a full range of healthcare options" and that people like herself "should be allowed to choose the end-of-life healthcare option that fits best with their values and beliefs, even if others disagree." *Id.* ¶¶ 12, 18. If the Act were enjoined, "people with six months or less to live" would be forced "to travel to another state or country to access the end-of-life healthcare option they need," which is "cruel, unrealistic, and nearly impossible for most people." *Id.* ¶ 16. When she faces her own death, Dr. Gurnett Bander does not want to go elsewhere, but wishes "to stay in [her] home, surrounded by friends and caregivers [she] know[s] and love[s] at the end of [her] life." *Id.*

The Act is likewise crucial for Intervenor Iris Dudman. Ms. Dudman is a 76-year-old New York resident who was diagnosed with a recurrence of glioblastoma in November 2025. Dudman Decl. ¶ 2. Glioblastoma is a highly aggressive, incurable brain cancer, and Ms. Dudman "likely only ha[s] months, not years, left to live." *Id.* Ms. Dudman witnessed both of her parents suffer drawn-out deaths, whereas her uncle had a peaceful death in Oregon via MAID many years ago. *Id.* ¶ 8. Because of her uncle's positive experience with MAID, and her desire to avoid the suffering that her parents experienced, Ms. Dudman has spent the last three years advocating for the Act. *Id.* ¶¶ 9, 13. Ms. Dudman believes that qualified New Yorkers should have access to MAID as a healthcare option and wants to be able to access it when her glioblastoma progresses to its final stages and her death is imminent. *Id.* ¶ 15. Since the Act was passed, Ms. Dudman has "experienced an increased sense of peace," knowing that she "will be able to access this healthcare

option and have the medication available to [her], even if [she] ultimately decide[s] not to use it." *Id.* ¶ 17. Were the Act to be enjoined, Ms. Dudman would be deprived of her "autonomy and ability to make [her] own end-of-life decisions in accordance with [her] values, morals, and beliefs." *Id.* ¶ 20.

Stacey Gibson is a 74-year-old New York resident who has been diagnosed with multiple cancers, including breast cancer, lung cancer, and B-cell lymphoma. Gibson Decl. ¶ 2. While Ms. Gibson's breast and lung cancers are thankfully in remission, unfortunately, her lymphoma is incurable. *Id.* Ms. Gibson was inspired to begin advocating for the Act by her experience with the death of her beloved husband, Sid, who died of spinocerebellar ataxia, a terminal progressively degenerative neurological disease similar to ALS. *Id.* ¶¶ 6-7. Spinocerebellar ataxia caused Mr. Gibson to lose much of his ability to breathe, speak, and swallow, and he would gag frequently, causing a great deal of suffering before his death in 2014. *Id.* ¶¶ 9-10. Because MAID was not a healthcare option that was available to Mr. Gibson, it is important to Ms. Gibson that qualified New Yorkers have the option of MAID, "so they can choose not to endure the kind of suffering that Sid did at the end of his life." *Id.* ¶ 13. Additionally, Ms. Gibson "want[s] the option to choose medical aid in dying if" she qualifies. *Id.* ¶ 14. Ms. Gibson is not certain that she would use MAID, "but its existence as an option is a comfort to [her] now." *Id.* ¶ 15. Should the Act not take effect, Ms. Gibson and terminally ill New Yorkers would be "without access to a full range of safe healthcare options" and made "to feel powerless." *Id.* ¶ 21.

Nancy Murphy is an 87-year-old New York resident who is currently in remission from triple-negative breast cancer ("TNBC"). Murphy Decl. ¶ 2. TNBC is extremely aggressive, with a greater than 25% chance of recurrence. *Id.* ¶ 5. Ms. Murphy has been a hospice volunteer for many years and has "witnessed death and dying." *Id.* ¶ 9. As such, Ms. Murphy "understand[s]

the suffering of a long, lingering death and want[s] to avoid that." *Id.* Ms. Murphy became passionate about advocating for MAID after experiencing her sister Joan's death from terminal ovarian cancer. *Id.* ¶ 10. After receiving a prognosis of months to live, and because she lived in Vermont where MAID is available, Joan began the process of obtaining MAID medication, wanting it on hand even if she never decided to use it. *Id.* Joan became weaker and weaker, "until she was in a hospital bed in her living room, unable to move or help herself in any way," and eventually "decided on her final day." *Id.* She ingested her medication at home "surrounded by her loved ones." *Id.* This was "a profound, beautiful, and meaningful experience for [Ms. Murphy] and [her] family." *Id.* Ms. Murphy firmly believes that "[e]veryone should have the option to die the way Joan did." *Id.* Just like her sister, Ms. Murphy "want[s] to be in charge of when [she] die[s], where [she] die[s], and with whom [she] die[s]." *Id.* ¶ 11. Ms. Murphy "want[s] to be surrounded by [her] loved ones when [she] die[s], just like Joan was surrounded by people who loved her." *Id.* "Medical aid in dying gives [Ms. Murphy] that choice." *Id.* Ms. Murphy's view is that the choice to use MAID or not is a personal decision, and she believes that "[t]hose who do not want to use the option" of MAID should not be able to "prevent other people from accessing it." *Id.* ¶ 12.

## III. Procedural History

On June 11, 2026, after waiting four months after the Act was signed, Plaintiffs filed suit, Dkt. 1 ("Complaint"), and simultaneously moved for a TRO seeking to bar the Act's implementation, Dkt. 2 ("TRO Motion"). On June 15, 2026, the Court denied Plaintiffs' request for a TRO but ordered Defendants to respond to "Plaintiffs' request for preliminary injunctive relief by June 23, 2026," ahead of a preliminary injunction hearing to be held on June 25, 2026, "as to why a preliminary order should not issue enjoining Defendants from implementing and

enforcing New York's Medical Aid in Dying Act." Order to Show Cause ("O.S.C."), June 15, 2026.

**LEGAL STANDARD**

"The standard for granting a TRO is the same as the standard governing preliminary injunctions." *Best v. Craivan*, 2025 WL 2822301, at *1 (E.D.N.Y. Oct. 5, 2025). Either "is a drastic remedy that will not be granted lightly." *Wright v. City of New York*, 2010 WL 167951, at *1 (E.D.N.Y. Jan. 6, 2010). "A party seeking injunctive relief through either a temporary restraining order or a preliminary injunction must 'establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.'" *Craivan*, 2025 WL 2822301, at *1 (quoting *Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022)).

**ARGUMENT**

**I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

Plaintiffs fail to meet the standard for a preliminary injunction because they are not likely to succeed on the merits of any of their claims.

**A. Plaintiffs' Disability Discrimination Claims Are Unlikely To Succeed**

The Act does not discriminate against anyone for any reason, including people with disabilities. To show a likelihood of success on any of their disability discrimination claims under Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act ("ADA"), and Section 1557 of the Affordable Care Act ("ACA"), Plaintiffs must establish, among other things, that they were "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or [were] otherwise discriminated against by [defendants]

because of [their] disabilit[ies]." *Mendoza-Lebron v. Adams*, 2025 WL 1920365, at *7 (E.D.N.Y. July 11, 2025) (quoting *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (explaining that "unless one of those subtle distinctions [between the ADA and the Rehabilitation Act] is pertinent to a particular case, we treat claims under the two statutes identically"). Plaintiffs cannot demonstrate either of these elements.

*First*, the Act does not exclude Plaintiffs from participating in or receiving benefits from any government program. Rather, the statute allows qualified patients the right to access the full spectrum of end-of-life care, including medical aid in dying as one of many healthcare options. *See supra*, at 3-5. When analyzing a similar challenge to Delaware's MAID law, a Delaware district court relied on this distinction in concluding "that Plaintiffs are not likely to succeed on their claims under the ADA, Rehabilitation Act, and/or Affordable Care Act." *Curran v. Meyer*, 2025 WL 3763413, at *9 (D. Del. Dec. 30, 2025), *appeal docketed*, No. 26-1001 (3d Cir. Jan. 2, 2026). In that case, an individual plaintiff with quadriplegia because of a severe spinal cord injury and six organizations sought a TRO enjoining the implementation and enforcement of Delaware's End of Life Options Act ("EOLOA"), 16 Del. C. § 2501C *et seq*. In analyzing the merits of the plaintiffs' disability discrimination claims, the court observed that the EOLOA did not remove access to any existing suicide prevention programs, but rather added an additional healthcare option also available to terminally ill Delawareans, regardless of disability, and that there is no "case where discrimination under the ADA (or Rehabilitation Act or ACA) was found by virtue of a person with disabilities being granted *more* options than their non-disabled counterparts." *Id.* (emphasis in original). Similarly, a California federal district court analyzing a challenge to that state's MAID law, Cal. Health & Safety Code § 443, *et seq.*, concluded that "discrimination occurs

when an individual is excluded from participation in or denied the benefits of a service … not when he or she chooses *not* to participate in or receive the benefits of the service." *United Spinal Ass'n v. California*, 2024 WL 1671167, at *6 (C.D. Cal. Mar. 27, 2024) (emphasis added), *appeal docketed*, No. 24-2751 (9th Cir. Apr. 30, 2024).

Also as in *Curran*, Plaintiffs here present no evidence to contradict the plain fact that the Act leaves preexisting government services intact, including those related to suicide prevention discussed in Plaintiffs' motion, *see* TRO Mot. at 11, allowing Plaintiffs to continue accessing them regardless of the Act's implementation. *See Curran*, 2025 WL 3763413, at *9 ("Contrary to Plaintiffs' suggestion, nothing in Delaware's EOLOA could reasonably be read to deny people with disabilities under the ADA with access to suicide prevention services."). Even if any of the individual Plaintiffs decided to decline these other government services because they one day became eligible and decided to pursue MAID—which may never happen—that would not be enough to succeed on their discrimination claims. As the court concluded in *United Spinal*, "[f]atal to Plaintiffs' claims … is that a terminally ill patient's decision to request aid-in-dying medication—and accordingly, to not participate in or seek the benefits of other public health services—is voluntary." 2024 WL 1671167, at *6.

*Second*, even assuming that Plaintiffs showed that the Act denied them a government benefit (it does not), Plaintiffs are unlikely to succeed on their disability discrimination claims because the Act does not distinguish based on disability and contains express protections to ensure that a terminal illness with a six-month-or-less prognosis is the key eligibility factor—not the existence of a disability. Despite conspicuously omitting any reference to § 2899-e(4) from their Complaint and motion, Plaintiffs cannot deny that this provision of the Act explicitly provides that disability on its own does not qualify someone for MAID. *See* N.Y. Pub. Health Law § 2899-e(4)

("No person shall qualify for medical aid in dying under this article solely because of age or disability."). If a patient has a qualifying terminal illness and prognosis and complies with the Act's procedural requirements, they would be eligible to request MAID regardless of whether they *also* have a disability. Moreover, nothing in the Act precludes patients who decide to pursue MAID from accessing any other government services "because of [their] disabilit[ies]." *Mendoza-Lebron*, 2025 WL 1920365, at *7.

At bottom, because the Act "does not deny people with disabilities the right to suicide prevention services" or any other government benefit, and because it does not "contain any provisions encouraging or steering patients toward" MAID, the Act "does not amount to discrimination or otherwise violate the ADA, Rehabilitation Act, or Affordable Care Act." *Curran*, 2025 WL 3763413, at *9. "Accordingly, Plaintiffs' request for a [preliminary injunction] under [these] counts [should be] denied on the merits." *Id.*

**B. Plaintiffs' Equal Protection Claim Is Unlikely To Succeed**

Plaintiffs' equal protection claim fares no better. To show a likelihood of success on a facial challenge under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 11 of the New York State Constitution, a plaintiff must demonstrate that in all cases, the government failed to "treat all similarly situated people alike." *Odums v. Niblack*, 2024 WL 4665268, at *3 (E.D.N.Y. Nov. 4, 2024) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)); *see also Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 107 (2d Cir. 2025) (explaining that "the Supreme Court has made facial claims the most difficult challenge to mount successfully" and that such challenges require plaintiffs to show "that the law is unconstitutional in all of its applications" (cleaned up)); *Dean v. Town of Hempstead*, 2024 WL 3849688, at *43 (E.D.N.Y. Aug. 16, 2024) ("New York State

Case 1:26-1:26-cv-02634-JAM Document #: 29-1 Filed 08/18/26 Page 80 of 90 PageID #: 266

Courts apply the same analysis for equal protection claims under the Fourteenth Amendment of the United States Constitution and Article 1 § 11 of the New York State Constitution."). Plaintiffs cannot make this showing because, as discussed below, patients with a terminal illness are not a suspect class, *see, e.g.*, *Deide v. Day*, 676 F. Supp. 3d 196, 220 (S.D.N.Y. 2023), because the Act treats all people alike for purposes of determining eligibility for MAID (whether they also have disabilities or not), and because the Act is rationally related to a legitimate state interest.

Here, Plaintiffs allege that the Act makes two classifications: (1) terminally ill individuals (who qualify for MAID under the Act) and (2) non-terminally ill individuals. *See* Compl. ¶¶ 141-142; TRO Mot. at 13. As an initial matter, Plaintiffs' equal protection claim fails because they cannot show that the Act treats "similarly situated" parties differently in all circumstances. As discussed above, the Act expressly prohibits anyone from qualifying for access to MAID based solely on their disability, *see* N.Y. Pub. Health Law § 2899-e(4), thereby treating all people alike for purposes of evaluating MAID eligibility regardless of disabilities. That is, the Act still requires anyone living with a disability to have a terminal illness, a prognosis of six months or less to live, and to comply with the Act's procedural requirements to be eligible to receive a MAID prescription, which are the same requirements the Act imposes on individuals without disabilities. Additionally, as the *United Spinal* court observed, to the extent the Act treats terminally ill patients differently, a fundamental difference between terminally ill patients who qualify for MAID and those who are ineligible for MAID is that the former group—that is, those with "an incurable and irreversible illness or condition" who will die within six months, N.Y. Pub. Health Law § 2899-d(17)—"face a distinctive prospect of pain and suffering associated with the dying process, along with heightened emotional anxiety related to that process" that those without such a prognosis do not face. *United Spinal Ass'n*, 2024 WL 1671167, at *7 (internal quotation marks omitted); *see*

*also supra*, at 5-9. "That the latter group does not face the imminent possibility of death … is sufficiently dispositive to render the two groups fundamentally dissimilar" and doom Plaintiffs' equal protection claims. *United Spinal Ass'n*, 2024 WL 1671167, at *7.

Even assuming that these groups are similarly situated, Plaintiffs' equal protection claim still fails. Because neither terminally ill individuals nor individuals with a disability are a suspect class, the Act is subject to rational basis review. *See, e.g.*, *Deide*, 676 F. Supp. 3d at 220 (identifying "race, national origin, or alienage" as the classifications warranting strict scrutiny) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)); *Marino v. City Univ. of New York*, 18 F. Supp. 3d 320, 340 (E.D.N.Y. 2014) ("Persons with disabilities are not a suspect class and review of their equal protection claims are subject to rational basis review." (citing *City of Cleburne*, 473 U.S. at 442-447)); *Curran*, 2025 WL 3763413, at *13 (concluding that Delaware's MAID law "is subject to rational basis review" because it does not "involve a classification based on a suspect or quasi-suspect class"). Under that standard, courts "will uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *United States v. Skrmetti*, 605 U.S. 495, 522 (2025) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

The Act easily survives rational basis review. The New York State Legislature's stated interests in enacting the Act include a desire to "enable mentally competent, terminally ill patients to choose to self-administer medication to bring about a peaceful death" and to "provide[] their physician, when acting in good faith in accordance with the provisions of the Act, protections from civil and criminal liability and professional disciplinary action." Sponsor's Mem., N.Y. Senate Bill S138, https://www.nysenate.gov/legislation/bills/2025/S138. Just as the *Curran* court concluded that similar reasons justified the classifications in the Delaware EOLOA, New York

legislators' stated interests supporting a finding that the Act's classifications are "rationally related to a legitimate governmental purpose" and pass rational basis review. *Curran*, 2025 WL 3763413, at *11, 13.

### C. Plaintiffs' Due Process Claims Are Unlikely To Succeed

Plaintiffs' due process claims are likewise destined to fail. Plaintiffs assert both substantive and procedural due process claims under the Fourteenth Amendment of the United States Constitution and Article I, Section 6 of the New York State Constitution. *See* Compl. ¶¶ 212-221. However, the Act does not abridge any fundamental right, is justified by legitimate governmental interests, and does not involve any deprivation by the state. Plaintiffs have not established otherwise, particularly under the heightened requirements for a facial challenge, which require Plaintiffs to "go further" than the baseline showing for a due process claim and "show[] that the challenged statute 'cannot constitutionally be applied to anyone' because due process will be deprived in all circumstances." *Hudson Shore Assocs. Ltd. P'ship*, 139 F.4th at 113 (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)). Accordingly, both of Plaintiffs' due process claims fail.

*First*, Plaintiffs will fail on their substantive due process claim. In assessing a facial substantive due process challenge, courts consider two questions: "first, whether a fundamental right is implicated … and, second, once the appropriate level of judicial scrutiny is determined, whether the challenged regulations pass muster." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022). "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Id.* (quoting *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003)). If the infringed right is fundamental, the court applies strict scrutiny; if not, it applies rational basis review. *Id.*

Plaintiffs allege that the Act infringes on their "right to live." *See, e.g.*, Compl. ¶ 145. But Plaintiffs provide no support for their conclusory assertion that "the Act implicates the fundamental right to life." TRO Mot. at 14. To the extent Plaintiffs seek to rely on *Washington v. Glucksberg*, 521 U.S. 702 (1997), this reliance is misplaced. In *Glucksberg*, the Supreme Court was confronted with the question of "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance." 521 U.S. at 723. Although the Supreme Court concluded that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause," *id.* at 728, it did not say that there was conversely a "right to live" that would forever foreclose the constitutionality of MAID laws. In fact, the Supreme Court was careful to note that its holding in *Glucksberg* did not preclude the possibility that states could enact laws allowing for MAID, explaining that "Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide," and that the *Glucksberg* "holding permits this debate to continue, as it should in a democratic society." *Id.* at 735-736.

Plaintiffs' conclusory argument also fails because implicit in their overbroad framing of the implicated "right" is a claim that terminally ill individuals have a fundamental right "to be free from living within a jurisdiction that *permits* them—but does not require them—to [pursue MAID]." *Curran*, 2025 WL 3763413, at *11. Yet as in *Curran*, Plaintiffs have not cited to any "historical tradition" showing that such a "right" is "implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Zucker*, 43 F.4th at 30. Accordingly, the Court should find, as the *Curran* court did, that MAID statutes like the Act do not implicate a fundamental right. *See* 2025 WL 3763413, at *10.

Because the Act "does not implicate a fundamental right, the Act is subject to a rational basis review." *Curran*, 2025 WL 3763413, at *11. As discussed above, *see supra*, at 15-16, New York has articulated multiple state interests, including an interest in "enabl[ing] mentally competent, terminally ill patients to choose to self-administer medication to bring about a peaceful death" and "provid[ing] their physician, when acting in good faith in accordance with the provisions of the Act, protections from civil and criminal liability and professional disciplinary action," Sponsor's Mem., N.Y. Senate Bill S138, https://www.nysenate.gov/legislation/bills/2025/S138. These "are all legitimate governmental interests that pass rational basis review." *Curran*, 2025 WL 3763413, at *10.

*Second*, Plaintiffs' procedural due process claim is also unlikely to succeed because pursuing MAID is entirely voluntary under the Act. "A procedural due process claim requires the plaintiff to establish (1) possession by the plaintiff of a protected liberty or property interest, and (2) deprivation of that interest without constitutionally adequate process." *Tooly v. Schwaller*, 919 F.3d 165, 173 (2d Cir. 2019). Neither element is met.

The Act does not deprive anyone of anything, let alone "a protected liberty or property interest." The Act functions by expanding healthcare options available to qualified patients that they otherwise would not have, without taking away eligibility or access to any benefit, service, property, or right from any individuals. *See supra*, at 11-12.

Moreover, MAID is entirely voluntary. Only a patient whose attending physician (and several others) have determined that the patient is making the request for MAID "voluntarily, of the patient's own volition and without coercion" is permitted to submit a "request for and consent to self-administer" MAID medication. N.Y. Pub. Health Law §§ 2899-e(2)-(3). The Act also guarantees that patients who request the medication have a right to rescind their request "at any

time … without regard to the patient's decision-making capacity." *Id.* § 2899-g; *see also id.* § 2899-f(1)(i) (requiring the attending physician to "inform the patient that such patient may rescind the request for medication at any time and in any manner"). And prior to the patient receiving the medication, multiple individuals must confirm that the patient "has decision-making capacity, has made an informed decision and has made the request voluntarily of the patient's own volition and without coercion." *Id.* § 2899-f(1)(a) (attending physician's responsibilities); *see also id.* § 2899-e(3) (same for at least two qualifying witnesses); *id.* § 2899-h(2) (same for consulting physician); *id.* § 2899-i (mental health professional's responsibilities). The Act also expressly prohibits anyone except the patient who requested and was prescribed the medication from administering it. *Id.* § 2899-f(4) ("A health care professional or other person shall not administer the medication to the patient."). Data from jurisdictions where MAID is authorized shows that over a third of individuals prescribed MAID do not end up taking the medication, further underscoring its voluntary nature. *See* MAID Utilization Report at 3.

In short, Plaintiffs have not presented any evidence showing that the Act would require them to do anything, instead relying on a baseless assumption that multiple individuals will disregard the requirements imposed by the plain language of the Act that are designed to facilitate a voluntary decision to pursue MAID. Nor have Plaintiffs pointed to any evidence to show that the Act's multiple eligibility requirements will be disregarded in a way that facilitates coercion, let alone any actual evidence that the *state* would be the one acting maliciously. The "voluntary nature" of the Act is thus "[f]atal to Plaintiffs' procedural due process claim." *Curran*, 2025 WL 3763413, at *12.

Further dooming Plaintiffs' procedural due process claim is Plaintiffs' failure to "establish[] why the [Act's] safeguards … do not constitute sufficient 'process.'" *United Spinal*

*Ass'n*, 2024 WL 1671167, at *7. In *United Spinal*, the court observed that the California MAID law's "stringent hurdles a requesting patient must overcome before receiving aid-in-dying medication … were presumably included to avoid the otherwise foreseeable danger of involuntary death." *Id.* The court further noted that

> for a patient to relinquish involuntarily his or her right to life, in violation of the Due Process Clause, the following would have to occur: (1) a terminally ill patient, mistakenly or under coercion, makes two oral requests and a written request on a specific legislative form for aid-in-dying medication; (2) two witnesses to the patient's signing of the written form fail to recognize that the patient is incapable of making a voluntary and informed decision; (3) the patient's attending and consulting physicians both misdiagnose him or her as being capable of making an informed decision; and (4) after receiving the life-ending medication, the patient self-administers it against his or her own free will.

*Id.* The court in *United Spinal* concluded that "[t]his speculative chain of contingencies is far too implausible and unforeseeable to amount to a deprivation of process." *Id.* The New York MAID Act not only contains the same procedural "hurdles" to individuals seeking MAID medication but adds additional requirements. *See* N.Y. Pub. Health Law §§ 2899-d to 2899-k. Accordingly, this Court should reach the same conclusion as in *United Spinal* and find that Plaintiffs' procedural due process claim fails.

## II. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Plaintiffs fail to establish that they will suffer irreparable harm, which "is the single most important prerequisite" to a preliminary injunction. *Javino v. Pergament*, 2013 WL 1952639, at *1 (E.D.N.Y. May 10, 2013) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "To establish irreparable harm, the alleged harm 'must be shown to be actual and imminent, not remote or speculative' and 'cannot be adequately redressed by final relief on the merits.'" *Squirewell v. City of New York*, 2026 WL 1284249, at *1 (S.D.N.Y. May 11, 2026)

(quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). "If the movant does not carry his burden to establish that he will suffer irreparable harm absent the issuance of an injunction, a court need not consider the other factors, such as likelihood of success on the merits." *Purgess v. Parauda*, 2021 WL 2269540, at *3 (S.D.N.Y. June 3, 2021).

The individual Plaintiffs have failed to establish that they will suffer any harm (let alone death, *see* TRO Mot. at 18) as a result of the Act, given that none of them has any desire to pursue MAID as an option. Moreover, "it is 'incorrect' that 'a violation of constitutional rights per se constitutes irreparable injury.'" *Siguencia-Romero v. Joyce*, 2025 WL 3090887, at *5 (S.D.N.Y. Nov. 5, 2025) (quoting *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025)).

Plaintiffs' attempt to manufacture an injury based on a purported threat to individuals with certain conditions also fails because these allegations are based on pure speculation or misrepresentations of the evidence. For example, Plaintiffs claim that the Act could harm people who are prescribed MAID medication based on a "terminal anorexia" diagnosis, Compl. ¶ 114, which they explain is a concept that "first emerged in a journal article in 2022," *id.* ¶ 111 (citing Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal anorexia nervosa: three cases and proposed clinical characteristics*, J. EATING DISORDERS, at 1 (Feb. 15, 2022), https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3). That article's authors, however, then retracted it and "apologi[zed] for the distress and the unintended negative impact of th[e] piece." Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Retraction Note: Regardless of inequities in care, terminal anorexia nervosa exists: a response to Sharpe et al.*, J. EATING DISORDERS (Jul. 17, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10353152/. Plaintiffs have no evidence that, with this context, any providers would rely on such a disputed diagnosis as a basis for prescribing MAID.

Because the only purported harm that the individual Plaintiffs have alleged is "remote or speculative" rather than "actual and imminent," *Nat'l Ass'n for Gun Rts.*, 153 F.4th at 248, the individual Plaintiffs have not established that they will suffer irreparable harm if the preliminary injunction is denied.

The organizational Plaintiffs likewise fail to establish irreparable harm. Although they claim that the Act goes against their "core business activities," TRO Mot. at 19, "invoking harm to an organizational mission is no end-run around the demanding test for irreparable harm," *Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 76 (D.D.C. 2025) (finding no irreparable harm). Plaintiffs' abstract assertions aside, the Act does not deprive anyone, let alone disabled individuals, of any existing benefits, *see supra*, at 11, nor does it prevent the organizational Plaintiffs from continuing to provide any of the advocacy, counseling, or other support services that they currently do, *see supra*, at 12. Rather, it offers eligible individuals an additional benefit, in the form of an end-of-life healthcare option, that they can choose to utilize or not. The organizational Plaintiffs thus remain free to pursue their missions even without a preliminary injunction.

In short, Plaintiffs have failed to show that they will suffer irreparable harm absent injunctive relief.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY WEIGH AGAINST INJUNCTIVE RELIEF

These remaining factors strongly weigh against a preliminary injunction. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) ("When the government is a party to the suit, [the court's] inquiries into the public interest and the balance of the equities merge."), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021). There is a compelling interest in both ensuring that New Yorkers, including Intervenors, are able to access MAID if they are eligible, and preventing

unnecessary pain and suffering. Enjoining the Act would prevent terminally ill New Yorkers who meet the Act's stringent eligibility criteria from obtaining and, if they then choose, utilizing MAID. Not only would this deny qualified patients autonomy over their healthcare decisions, including the manner and timing of their deaths, but it would also force them to die in a manner contrary to their personal morals, beliefs, and values, and in spite of their physicians' medical judgment that MAID is a suitable healthcare option. Enjoining the Act would specifically disrupt the expectations of individuals like Intervenors, who have relied on the passage of the Act in planning their end-of-life care and who would be plunged into a state of uncertainty and fear if the Act is even preliminarily enjoined. No countervailing factors weigh in Plaintiffs' favor, given that, as discussed above, the Act does not require the individual Plaintiffs to do anything, and it does not interfere with the organizational Plaintiffs' ability to continue providing the services that they already do.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: June 22, 2026

Respectfully submitted,

/s/ Ryan Chabot
WILMER CUTLER PICKERING
HALE AND DORR LLP
Ryan Chabot
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6513
ryan.chabot@wilmerhale.com

COMPASSION LEGAL
THE END-OF-LIFE JUSTICE CENTER AT
COMPASSION & CHOICES
Veronica Darling, Esq. (She/Her/They)*

Case 1:26-cv-03490-CBM-JAM Document 20-9 Filed 06/22/26 Page 30 of 30 PageID #: 268

Jessica Pezley, Esq. (She/Her)*
8156 S. Wadsworth Blvd. E162
Littleton, CO 80128
(800) 247-7421
vdarling@compassionandchoices.org
jpezley@compassionandchoices.org

*Pro hac vice forthcoming

*Attorneys for Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak*