**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EBONY PAYNE, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 26-CV-06886 |
| JAY ROBERT PRITZKER, in his official capacity as Governor of Illinois, et al., | ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This lawsuit challenges Illinois' End-of-Life Options for Terminally Ill Patients Act ("the "Act"), or "Deb's Law," which is set to take effect on September 12, 2026. The plaintiffs are two individuals with life-threatening disabilities (quadriplegia and cerebral palsy), six organizations who advocate for the rights of disabled persons or provide direct services to them, and one Illinois physician concerned about the ethical norms of the medical profession. The plaintiffs assert that the Act discriminates against disabled patients in violation of three federal statutes and violates both the Due Process and Equal Protection Clauses of the United States Constitution by eliminating, solely for disabled persons, the existing standard of medical care. Now three plaintiffs move for a preliminary injunction to stop state officials from implementing the Act. The defendants, who are the Governor and the Director of the Department of Public Health in their official capacities and the Department itself, responded in defense of the law. The Court held a hearing on September 4, 2026, at which the parties addressed whether the plaintiffs have standing to seek a preliminary injunction and whether they have established the requirements for that relief.

Having considered the parties' written submissions and oral arguments, the Court denies the motion for a preliminary injunction on the ground that the plaintiffs lack standing to seek that

relief: they fail to establish that they have a concrete and imminent future injury that is traceable to the action or inaction of any named defendant. In addition, the plaintiffs have not demonstrated that they will suffer irreparable harm without an injunction. Finally, the Governor is not a proper defendant in this action, and the Department of Public Health is proper only with respect to the statutory discrimination claims.

## BACKGROUND

### I. The Act

The Governor of Illinois signed the Act into law on December 12, 2025, with an effective date nine months from approval. In enacting the legislation, the General Assembly made findings that medical aid in dying "is part of general medical care and complements other end-of-life options, such as comfort care, pain control, palliative care, and hospice care, for individuals to have an end-of-life experience aligned with their beliefs and values" and that it "provides an additional end-of-life care option for terminally ill individuals who seek to retain their autonomy and some level of control over the progression of the disease as they near the end of life or to ease unnecessary pain and suffering." 410 ILCS 22/5(a)(1), (2).

Under the Act, a "qualified patient"—defined as "an adult Illinois resident with the mental capacity to make medical decisions" with a "terminal disease"—may ask a physician to prescribe "medication to bring about a peaceful death."410 ILCS 22/10; 22/25(a). A "terminal disease" is defined as "an incurable and irreversible disease that will, within reasonable medical judgment, result in death in 6 months," based upon an in-person examination by the patient's attending physician and the agreement of another doctor. 410 ILCS 22/10.

A "qualified patient" must presently possess the mental capacity to make his or her own medical decisions. 410 ILCS 22/10; 22/35(a)(2); 22/40(2)(C). The patient cannot confer decision-making to anyone else and cannot use an advance healthcare directive to request medical aid in

dying. 410 ILCS 22/25(e). The patient must also have the capacity to self-administer the medication through ingestion. 410 ILCS 22/10. The Act specifies that "[n]o person will be considered a 'qualified patient' under this Act solely because of advanced age, disability, or a mental health condition, including depression." *Id*.

If a patient requests medical aid in dying, the Act mandates a lengthy process to determine the patient's qualifications and allow the patient time to consider the decision. First, the patient must make an oral request to his or her attending physician, who documents it, and then a written request that is witnessed by two people who are not the patient's doctor and at least one of whom is not a family member or other interested party. 410 ILCS 22/25(a); 410 ILCS 22/30(a)-(c). The attending physician "must provide sufficient information to a patient regarding all appropriate end-of-life care options, including comfort care, hospice care, palliative care, and pain control, as well as the foreseeable risks and benefits of each." 410 ILCS 22/15(b); 22/35(a)(4). At least five days after the first oral request, the patient must make a second oral request to the attending physician, at which time the physician shall provide the patient with the opportunity to rescind the request. 410 ILCS 22/25(a)(4);410 ILCS 22/25(d). (There is a condensed procedure for patients who are likely to die within 5 days. 410 ILCS 22/25(c)).

At that point, a second doctor enters the process: a consulting physician evaluates the patient, reviews his or her medical records, and, if appropriate, confirms in writing that the patient has requested a prescription for medical aid in dying; has a documented terminal disease; has mental capacity to make such decision; and is acting voluntarily without coercion or undue influence. 410 ILCS 22/40. If the doctors are unable to determine whether the patient has the requisite mental capacity, the patient is then referred to a licensed mental health professional. 410

ILCS 22/45(a). If the patient is deemed to have a psychological disorder causing impaired judgment, the patient is not qualified to receive medical aid under the Act. 410 ILCS 22/45.

After this process unfolds and a patient is deemed qualified, the attending physician can prescribe medication for the patient to self-administer and thereby end his or her life. 410 ILCS 22/35(a)(14), (a)(15). The physician must inform the patient that he or she can rescind the request and has no obligation to fill the prescription or take the medication. 410 ILCS 22/35(a)(4)(E), (a)(5). If that patient proceeds, his or her death "shall be attributed to the underlying terminal disease" and "shall not be designated a suicide or homicide." 410 ILCS 22/90(b). The Act provides that its procedures "do not, for any purposes, constitute suicide, assisted suicide, euthanasia, mercy killing, homicide, murder, manslaughter, elder abuse or neglect, or any other civil or criminal violation under the law." 410 ILCS 22/100(b).

The Act also regulates physicians. It provides that nothing in the Act "shall be interpreted to lower the applicable standard of care for the health care professionals participating under this Act." 410 ILCS 22/20. A physician is obligated to explain to patients interested in end-of-life assistance all alternative options for end-of-life care and to confirm that the patient has the requisite mental capacity and is not acting out of coercion or in duress. 410 ILCS 22/35(a)(2)- (a)(4). A physician who provides medical aid in dying must submit a report to the Department of Public Health within 30 days of prescribing life-ending medication; the report must include "notice that the requirements under this Act were completed." 410 ILCS 22/75(b).

The Act does not allow anyone but a patient to initiate medical aid in dying, 410 ILCS 22/25(e), and the patient can rescind the decision at any time. See 410 ILCS 22/30(e), 22/35(a)(5). It also bars insurance companies from reducing or removing coverage because a patient has a

terminal illness that might qualify him or her for medical aid in dying, 410 ILCS 22/80(c), 410 ILCS 22/85.

## II. The Lawsuit

Plaintiff Ebony Payne is paralyzed from the neck down and has severe asthma. She has continuous home care for help with eating, bathing, and going anywhere. She is frequently hospitalized for serious, life-threatening situations. She is a member of the United Spinal Association ("United Spinal") and has received services from the Progress Center for Independent Living ("PCIL"). Plaintiff Pamela Heavens "lives with cerebral palsy which causes significant weakness" and confines her to a wheelchair." She is also a member of United Spinal serves as board secretary for PCIL. And plaintiff Nooshig Luz Salvador is an internal medicine physician whose practice includes treating people with disabilities and who has a specialty in hospice and palliative medicine. She has an interest in the rights of medical professionals to censure or discipline physicians who violate the ethical norms of the profession by assisting suicide.

Plaintiff United Spinal is a national organization whose members have serious spinal cord injuries and diseases. According to the Complaint, "[m]any of the members, at least initially, suffer from depression and some have suicidal thoughts or compulsive and involuntary thinking about suicide, known as suicidal ideation, but oppose suicide and support suicide prevention programs." United Spinal advances disability rights through its "work on issues such as increasing access to quality, affordable health care and independent living services, enhancing and reforming government benefit systems, and preserving social security benefits." Plaintiff PCIL is a non-profit corporation that provides direct services to approximately 150 individuals with disabilities at any given time. It also "uses many means to try to dissuade consumers from taking their own lives, including counseling, verbal persuasion, referral to resources, and reaching out to loved ones,

family members and others to help.” Plaintiff National Council on Independent Living (NCIL) is a national cross-disability grassroots organization run by and for people living with disabilities. NCIL’s members are centers for independent living, statewide independent living councils, allied organizations, and individuals with disabilities. Plaintiff Not Dead Yet (NDY) is a national disability rights organization with a mission “to prevent the involuntary withdrawal or withholding of life sustaining medical treatment for persons with severe disabilities.” Plaintiff Institute for Patients’ Rights (IPR) is a national organization that “advocates for individuals’ rights in numerous health care contexts wherein people are being devalued to death by public policies or practices in medicine.” Plaintiff Chicago ADAPT is a grassroots membership organization that campaigns for people with disabilities to live independently and with the least restrictions.

About six months after the Act was signed into law (and three months before its effective date), the three individual and six organizational plaintiffs filed a six-count complaint seeking declaratory and injunctive relief. They assert that the Act violates Title II of the ADA because, for those with terminal disabilities, “it relieves their physicians of the obligation to provide life extending care, which they are obliged to provide to other citizens” and “remov[es] for them, and only for them the legal duty of the doctor to do no harm.” Further, they allege a “disproportionate adverse and harmful impact on individuals who have extended and severe disabilities that are a costly burden to insurers and hospitals and make them especially vulnerable to being pressured into assisted suicide.” And they assert that the Act also “excludes Plaintiffs, by virtue of their disabilities, from the Defendant State’s suicide prevention programs.” Finally, they allege that the Act deprives disabled persons of reasonable accommodations, which would include “safeguards” such as a judicial hearing as part of the medical-aid-in-dying protocol. The plaintiffs assert that the

alleged ADA violations also constitute violations of §1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

As to the constitutional violations, the Complaint alleges that the Act deprives persons with disabilities of procedural due process by "setting up a scheme for assisted suicide without any prior hearing or procedural check on the taking of life of another by a private party" and of substantive due process by virtue of its "delegation of the power to take life to private actors, and its erasure of the physician's duty to do no harm," which puts "Plaintiffs and the constituents of Plaintiff organizations in a situation of state-created danger, in [a] manner that shocks the conscience." The plaintiffs also assert a denial of their rights under the Equal Protection Clause because the Act imposes a "scheme for physician assisted suicide, with no objective parameters for who is eligible, [which] cannot be consistently applied, and is arbitrary, capricious, and dangerous to the Plaintiffs and others with life threatening disabilities." And finally, plaintiff Dr. Salvador claims that the Act unlawfully interferes with doctors' protected liberty interest "to censure or discipline physicians who violate the ethical norms of the profession" and "to control their own norms and internal practices that have been collectively developed as an essential part of the practice of medicine."

A month after filing suit, three of the plaintiffs—Ebony Payne, United Spinal, and PCIL—moved for a preliminary injunction "prohibiting the Defendants in this action from implementing the [Act]…during the pendency of this action." In their briefing, they primarily discuss their standing and their likelihood of success on the merits of their claims, though they also contend that they meet the other requirements for a preliminary injunction. They supported the motion with declarations from (1) Payne; (2) Stephen Lieberman, Director of Advocacy & Policy for United Spinal; and (3) Horacio Esparza, Executive Director of PCIL. The defendants, in opposition to the motion, contend that no plaintiff has standing, that certain defendants are not proper parties, that

the plaintiffs have no likelihood of success on their claims, and that the other requirements for injunctive relief are lacking. The Court held a hearing where the parties argued their positions and answered questions but did not submit testimony or any further evidence. The motion is ripe for decision.

## DISCUSSION

### I. Standing

Because Article III standing goes to subject-matter jurisdiction, the Court must begin with that issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998). Article III standing has three required components: (1) an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairy traceable to the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id*. at 561.

The plaintiffs must establish their standing for the type of relief sought—here, prospective injunctive relief. *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009). This requires them to "show a significant likelihood and immediacy of sustaining some direct injury." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000). "[A]n alleged risk of injury does not satisfy Article III unless it is both 'substantial' and likely to materialize 'in the near future.'" *Arcidiacono v. Whitehorn*, 178 F.4th 338, 344 (7th Cir. 2026) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). "Allegations of future injury founded on nothing more than conjecture or hypothesis do not suffice." *Id*. (citing *Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043, 1048 (7th Cir. 2025)).

The organizational plaintiffs can establish standing in two ways. First, they may have associational standing, which is "derivative of—and not independent from—individual standing."

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021). In a suit on behalf of its members, "an association must show that: (1) at least one of its members would 'have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members.'" *Id*. (quoting *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977)).

Alternatively, an organization may have standing on its own behalf, in which case it must independently satisfy the requirements of standing. *See White v. Illinois State Police*, 15 F.4th 801, 807 (7th Cir. 2021). When it comes to injury-in-fact, "an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *Food & Drug Admin. v. All. for Hippocratic Med*., 602 U.S. 367, 394 (2024) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 486 (1982)). Instead, an organization has an injury-in-fact if a defendant "directly affect[s] and interfere[s] with" the organization's "core business activities." *Id*. at 395.

**A. The individual plaintiff lacks a sufficiently concrete future injury.**

Ms. Payne asserts that the Act removes "the physician's legal obligation to do no harm." As a result, she contends, the Act imposes a substantial risk of imminently inflicting four types of intangible injury on her. It "(1) deprives Payne of her legal right to the physician's ethical obligation to do no harm, (2) changes the legal and real-life basis of the patient-physician relationship, (3) excludes Payne from the full force of suicide prevention programs and activities of the State, which were previously intended for her, and (4) subjects her to have painful conversations about suicide now that suicide is a standard treatment under [the Act]."

As a threshold matter, as it relates to the concreteness of her purported injuries, Ms. Payne says that "right now" she "qualifies for [medical aid in dying] because, she attests, "she is "likely to die within six months without ongoing medical treatment and support." The defendants dispute that this is qualifying. The debate arises because they have different interpretations of the definition of "terminal disease"— "an incurable and irreversible disease that will, within reasonable medical judgment, result in death within 6 months." 410 ILCS 22/10. Payne contends that the definition applies to patients like her who will die within six months "without treatment"—for example, the diabetic who stops using insulin. The defendants contend that it applies only to patients who will die within six months *even with* treatment. The Act is silent, unlike in New York, for example, where the definition specifies that death will occur "with or without treatment." The district court in *Brooklyn Center for Independence of the Disabled, et al. v. Hochul et al.*, No. 26-CV-03492, 2026 WL 2198870 (E.D.N.Y. July 30, 2026) held, over the plaintiffs' arguments, that this means "even with" treatment. The Illinois definition of "terminal" resembles statutes in Delaware, 16 Del. C. § 2502C(17), and California, Cal. Health & Safety Code § 443, which do not further qualify the phrase "will result in death within 6 months." Still, district courts in those states have rejected the argument that the statutes could apply to a plaintiff whose condition would result in death within six months only without medical intervention. *Curran v. Meyer*, No. CV 25-1475-GBW, 2025 WL 3763413, at *6 (D. Del. Dec. 30, 2025); *United Spinal Ass'n v. California*, No. 2:23-cv-03107, 2024 WL 1671167, at *4 (C.D. Cal. Mar. 27, 2024). The Delaware court deemed it "absurd" to interpret "terminal" to include treatable illnesses. *Curran*, 2025 WL 3763413, at *6; *see United Spinal Ass'n*, 2024 WL 1671167, at *4 ("reasonable medical judgment" of death within six months necessarily incorporates possible avoidance of death with treatment.).

The Court agrees with the defendants that it would not make sense to interpret the Act to apply to patients who would live beyond six months, perhaps indefinitely, with treatment. A "qualified patient" must have a "terminal" condition—both "incurable and irreversible"— and therefore is not someone whose condition is amenable to treatment. And it would not be a "reasonable medical judgment" that a person who has a treatable condition "will" die within six months. Regardless, Ms. Payne's declaration does not state that she has been given a "terminal" diagnosis "after in-person examination by the patient's physician and concurrence by another physician," nor that it is any physician's "reasonable medical judgment" that she has six months to live. 410 ILCS 22/10 ("terminal disease"). She therefore has not demonstrated that she is presently a "qualified patient" under the Act, and her chance at demonstrating injury is slight. *See, e.g., Curran*, 2025 WL 3763413, at *6 (no standing because not eligible for end-of-life care); *Brooklyn Center for Independence of the Disabled,* 2026 WL 2198870, at *6 (same).

In any event, whether or not Ms. Payne is currently eligible for end-of-life care under the Act, her asserted risk of injury is too speculative and conjectural to satisfy the injury requirement of standing. Her anticipated injuries rest on the speculative premise that the Act will cause doctors immediately to repudiate their fiduciary duty to do no harm to their patients. Indeed, at the hearing, the plaintiffs argued that the Act transforms what it has meant to practice medicine since ancient times by turning doctors from healers to killers.

The plaintiffs correctly assert that Illinois common law recognizes a fiduciary duty running from doctor to patient, *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). The parameters of the duty are not well-explored in the case law, which primarily addresses conflicts of interest, but it is safe to assume that the duty encompasses at least the standard obligation "to act for the benefit of another on matters within the scope of the relationship." FIDUCIARY RELATIONSHIP, Black's Law

Dictionary (12th ed. 2024). And there is no question that sources outside of Illinois common law specifically compel doctors to do no harm; non-maleficence is a "cornerstone principle" of medical ethics. *See*, *e.g.*, American Institute of Health Care Professionals, "Understanding Non-maleficence in Health Care Ethics" (Sep. 10, 2024), https://aihcp.net/2024/09/10/understanding-non-maleficence-in-health-care-ethics/ (last visited Sep. 9, 2026).

So the duty exists, but where is the breach (or, as plaintiffs put it at the hearing, the forced "repudiation")? Ms. Payne contends that, for disabled persons, the Act removes the legal and ethical obligation of doctors to act solely in the role of healer by permitting physicians to respond to requests by patients about procedures for obtaining medical-aid-in-dying.[1] But even accepting that proposition for the sake of argument, she does not explain why she is necessarily harmed by the Act if she does not seek medical-aid-in-dying or the physician is in any event unwilling to provide such assistance. Instead, she denigrates the provisions of the Act that forestall the loosening of doctors' duties. The Act mandates that the standard of care remain unaltered, 410 ILCS 22/20, and requires that doctors proceeding under the Act must explain *all* medical options for patients at the end of their lives and explain their risks and benefits. 410 ILCS 22/10 ("informed decision" definition); 22/15(b); 22/35(a)(13)(D). Doctors are also required to refer their patients, "as requested and as clinically indicated" for end-of-life "comfort care, palliative care, hospice care, pain control," or other options. 410 ILCS 22/35(a)(6).

[1] The plaintiffs emphasize a doctor's duty to "heal," and their Complaint states that the Act removes for disabled persons the physician's obligation to provide "life extending" care. Notably, though, various forms of end-of-life care—hospice and palliative care, for example— are not "life extending" but meant to make a patient comfortable. *See, e.g.*, 210 ILCS 60/3(d), (i) (defining, respectively, "hospice care" and "palliative care" under Illinois law).

Although Ms. Payne assumes the ineffectiveness of these provisions, that kind of speculation does not an injury make. For example, in *Dinerstein v. Google, LLC*, a plaintiff who feared that the disclosure of his anonymized health data would allow him to be identified lacked a sufficiently imminent future injury to support standing. 73 F.4th 502, 515 (7th Cir. 2023). Among the reasons was that: "the governing Data Use Agreement *expressly prohibited* Google from using the transferred medical records…'to identify any individual.'" *Id.* (emphasis added); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (journalists who feared surveillance of their communications had speculative injury in part because statute "expressly provides that respondents…cannot be targeted for surveillance"). So too, here: the Act expressly prohibits reducing the standard of care, which undermines Ms. Payne's claim of a substantial risk of imminent harm.

Further, Ms. Payne does not attest that any doctor who treats her intends to participate in the aid-in-dying systems allowed by the Act, nor can she predict with any certainty that doctors she encounters in the future will participate. The Act exempts healthcare professionals from any duty to provide aid-in-dying care, states that a healthcare provider "may choose not to engage in aid-in-dying care," and provides that "only willing healthcare professionals shall provide aid-in-dying care in accordance with the Act." 410 ILCS 22/60(a), (d), (e). With this amount of discretion afforded to doctors, Ms. Payne cannot establish an immediate, imminent risk that all doctors will start inviting disabled patients to consider medical aid in dying. For example, in *Sierakowski v. Ryan*, the plaintiff sought to enjoin, on constitutional grounds, an Illinois statute allowing doctors to perform HIV tests without a patient's knowledge or consent if "testing is medically indicated to provide appropriate diagnosis and treatment of the subject." 223 F.3d 440, 441-42 (7th Cir. 2000). Even though that plaintiff had already been given an HIV test without his knowledge and consent

once before, the Seventh Circuit concluded that he lacked standing for injunctive relief. His "prospects of future injury [were] purely speculative" because "there is no policy mandating testing," and decisions were left "in the hands of individual physicians, to be made on a case-by-case basis." *Id*. at 444, 445. Here, there is similarly no policy requiring end-of-life measures, and doctors retain discretion to provide them even when asked; moreover, the Act requires the process to start with a patient's request.

Ms. Payne's argument that the Act obliterates a doctor's fiduciary duties rests on a belief that the end-of-life protocol for terminally ill patients is fundamentally incompatible with the mandate to "do no harm." That is plainly the plaintiffs' view, but the Act rests on different premises. Under the Act, prescribing life-ending medication to a defined class of terminally ill patients is not "harm"; it is "part of general medical care" and one option to "ease unnecessary pain and suffering." 410 ILCS 22/5(a)-(b). It cites three examples of patients, one still living and two who have died, who wished for Illinois to permit the kind of end-of-life care embodied in the Act so that they could avoid suffering and pain during their final days. 410 ILCS 410 22/5(a)(3). Under this view, providing end-of-life care *promotes* the duty to "do no harm" rather than erases it because failing to alleviate pain and suffering would itself be a cause of harm. This is an issue as to which reasonable minds can, and do, differ.[2] *See*, *e.g.*, AMA Code of Medical Ethics, Opinion 5.7 ("individual physicians who, after due moral consideration, exercise their conscience . . . and legally engage in the practice of physician-assisted suicide will not have acted in violation of the Code"). But the plaintiff's standing depends on this Court accepting her view that, contrary to its

[2] Plaintiffs argued during the hearing that the Act "is not medicine" and is inconsistent with "the profession's self-understanding of what medicine is." Yet counsel also asserted that "our due process argument is that "doctors are going to disagree about this and that the reality is that there are doctors who are going to be set up in this business of physician assisted suicide."

terms, the Act will change the standard of care for the entire medical profession for treating patients like her who are not even eligible to receive end-of-life care. There is no way to do this without making a series of assumptions.

The problem is not that Ms. Payne's injuries are "intangible." As she points out, a breach of a fiduciary duty is a type of harm that courts have traditionally recognized as providing a basis for suit, which is one way to show that a harm is "concrete." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). But in *TransUnion*, the plaintiffs had actually incurred the intangible harm (reputational damage) on which they based standing, *see id*. at 432-33. There was no need to speculate. Here, however, Ms. Payne's intangible injuries rest on her speculation that physicians in Illinois will decide, *en masse*, to abandon their existing duties to their patients. She has not persuaded the Court that this is anything other than speculation.

**B. The organizations lack a sufficiently concrete future injury**

The two organizational plaintiffs, United Spinal and PCIL, contend that they have standing independently and on behalf of their members, including plaintiff Payne. The latter argument is a non-starter because associational standing requires that at least one member of the organization have individual standing. *Prairie Rivers Network*, 2 F.4th at 1008. Ms. Payne does not, and the organizations point to their other members only to say they "share Ms. Payne's injuries." They therefore fail the first requirement of associational standing.

United Spinal and PCIL also contend that they have independent organizational standing based on the Act's effect on their "core business activities" of (1) "assisting persons with disabilities [to] overcome the prejudices of medical providers and medical care systems that devalue them based on misguided notions of their quality of life" and (2) "persuading members to meet the challenges of living rather than giving in to societal prejudices that their lives are not

worth living." Specifically, PCIL contends that the Act will require it to increase counseling services and "other measures" to provide suicide-prevention programming "that the State of Illinois is abandoning."[3] Similarly, United Spinal contends that it will be required to "counsel its members away from suicide" to "keep its core business activities intact."

It is dubious that the need to increase suicide prevention programming directly interferes with the core business activities of the organizations as the Supreme Court explained that concept in *FDA v. Alliance for Hippocratic Medicine*. In their declarations, the leaders of both United Spinal and PCIL attest that their organizations have been doing suicide-prevention work since before the Act was passed. Their concern is having to increase those efforts at the expense of other programming. Stepping up activity already within the organizations' wheelhouses—voluntarily reallocating their priorities—does not amount to suffering interference with a core business activity. An organization cannot "manufacture its own standing" by spending resources, to the detriment of other spending priorities, on advocacy or education to oppose the defendant's action. *All. for Hippocratic Med.*, 602 U.S. at 394 (rejecting organization's argument that it was "forced" to "expend considerable time, energy, and resources"). The standard requires the organizations to show "concrete disruptions to mission-critical business operations," not simply the frustration of interests that are important to the organization's mission. *See Wisconsin Voter All. v. Millis*, 166 F.4th 627, 637 (7th Cir. 2026). Here, neither affiant predicts that his organization will have to terminate any specific program or function; they are concerned that their organizations' missions will be hindered once medical aid in dying is available for terminal patients.

---

[3] The Complaint states that the Illinois Department of Public Health established a private-public partnership called the Illinois Suicide Alliance to develop and administer the Illinois Suicide Prevention Strategic Plan. According to the plaintiffs, the Act is incompatible with statutory suicide-prevention measures and requires the "exclusion of persons with life-threatening disabilities from suicide prevention programs." Compl., Dkt. #1 at ¶¶ 31-40.

In any case, the organizations' purported need to increase suicide-prevention programming is wholly speculative, not immediate or imminent. There is nothing in the record about the State of Illinois reducing or changing its suicide prevention programs other than the speculation of the two affiants. No relevant law has been amended or repealed. And there is no reason to think they will be: The Act expressly provides that its process is neither "suicide" nor "assisted suicide" under Illinois law, 410 ILCS 22/100(b), so the Act would have no effect on the state-supported suicide-prevention measures the plaintiffs describe.

The organizations also argue that they have a concrete future injury because they fear penalties if they counsel their members against "suicide." But the Act imposes no penalties. It states only that the Act *does not limit* "civil or criminal liability arising from . . . intentionally or knowingly coercing or exerting undue influence on a patient to . . . use or not use medication pursuant to this Act."[4] The organizations would need to cite some other provision of law under which they possibly could be held civilly or criminally liable for counseling ***against*** suicide. They cite none, and the Court cannot even hypothesize such a law. Indeed, Illinois criminalizes *inducing* a person to commit suicide, 720 ILCS 5/12-34.5, and has, as the Complaint points out, numerous laws and programs aimed at preventing suicide. Further, the plaintiffs appear to equate their advocacy or counseling with the "undue influence" the Act rejects. But "undue influence" has a specific meaning in Illinois law: "improper urgency of persuasion whereby the will of a person is over-powered and he is indeed induced to do or forbear an act which he would not do or would if left to act freely." *See Singer v. Massachusetts Mut. Life Ins. Co.*, 335 F. Supp. 3d 1023, 1031

[4] The defendants assert that this provision applies only to the doctors and healthcare providers who provide care under the Act, and so it could not be used against the plaintiff organizations. The language of the statute does not contain this limitation, however, and so the Court does not rely on it at this time.

(N.D. Ill. 2018) (citing Illinois cases). Anticipating legal jeopardy for counseling disabled persons against suicide strains the language of the Act, and the risk of injury is purely hypothetical.

**C. The plaintiffs' purported injuries are not traceable to the action of the defendants.**

Even if the plaintiffs had identified a substantial risk of injury likely to materialize imminently, they could not show that any injury was traceable to the defendants. The organizational and individual plaintiffs' injuries all center on the premise that the Act eliminates doctors' duty to do no harm in favor of promoting "assisted suicide," which will cause patients to suffer a lesser standard of care and the organizations to have to counteract a collapse in suicide prevention measures. Because the Act does not alter any duty owed by doctors to patients, however, it is not enforcement of the Act that produces the injury the plaintiffs fear; instead, they fear how doctors will behave without the constraints they think (implausibly) have been removed.

But the plaintiffs cannot base their standing to seek an injunction against the defendants on injuries that would result from the discretionary decisions of independent actors rather than government enforcement of the Act. The Supreme Court has cautioned judges against finding standing when the asserted injuries depend on "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper* 568 U.S. at 411; *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (quoting *Simon*, 426 U.S. at 41–42)). An injury is "not 'fairly traceable' to any 'allegedly unlawful conduct' of which the plaintiffs complain when the plaintiffs have not pointed to any way in which the defendants . . . will act to enforce" the challenged law. *California v. Texas*, 593 U.S. 659, 669–70 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). So here, the plaintiffs must show that State "action or conduct has caused or will cause the injury they attribute to" the Act. *Id*.

But the Act predominantly regulates private actors: patients and doctors, not the public officials the plaintiffs have sued. When "a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "'substantially more difficult to establish'" and depends on and depends on the plaintiff showing "at the least 'that third parties will likely react in predictable ways.'" *California v. Texas*, 593 U.S. at 675 (citations omitted). The plaintiffs here cannot show that doctors will act "predictably" in response to the Act because of the broad discretion it gives doctors. An entire section of the statute, see 410 ILCS 60(a)-(g), provides that doctors do not have to participate in the end-of-life regime authorized by the Act, that only "willing" doctors may do so, and that doctors cannot be disciplined or held liable in any way for declining to participate in the Act's protocols. Thus, there is no basis on which to speculate that any doctor, let alone one who encounters Ms. Payne or disabled members of the plaintiff organizations, will even be a provider of end-of-life care under the Act. *See Clapper* at 412 ("Moreover, because § 1881a at most authorizes—but does not mandate or direct—the surveillance that respondents fear, respondents' allegations are necessarily conjectural."). In fact, the plaintiffs' injuries depend on doctors choosing to *violate* the Act's provision requiring the standard of care to remain unchanged. *See Schirmer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010) (no standing for injunction when future injury would depend on police officers violating failure-to-disperse law). But they provide no reason why this lawlessness is a "predictable" response to the statute. If the statute is carried out "according to its terms," *see id*. at 585, then the fiduciary duty of doctor to patient will remain unaffected.

**II. Irreparable Harm**

Having concluded that the plaintiffs lack standing, the Court need not address the merits of the preliminary-injunction motion. Nevertheless, even if the plaintiffs could establish standing,

the motion would fail for largely the same reasons the plaintiffs lack a non-speculative injury-in-fact for standing purposes: they cannot establish that they will suffer irreparable harm without a preliminary injunction. To obtain a preliminary injunction, the plaintiffs must demonstrate that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction would promote the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Irreparable harm is harm that cannot be repaired and cannot be compensated with money damages. *See Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020). There must be more than a mere possibility that the harm will befall the plaintiffs absent an injunction; it must be "likely" that the harm will occur. *See id*.

Ms. Payne contends that a preliminary injunction is required to prevent the irreparable harm of emotional distress. She states that she will no longer be able to depend on physicians' obligations to do no harm when she inevitably needs treatment for flare-ups in her condition; further, she cites her worry about "being pressured into considering suicide by my doctor, hospital, and insurer" and about "having to talk about suicide as part of the informed consent process for treatment." The organizational plaintiffs, for their part, assert that they will suffer irreparable harm "from [the Act's] prohibitions on their efforts to dissuade their members from killing themselves" because "[t]his is either a direct threat of prosecution, or it so overbroad and vague as to chill the organization's core business activities."

Although the Court takes Ms. Payne at her word that the Act inspires significant apprehension, her emotional distress does not justify injunctive relief because the harms she fears are conjectural. As noted above, Ms. Payne (having not attested that two physicians have opined that she has six months to live) is not a qualified patient under the Act at this time, so no doctor,

hospital, or insurer could press her into the Act's end-of-life measures. Further, given how the Act operates, only Ms. Payne could initiate those protocols in any event. And she plainly does not intend to request life-ending medication nor follow any of the required steps to obtain it. Finally, the Act prohibits much, if not all, of what Ms. Paynes attests she fears: it prohibits any change in the standard of care for patients; it bars physicians and others from coercing a patient or exerting undue influence; and it requires physicians to inform patients about every possibility for treatment or care at the end of their lives. Under these circumstances, Ms. Payne's fears are hypothetical and speculative, and she does not establish a likelihood of irreparable harm.

So too for the organizations. If they choose to stop "dissuad[ing] their members from killing themselves"[5] to avoid prosecution, it will not be because the Act created such a need. As noted, the Act itself imposes no penalties or enforcement scheme. And the organizations have not pointed to a single ordinance or statute under which they could possibly be prosecuted for discouraging "suicide." Any threat of prosecution is therefore speculative. The same is true for a "chilling effect" on the organizations' anti-suicide messaging. Their reluctance to continue this messaging after the Act becomes effective is based on a misreading of the statute that would allow for prosecutions directly under the Act, which are not available, and for conduct—discouraging the disabled from committing suicide—distinct from what the Act contemplates as punishable, which is intentionally or knowingly coercing or exerting undue influence on a patient with respect to end-of-life choices. The Act explicitly does not pertain to "suicide." Further, if the Act directly restricted any conduct by the organizations (and it does not), it would be only the interference with

[5] It is not lost on the Court that, for purposes of establishing an injury-in-fact, the organizations assert that they will increase suicide-prevention counseling to fill a void left by the state, and for purposes of establishing irreparable harm, they contend that they will cease suicide-prevention counseling for fear of prosecution.

a qualified patient's decision to follow the Act's end-of-life protocol. The organizations predict that they will step up their anti-suicide programming, but they have not provided any evidence that they intend to target qualified patients who request end-of-life medication under the Act and apply coercion or undue influence, rather than counseling.

## III. Proper Defendants

Insofar as this case progresses after the denial of the preliminary injunction, it is prudent to address the arguments that certain defendants are improperly named in this lawsuit. The defendants contend that only Dr. Vohra, the Director of the Illinois Department of Public Health, is an appropriate defendant. The Court agrees.

The Eleventh Amendment circumscribes the jurisdiction of federal courts to hear suits against the States, including state agencies, absent their consent. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State"); *Woods v. Illinois Dep't of Child. & Fam. Servs*., 710 F.3d 762, 764 (7th Cir. 2013). This applies to all the defendants here with respect to all but the Rehabilitation Act claim. (The Eleventh Amendment is no barrier to the suit under § 504 of the Rehabilitation Act, because Illinois consents to suit under that provision as a condition of receiving federal funds. *Jaros v. Illinois Dep't of Corr*., 684 F.3d 667, 672 (7th Cir. 2012). On the other hand, the abrogation of state sovereign immunity in Title II of the ADA applies only to "an action for damages against the States for conduct that actually violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006).)

But there is an exception to Eleventh Amendment immunity under the doctrine of *Ex Parte Young*: a state official can be sued for injunctive relief for an ongoing violation of federal law. 209

U.S. 123, 157 (1908); *see Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018).[6] This is true even with respect to Title II of the ADA, though that statute ordinarily applies to a "public entity," not individual officials. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 606 (7th Cir. 2004) (citing *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 n.9 (2001)).

The *Ex Parte Young* exception applies only to a suit against "a state official who has 'some connection with the enforcement' of an allegedly unconstitutional state statute for the purpose of enjoining that enforcement." *Holcomb*, 883 F.3d at 975 (quoting *Young*, 209 U.S. at 158). The Supreme Court and the Seventh Circuit have explained why the defendant official must be someone with specific enforcement power with respect to the statute at issue. A federal court has no power to "enjoin" a "law"; instead, "a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43-44 (2021). "A federal injunction does not erase an unconstitutional state law from existence; federal courts cannot repeal state laws…. Rather, a federal injunction prevents state officials from enforcing the challenged statute, regulation, or agency action in the future based on its incompatibility with federal law." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521–22 (7th Cir. 2021).

As the defendants argue, here Governor Pritzker does not have the requisite enforcement power to be subject to suit under *Ex Parte Young*. The plaintiffs do not point to any "specified

[6] This exception also allows suit for prospective injunctive relief for constitutional violations under 42 U.S.C. § 1983, although no defendant would be appropriately named in a suit for damages. States are not "persons" subject to suit under that statute. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) State agencies and state officials in their official capacities are both the "State" for purposes of this rule. *Will*, 491 U.S. at 71; *see Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

unlawful action" that the Governor could possibly take pursuant to the Act. [7] And his role as the State's chief executive "under a general duty to enforce state laws" does not suffice. *See Holcomb*, 883 F.3d at 976 (quoting *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)). In *Holcomb*, concluding that the *Ex Parte Young* doctrine did not extend to Indiana's governor (and therefore the head of its Bureau of Motor Vehicles), the Seventh Circuit explained that "the Governor was not specifically charged with a duty to enforce the name-change statute," "has not taken on any duty to enforce it," and "doesn't do anything to enforce [it]." *Id.*; *see also Ruiz v. Pritzker*, No. 22-CV-07171, 2024 WL 1283703, at *2 (N.D. Ill. Mar. 26, 2024) (In action challenging new parole system for certain juveniles: "Plaintiff must plausibly allege that the Governor is *specifically* involved in enforcing the Act."). The Supreme Court in *Young* explained that, if it were enough to be "the executive of the state" who is "charged, in a sense with the execution of all its laws," then the constitutionality of any state law could be challenged in a suit against a state's governor or attorney general, contrary to the Eleventh Amendment principle that states "cannot, without their assent, be brought into any court at the suit of private persons." 209 U.S. at 157. Because the plaintiffs have nothing but his general enforcement powers on which to base the suit against the Governor, he is not a proper defendant.

On the other hand, Dr. Vohra is a proper defendant. The Act imbues both the Department of Public Health, which Dr. Vohra leads, and the Department of Veterans Affairs with the power to "adopt rules for the implementation and administration of this Act," 410 ILCS 22/105, suggesting that the directors of those agencies have the responsibility to carry out the law. The Act

[7] The plaintiffs have not asked the Court to enjoin any specific actions of any defendant. They have not proposed an injunction, but their prayer for relief asks the Court generally to enjoin the defendants "from enforcing [the Act]," and their motion and brief refer to an injunction "prohibiting the defendants in this action from implementing [the Act]" or to "prevent implementation of [the Act]."

also obligates the Department of Public Health to create and post certain forms and reports and to receive and compile the reports required of physicians. 410 ILCS 22/75. It is not clear that enjoining the Director from performing these duties under the Act would prevent the rest of the Act from taking effect. *See, e.g.*, 410 ILCS 22/75(a) ("Failure to create or post the Attending Physician Checklist Form, the Attending Physician Follow-Up Form, or both shall not suspend the effective date of this Act."); 22/110 ("The provisions of this Act are severable under Section 1.31 of the Statute on Statutes.") But, for purposes of *Ex Parte Young*, the Director has sufficient enforcement power to be a proper defendant.

* * *

For the foregoing reasons, the motion for a preliminary injunction is denied, Governor Pritzker is dismissed as a defendant, and the Department of Public Health is dismissed as a defendant except as to the statutory claims. The plaintiffs have 30 days to show cause why the entire action should not be dismissed for lack of standing by any plaintiff.

Date: September 10, 2026

John J. Tharp, Jr.
United States District Judge