**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

EBONY PAYNE, PAM HEAVENS, UNITED SPINAL ASSOCIATION, NATIONAL COUNCIL ON INDEPENDENT LIVING, NOT DEAD YET, INSTITUTE FOR PATIENTS' RIGHTS, PROGRESS CENTER FOR INDEPENDENT LIVING, CHICAGO ADAPT, and NOOSHIG LUZ SALVADOR, M.D.,

Plaintiffs,

v.

ILLINOIS DEPARTMENT OF PUBLIC HEALTH and THE HONORABLE SAMEER VOHRA, M.D, in his official capacity as Director of the Illinois Department of Public Health,

Defendants.

Case No. 1:26-cv-06886
District Judge John J. Tharp, Jr.
Magistrate Judge David Weisman

**PLAINTIFFS' RESPONSE TO SEPTEMBER 10, 2026 ORDER TO SHOW CAUSE**

## **Introduction**

Plaintiffs respectfully respond to the Court's Order issued September 10, 2026 to "show cause why the action should not be dismissed for lack of standing by any plaintiff." ECF No. 49 at 25 ("Order"). As detailed below, Plaintiffs have adequately established Article III standing for the individual and organizational plaintiffs, each of whom suffered immediate injuries upon the Act going into effect as detailed in their declarations, the declaration of Dr. Diane Meier, and the concurrently filed First Amended Complaint (ECF No 54). These are concrete, particularized injuries that are either ongoing or certainly impending, caused by Defendants' enforcement and promotion of assisted suicide through EOLA, and redressable by the relief sought which would enjoin that act. For these reasons and those set forth below, the Order to Show Cause should be discharged, and the case should proceed on the merits.

## **Legal Standard**

To establish Article III standing, Plaintiffs must show: (1) a "concrete and particularized" and "actual or imminent" injury, (2) a "causal connection between the injury and the conduct complained of," and (3) that the injury will likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). For an organization to assert direct standing, it must meet the same three requirements. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). An organization meets the injury requirement if it suffers an actual and concrete harm that "directly affect[s] and interfere[s] with" the organization's "core business activities," not merely its "abstract social interests." *All. for Hippocratic Med.*, 602 U.S. at 394-95. An organization may also have standing on behalf of its members if it can show that: (1) at least one of its members has standing to sue in their own right; (2) the interests it seeks to protect are germane to its purposes; and (3) neither the claim or relief requested requires the participation of individual members. *Prairie Rivers Network v. Dynegy Midwest Generation,*

*LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1997)). In evaluating jurisdiction, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (quoting *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008)).

## Argument

### I. Individual Plaintiffs Ebony Payne and Pam Heavens Have Standing to Challenge EOLA

Ms. Payne is a quadriplegic, paralyzed from the neck down, due in part to a spinal cord injury. ECF No. 25-1 ("Payne Decl.") ¶ 3. Ms. Payne requires special treatment to breathe, without which she would die. *Id.*; *see also* Decl. of Dr. Diane Meier ("Meier Decl.") ¶ 30. She is frequently in the hospital for life-threatening medical complications. Payne Decl. ¶ 4. Since May alone, she has been in the emergency room at least three times for serious complications, including twice in the intensive care unit and for many days. *See* Decl. of Ebony Payne ("Supp. Payne Decl.") ¶¶ 8-11. During one recent visit, she was put on ventilator support to survive. *Id.* ¶ 9. Dr. Diane Meier, a preeminent expert in the field of palliative care, has examined Ms. Payne's medical records, and determined that her medical condition is such that she could qualify for assisted suicide. *See* Meier Decl. ¶¶ 30, 14.

Dr. Meier opined that Ms. Payne is vulnerable to present harms from EOLA's impact on her medical care even if she does not die by physician assisted suicide. *Id.* ¶¶ 23-27. She also found that a substantial risk of death exists when a person with life-threatening disabilities like Ms. Payne experiences periods of despair like she has experienced before. *Id.* ¶¶ 17, 31. Indeed, doctors have frequently conveyed to Ms. Payne that, because of her quality of life, it is not worth

their time or energy to keep her alive. Supp. Payne Decl. ¶ 4. Ms. Payne was also recently notified by the State about impending Medicaid cuts, which exacerbates her distress due to EOLA because these cuts will make it harder to access life-saving medical treatment. *Id.* ¶ 13.

The Act's eligibility requirement does not guarantee that everyone who will be deemed terminal by doctors *will actually* die within six months. Doctors are poor prognosticators and despite their best efforts and training, cannot definitively know when a patient will die. *See* Meier Decl. ¶ 31. It is not absurd and is in fact expected that Illinois citizens will die by assisted suicide while having more than six months to live. In fact, Ms. Payne has already experienced a doctor's perception that she is terminal. Two years ago, she was very ill and needed an emergency trachea surgery, and a doctor told Ms. Payne's mother he did not want to continue intubating her and suggested administering pain medication to end her life. Payne Decl. ¶ 7; Supp. Payne Decl. ¶ 6. In another instance, a doctor refused to give her Narcan to reverse a hospital-induced opioid overdose that would likely have killed her. Supp. Payne Decl. ¶ 5.

Ms. Payne is harmed by the law even if she does not plan to seek assisted suicide or if her primary care physician is unwilling to provide it. *Cf.* Order at 12 (questioning whether plaintiffs are harmed if they do not seek or are not provided with assisted suicide). Ms. Payne, like all individuals with very serious disabilities, can experience hopelessness, especially when her medical condition is poor. *See* Supp. Payne Decl. ¶ 7; Meier Decl. ¶¶ 17, 31. She has previously called out to end her life when she was in the emergency room with an altered mental state, which may or may not be recognized as an incapacitated state by medical professionals. Supp. Payne Decl. ¶ 7. Doctors often miss the diagnosis of depression or wrongly assume it is normal for these patients to feel depressed. Meier Decl. ¶ 31. The harm caused by the Act is particularized to Ms. Payne because for individuals who are not deemed eligible for this law,

hopelessness would trigger suicide prevention efforts. *See* ECF No. 54 ("Amended Compl.") ¶¶ 32-43. But with the Act in place, for Ms. Payne, hopelessness triggers the process of assisted suicide, which does not require a mental health evaluation unless there is doubt about mental capacity. *Id.* ¶¶ 46-47; 410 ILCS 22/45(a). In the absence of a strict requirement to refer every patient to a comprehensive mental health evaluation, this referral rarely takes place. *See* Meier Decl. ¶ 31. And even if Ms. Payne happens to experience this hopelessness in front of a provider who knows her well – which is unlikely given the fact that Ms. Payne has unpredictable health complications that land her in front of unknown doctors frequently – her provider is *required* to help facilitate a request for assisted suicide. Amended Compl. ¶ 55.

Ms. Payne is harmed by the law even if she does not request assisted suicide. This Court found that Ms. Payne's "anticipated injuries rest on the speculative premise that the Act will cause doctors immediately to repudiate their fiduciary duty to do no harm to their patients." Order at 11. The Court acknowledged that such a duty exists. *Id.* at 11-12. Repudiation of any fiduciary duty, without *any* economic or physical injury, is an intangible injury recognized by Article III. *Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt.*, 105 F.4th 46, 50 (2d Cir. 2024); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (holding that intangible injuries similar to "harms traditionally recognized as providing a basis for lawsuits in American courts" constitute a concrete injury for purposes of Article III standing). Plaintiffs sufficiently alleged that EOLA breaches this duty, but the Court was unconvinced because the "Act mandates that the standard of care remain unaltered." Order at 12 (citing 410 ILCS 22/20). But the standard of care *is* altered. The Act expressly redefines the medical standard of care by declaring that "[m]edical aid in dying is part of general medical care and complements other end-of-life options" and requiring that doctors provide patients with information "regarding all

appropriate end-of-life care options," which by the Act's definition includes assisted suicide. *See* 410 ILCS 22/5(a)(1); 410 ILCS 22/15(b); *Nat'l Inst. of Fam. & Life Advocs. v. Treto*, 777 F. Supp. 3d 867, 877-78 (N.D. Ill. 2025) (rejecting State's contentions that abortion-counseling statute locked in place existing standard of care). The existence of EOLA fundamentally alters Ms. Payne's relationship with the medical profession and her trust that physicians will do no harm. Payne Decl. ¶ 9.

Doctors previously authorized by the State only to heal Ms. Payne can now provide assisted suicide as part of medical care. Dr. Meier opined that EOLA alters the standard of care and threatens the foundation of medicine. Meier Decl. ¶¶ 25, 28. Ms. Payne is not an ordinary citizen of Illinois who is morally opposed to EOLA. She is a person whose health is precarious at the best of times, which makes end-of-life care questions very real for her, and EOLA impacts her immediately in ways that do not impact every Illinoisian. *See id.* ¶¶ 16-18; Compl. ¶¶ 54-59. There can be no question that she is at a material disadvantage in the EOLA framework.

Ms. Payne alleges an injury that requires no chain of events – besides the law going into effect – to cause immediate harm. Even before EOLA went into effect, Ms. Payne encountered medical discrimination by doctors who perceived her as having a low quality of life. Supp. Payne Decl. ¶ 4. Studies confirm that doctors perceive people with disabilities as having a worse quality of life than those without disabilities, and consider depression and suicidality to be rational responses to serious disabilities. *See* Meier Decl. ¶¶ 22, 25, 26, 31. It is through these unconscious biases that doctors direct their decision making and conversations with patients about the benefits and risks of starting and continuing treatment. *Id.* Ms. Payne's survival is dependent on her doctors "being alongside" her, and physician assisted suicide shatters the therapeutic alliance, which has and will continue to cause Ms. Payne significant distress. *See*

Meier ¶¶ 25-27. This particularly impacts Ms. Payne, who has very visible disabilities. *See* Payne Decl. ¶ 7; Supp. Payne Decl. ¶ 5. The harm is not speculative. It is concrete, particularized, and increasing.

Ms. Heavens has cerebral palsy, which can cause complications including respiratory illness, breathing issues, aspiration, seizures, and death. Declaration of Pam Heavens ("Heavens Decl.") ¶ 3. Ms. Heavens needs help to eat, go to the doctor, and complete household chores, for which she pays service professionals out of pocket to assist her. *Id.* ¶ 4. Without her current medical supports, she would likely die within six months. *Id.* Even if Ms. Heavens does not wish to seek out assisted suicide, she now must deal with medical providers for whom EOLA dictates that assisted suicide is part of general medical care to be considered alongside other treatment. *See* Meier Decl. ¶¶ 28. Ms. Heavens has a speech impediment that makes it hard for medical professionals to understand her. Heavens Decl. ¶¶ 3, 7. She previously had a medical emergency where she struggled to communicate with staff, but at the time she knew doctors had the obligation to do no harm. *Id.* ¶ 7. Under EOLA, Ms. Heavens has serious fear and distress about how this law impacts her relationship with doctors, especially in the future when she has medical emergencies and struggles to advocate for herself. *Id.*; *see* Meier Decl. ¶¶ 20-24, 26-27.

Thus, Ms. Payne's and Ms. Heavens's facts are different than the ones in *Dinerstein* and *Clapper*, *see* Order at 13, because the harm does not depend on doctors disobeying the law. *See Dinerstein v. Google, LLC*, 73 F.4th 502, 515 (7th Cir. 2023); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013). Indeed, the harm occurs even when the law's minimal requirements are followed perfectly. Furthermore, in *Sierakowski*, the Seventh Circuit found there was no standing when the harm depended on the plaintiff being tested for HIV in future visits, and there was no indication he would be. *Sierakowski v. Ryan*, 223 F.3d 440, 445 (7th Cir. 2000). Here,

by contrast, Ms. Payne and Ms. Heavens have conditions which require them to encounter unknown medical providers during life-threatening and uncomfortable medical treatments. *See* Supp. Payne Decl. ¶¶ 5-11; Heavens Decl. ¶¶ 3, 7. Due to their ongoing medical conditions, it is certain they will have more medical encounters, including for life-threatening crises. In all of these, they must now face doctors that are newly authorized, indeed required, to include physician assisted suicide as "part of general medical care." 410 ILCS 22/5(a)(1).

## II. Dr. Nooshig Luz Salvador Has Standing to Challenge EOLA

EOLA deems assisted suicide as "part of general medical care [that] complements other end-of-life options," *id.*, and requires physicians as part of "informed consent" to "provide sufficient information to a patient regarding all appropriate end-of-life care options," including assisted suicide. 410 ILCS 22/15(b). EOLA also implies a threat of civil liability and criminal prosecution for speech that the State would consider an "undue influence" on patients not to consent to suicide but to choose other end of life options like palliative care. 410 ILCS 22/95(a)(2). EOLA defines "undue influence" as the "willful attempt" by "any" means to "prevent a qualified patient … from obtaining or self-administering medication pursuant to this Act." 410 ILCS 22/10.

Plaintiff Dr. Salvador is a licensed doctor specializing in palliative and end-of-life care who is subject to the State's regulation of the standards of care that she must deliver. Decl. of Nooshig Luz Salvador ("Salvador Decl.") ¶ 8. Despite it being contrary to her professional duties as she conceives them, Dr. Salvador is now required under EOLA to inform patients that assisted suicide is part of their general medical care if she estimates that they qualify for lethal drugs under the law. *Id.* Through Defendants' new definition of "undue influence," Dr. Salvador is prevented from fulfilling her ethical duty to help patients to continue living despite the fear and despair they may experience in the face of a six-month or less prognosis. *Id.* ¶ 9.

She engages in this speech regularly and can now only do so at the risk of violating the State's new dictate that she refrains from such speech at the risk of being found to have coerced or unduly influenced a patient. *Id.* Dr. Salvador can take no comfort in the section of EOLA that bars discipline or criminal liability, 410 ILCS 22/60(b), because she cannot be in "good faith compliance" with EOLA if she refuses to comply with the so-called "informed consent" provision of the law which requires her to mislead patients by telling them that physician assisted suicide is part of appropriate end-of-life care and forces her to participate here and now in the inherently discriminatory framework EOLA has established. Salvador Decl. ¶ 9.

As emphasized by the Seventh Circuit this year, a doctor has standing when a law has "chilling effects on [their] protected expression." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r of the Ind. State Dep't of Health*, 187 F.4th 939, 951 (7th Cir. 2026). A doctor has standing even when they are "safe from any sort of prosecution" due to the challenged law when that law has a "continuing restrictive effect" on the doctor. *Friendship Med. Ctr., Ltd. v. Chi. Bd. of Health*, 505 F.2d 1141, 1146 (7th Cir. 1974). Here, Dr. Salvador is not only chilled from her regular professional speech but is compelled by EOLA to talk about assisted suicide as part of providing care. This is a result of the very real risk that she faces from enforcement actions due to her speech. The Northern District of Illinois has already entered an order enjoining Defendant IDPH from penalizing certain medical providers who are opposed to EOLA. *Kirchoff v. Treto*, No. 1:26-CV-9628, 2026 WL 2516712, at *2 (N.D. Ill. Aug. 21, 2026). The order "does not prevent [IDPH] … from pursuing enforcement actions against non-parties" such as Dr. Salvador. *Id.*

## III. The Organizations Have Standing Due to EOLA's Impairment of their Core Business Activities.

### A. EOLA Directly Impairs Each Organization's Core Business Activity to Help Persons With Disabilities Continue Living Despite Barriers and Prejudice,

**Including in Medical Care.**

Each of the organizational Plaintiffs engages in services and/or activities directed towards helping persons with disabilities continue living despite barriers and prejudice in medical care. ECF No. 25-2 ("United Spinal Decl.") ¶¶ 3, 6, 8, 11; ECF No. 25-3 ("PCIL Decl.") ¶¶ 6-7; Decl. of Scott Nance ("ADAPT Decl.") ¶¶ 4, 10; Decl. of Ian McIntosh ("NDY Decl.") ¶¶ 4-5; Decl. of Matthew Valliere ("IPR Decl.") ¶¶ 5-6; Decl. of Jessica Podesva ("NCIL Decl.") ¶¶ 6-7. One of the purposes of these services is to dissuade people from giving up on medical or mental health care in the face of barriers that include medical prejudice and indifference. United Spinal Decl. ¶¶ 7-8; PCIL Decl. ¶¶ 6-8; ADAPT Decl. ¶¶ 10-12; NDY Decl. ¶¶ 4-5; IPR Decl. ¶¶ 5-6; NCIL Decl. ¶¶ 8, 11. EOLA directly impedes these activities in two ways. First, EOLA defines these activities as "coercion or undue influence." Second, EOLA interferes with these activities by grafting assisted suicide onto the standard of medical care.

**1. EOLA Defines Using Any Means to Prevent a Qualified Patient from Obtaining or Using Lethal Medication as Coercion and Undue Influence.**

EOLA defines "[c]oercion or undue influence" to include "the willful attempt, whether by deception, intimidation, or any other means to … prevent a qualified patient, in a manner that conflicts with the Health Care Right of Conscience Act, from obtaining or self-administering medication pursuant to this Act." 410 ILCS 22/10. The reference to the Health Care Right of Conscience Act, 745 ILCS 70/1 ("HCRCA") in no way softens the impact of this definition on the organizational plaintiffs. The HCRCA provides that "[n]o physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel." 745 ILCS 70/4. HCRCA thus

immunizes refraining from participating in a health care service that is contrary to the provider's conscience. It in no way protects a person or organization that seeks to prevent a patient from obtaining a specific medical procedure, in this case assisted suicide. That act of preventing assisted suicide is prohibited by EOLA under the guise of its peculiar and harsh definition of "coercion or undue influence."

EOLA further provides that nothing in the Act limits "civil or criminal liability arising from . . . [i]ntentionally or knowingly coercing or exerting undue influence on a patient with a terminal disease to . . . use or not use medication pursuant to this Act." 410 ILCS 22/95(a), (a)(2). The Order rejects EOLA's definition of "coercion or undue influence," and the non-limitation clause, as a reasonable basis for chilling the organizations in the absence of "some other provision of law" under which they could be held liable for counseling against assisted suicide. Order at 17. Illinois law includes such provisions. Caregivers and family members who use coercion or deprivation of medical care to influence decisions can face liability under criminal statutes under the Criminal Code. Section 12-4.4a of the Illinois Criminal Code imposes criminal liability on caregivers who expose elderly persons or persons with disabilities to "willful deprivation," defined to include willfully deny medical care or medication. 720 ILCS 5/12-4.4a(b)(1)(E) (incorporating definition of "willfull deprivation" contained in 750 ILCS 60/103(11)(A)(iv).) This includes members and staff of Plaintiff organizations. Urging an individual to forgo lethal medication in the form of assisted suicide could be seen as willfully denying required medication and expose these members and staff to such liability. Furthermore, EOLA's definition of "undue influence" is controlling because the Seventh Circuit recognizes that "there are myriad definitions of 'undue influence' in the civil context" and that the definition cited in *Singer* – which the Court referenced in its Order – is specific to the area of "contracts,

wills, and trusts." *United States v. Mitchell*, 353 F.3d 552, 557 (7th Cir. 2003); *see* Order at 17 (quoting *Singer v. Mass. Mut. Life Ins. Co.*, 335 F. Supp. 3d 1023, 1031 (N.D. Ill. 2018)).

Plaintiff United Spinal now faces the prospect of a Sophie's choice between breaking EOLA and risking the liability therein or terminating specific programs regarding suicide counseling because of these provisions. Decl. of Stephen Lieberman ("Supp. United Spinal Decl.") ¶ 4. At a minimum, United Spinal has had to change how they discuss issues of suicidality with members. *Id.* ¶ 6. Plaintiff PCIL employs staff who meet directly with persons with disabilities, whom it refers to as consumers. PCIL Decl. ¶¶ 6-7. The "coercion and undue influence" sections of EOLA have chilled PCIL staff in advising such consumers. Declaration of Horacio Esparza ("Supp. PCIL Decl.") ¶ 9. Plaintiff Chicago ADAPT's elected officers and other members have already experienced hesitation and fear in continuing its core activity of working with members who are considering ending their life due to the potential liability that EOLA imposes on people who engage in such activities. ADAPT Decl. ¶ 13. Such chilling of activities or speech amounts to a cognizable injury under Seventh Circuit precedent. *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012) (finding that an organization has standing "even without an actual prosecution" when it self-censors as result of an "alleged … actual and well-founded fear."). Here, the fear that is alleged by the Plaintiff organizations is actual. The organizations also adequately allege that their fear is well-founded because while EOLA protects health care providers from participating in assisted suicide under the Act, it does not limit liability for those who dissuade patients from participating in assisted suicide. *Compare* 410 ILCS 22/60(b) (immunity for actions take in "good faith compliance with this Act") *with* 410 ILCS 22/95 (not limiting liability for attempting to prevent a patient from engaging in assisted suicide). Indeed, PCIL's Director states that he now must consult a lawyer

to determine whether or not PCIL's annual working plan to address assisted suicide subjects it to liability under EOLA, underscoring the threat that it faces and the deferral of resources away from its core business activities. Supp. PCIL Decl. ¶ 6.

**2. EOLA Directly Interferes with the Organizations' Activities By Grafting Physician Assisted Suicide Into the Standard of Care**

EOLA interferes with each of the organizations' core business activities, most notably direct services to members to help them navigate medical and mental health care. EOLA begins with the statement that physician assisted suicide is part of "general medical care." 410 ILCS 22/5(a)(1). The organizational plaintiffs now see their counseling of persons with disabilities countered by the State's endorsement of assisted suicide as just another medical option.

Since the law went into effect, United Spinal has already had to change how it interacts with members expressing suicidal ideation. Supp. United Spinal Decl. ¶ 3. Instead of carrying out its core business services, United Spinal has had to create new processes to ensure the safety of their members while handling an increased volume of calls and requests for support. *Id.* ¶ 4. This includes creating a new training regimen by which its staff and members are educated on these issues. *Id.* PCIL's staff must now discern how to respond to increased calls regarding assisted suicide, preventing them from carrying out PCIL's core activity of addressing members' independent living needs. Supp. PCIL Decl. ¶¶ 5, 7-8. The disruption in PCIL staff's previous counseling and referral role is underscored by the fact that it has already held trainings and amended its annual working plan to specifically address suicide prevention since the law went into effect a month ago. *Id.* ¶¶ 5-6. The other Plaintiff organizations have also experienced direct interference by EOLA with their core activities of advocating for people with life-threatening and other disabilities to live independently and receive medical treatment on their own terms in the community. ADAPT Decl. ¶¶ 10-12; NCIL Decl. ¶¶ 8, 10-11; NDY Decl.

¶¶ 4-6; IPR Decl. ¶¶ 5-6. In contrast with the concerns raised in the Order, *see id.* at 16, Plaintiff organizations are not "attempting to 'convert ordinary program costs into an injury in fact,' but ha[ve] clearly demonstrated 'new burdens … created by the law [they are] challenging.'" *Reps. Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 941-42 (S.D. Ind. 2024), *aff'd and remanded*, 147 F.4th 720 (7th Cir. 2025) (quoting *Common Cause Ind. v. Lawson*, 937 F.3d 944, 953-55 (7th Cir. 2019)). As the Supreme Court explained in *Alliance for Hippocratic Medicine*, a "perceptibl[e] impair[ment]" of "counseling and referral services" constitutes "interfere[nce] with [the organization's] core business activities." 602 U.S. at 395 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 353, 379 (1982)). PCIL's core activity was to counsel and refer people to services such as housing and medical care, but now it must counsel people regarding assisted suicide and suicidality, essentially providing a different service. *See id.* at 395 (finding organizational standing for similar reasons). As with the organization that had standing in *Rokita*, Plaintiff organizations have already hosted and "intend[] to host additional trainings … to address the effects of [EOLA], anticipate[] an increased need for legal advice and representation, and anticipate[] increased use of its [] hotline." 751 F. Supp. 3d at 940 (internal quotation marks omitted).

**IV. The Organizations Have Associational Standing through Their Members.**

PCIL and Chicago ADAPT have standing on behalf of their members, including Plaintiffs Payne, who is a member of both, and Heavens, who is PCIL's board secretary. PCIL Decl. ¶ 14; ADAPT Decl. ¶ 2. Plaintiff United Spinal has standing based on its members, including Plaintiffs Payne and Heavens, as well as on behalf of its hospital members. United Spinal Decl. ¶¶ 4, 16; Supp. United Spinal Decl. ¶¶ 7-8. Other United Spinal, PCIL, and Chicago ADAPT members are also eligible for assisted suicide under the new law and have had past suicidal ideation, attempts, or are at risk of suicide. Supp. PCIL Decl. ¶ 10 (discussing

PCIL consumers who have late stage illnesses such as cancer); Supp. United Spinal Decl. ¶ 3 (same); ADAPT Decl. ¶¶ 6-8 (explaining that over half of Chicago ADAPT's members could be diagnosed as having six months or less to live and describing a former Chicago ADAPT member who intended to be a Plaintiff and died only two months before this case was filed). This makes them particularly vulnerable because they are not only eligible for assisted suicide but likely to be steered by doctors and a system stacked against them into assisted suicide. *See id.* These members also have standing because they are people with disabilities whose relationship with their doctors and medical profession has changed as a result of EOLA and who suffer stigma, emotional distress, and worsened medical care as a result of this altered relationship. ADAPT Decl. ¶ 9.; Supp. PCIL Decl. ¶ 10; United Spinal Decl. ¶¶ 7-10; *see* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(ii)-(iv) (prohibiting offering separate, lessor, or unequal services or benefits to people with disabilities).

United Spinal's members include six Illinois hospitals ("Hospital Members") now subject to EOLA. Supp. United Spinal Decl. ¶ 7. The Hospital Members are now required to inform patients of assisted suicide as an option when, in their estimation, the patient qualifies, because the law incorporates it into the standard of care. *See* 410 ILCS 22/5(a)(1); *Treto*, 777 F. Supp. 3d at 877-78 (rejecting State's contentions that abortion-counseling statute locked in place existing standard of care). When discussing end-of-life care, doctors are now required to provide patients with information "regarding all appropriate end of life care options," which by EOLA's definition includes assisted suicide. *See* 410 ILCS 22/15(b); 410 ILCS 22/5(a)(1). Failure to do so puts the Hospital Members at risk of violating EOLA's prohibition on preventing a qualified patient from obtaining or self-administering lethal medication by any means. 410 ILCS 22/95; 410 ILCS 22/10. Defendants previously admitted such penalties apply to health care

professionals such as Hospital Members if they prevent access to EOLA. ECF No. 29 at 13; *Treto*, 2026 WL 2516712, at *2 (order enjoining Defendant IDPH from pursuing enforcement of EOLA as to certain healthcare providers "does not prevent" enforcement actions against non-parties who violate EOLA). Hospital Members are further harmed because they must comply with the requirements of informed consent. The State of Illinois itself has taken the position that "'[i]nformed consent is not limited to seeking authorization for an imminent medical procedure'" and can "'apply to counseling both about a specific medical intervention by a health care provider or more broadly about different relevant medical options'…. So, '[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility.'" *Treto*, 777 F. Supp. 3d at 878. The Hospital Members are now faced with uncertainty on how to operate under the law including how to advise patients and provide life-sustaining treatment without violating EOLA. *See* Supp. Lieberman Decl. ¶ 8. This directly impacts their daily operations, ability to provide counseling and referral services to patients, and restricts their speech. *All. for Hippocratic Med.*, 602 U.S. at 395 (explaining that an issue-advocacy organization had standing when its "ability to provide counseling and referral services" was impaired); *Chiles v. Salazar*, 607 U.S. 627, 641 (2026) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)) (when government seeks not just to restrict speech based on its subject matter, but also to dictate what particular "opinion or perspective" individuals may express on that subject, "the violation of the First Amendment is all the more blatant").

**<u>Conclusion</u>**

For the foregoing reasons, the Court should discharge the Order to Show Cause and confirm that Plaintiff has Article III standing to proceed.

Date: October 13, 2026

Respectfully submitted,

By: */s/ Kara J. Janssen*

Michael W. Bien*
Ernest Galvan*
Kara J. Janssen*
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830
mbien@rbgg.com
egalvan@rbgg.com
kjanssen@rbgg.com

Thomas H. Geoghegan
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeohegan@dsgchicago.com

*Attorneys for Plaintiffs*

**Admitted Pro Hac Vice*